. **Frederick PAUL, Plaintiff,**

**v.**

**The UNITED STATES, Defendant.**

**Cong. Ref. No. 2–88.**

United States Claims Court.

April 23, 1990.

William A. Helsell, Seattle, Wash., atty. of record, for plaintiff. Frederick D. Huebner, Ann G. Copley and Helsell, Fetterman, Martin, Todd & Hokanson, of counsel.

John S. Gregory, Washington, D.C., with whom was Asst. Atty. Gen. Richard B. Stewart, for defendant. Susan V. Cook, Dept. of Justice, of counsel.

## HEARING OFFICER'S REPORT

KENNETH R. HARKINS, Hearing Officer.

This congressional reference case is concerned with a private bill to compensate Frederick Paul for legal services performed between January 1, 1966, and December 18, 1971, in connection with enactment of the Alaska Native Claims Settlement Act of 1971 (ANCSA).[1] The bill was referred to the Claims Court by the Senate for a report under the statutory standards and the court's rules applicable to congression-

---

1. Pub.L. No. 92–203, 85 Stat. 688 (1971) (codified as amended at 43 U.S.C. §§ 1601–28 (1982)).

al reference cases.[2] The complaint was filed December 28, 1988; the resolution specifies the court is to file its report within 18 months from that date.

Frederick Paul's legal services were provided to the Inupiat, a group of Alaskan natives, who mainly reside on the Arctic North Slope of the Brooks Range.[3] The Arctic Slope extends from the Canadian border to the Chukchi Sea, and is an area comprising approximately 56.5 million acres. Until the early 1960's, the Inupiat had a subsistence economy based on traditional patterns of hunting, fishing and whaling, and had had little contact with European cultures. Legal services provided by Frederick Paul included a wide range of advice and activity directed toward organization of Inupiat associations and corporations, collection of anthropological data, litigation, and legislative effort.

As a result of ANCSA's passage, the Inupiat, through regional and village corporations, received $46,888,936 in cash, 3,582,-000 acres of land in fee, subsurface rights to an additional 731,000 acres and surface rights to 132,000 acres of land. Through June 30, 1988, the Arctic Slope Regional Corporation (ASRC) has received approximately $97,861,612 in oil exploration fees and oil and gas leases on those lands.

Frederick Paul contends that he had a valid, approved contract to provide legal services to the Inupiat, which was abrogated by the United States on enactment of ANCSA. The complaint asserts that according to established principles of law applicable to Indian claims he would have received not less than $10 million. During the course of this proceeding, the claim has been reduced, first to $5.9 million, and at trial to $3.6 million.

Frederick Paul claims he expended 6,621 hours on behalf of the Inupiat during the period January 1, 1966, to December 18, 1971. Of this amount, he asserts only 1,651 hours were compensated under ANCSA, and 4,970 hours have not been compensated. In connection with his representation of the Inupiat, Frederick Paul has received pursuant to ANCSA $275,095, as attorney fees, and $2,893.83 for expenses, a total of $278,988.83. For legal services to the Inupiat after December 18, 1971, he has been paid a total of $123,377.

## I

The record in this case is largely documentary.[4] During the proceedings, the parties filed a lengthy stipulation that includes a wide range of materials. The stipulation includes objective facts, derivative conclusions from such facts and, particularly in materials relevant to legislative hearings and reports, ultimate conclusions on the significance of legal proceedings. The stipulation is attached to this report as Appendix A. Objective facts stipulated are adopted by the court. Materials in the stipulation are incorporated by reference but are not repeated in the following discussion of significant controlling facts, except as appropriate in the interest of continuity. The opinion that follows includes facts that correct, supplement, or add to, the matters stipulated. Where significant facts in the opinion differ from materials in the stipulation, the statement in the opinion controls.

Frederick Paul was born January 26, 1914, in Alameda, California. He is a one-quarter Indian native by blood, and a mem-

2. S.Res. 187, 100th Cong., 1st Sess. (1988), referred the bill, S. 966, 100th Cong., 1st Sess; 28 U.S.C. §§ 1492 & 2509 (1982); RUSCC, Appendix D.

3. The terms "Inuit" and "Eskimo" also were used in this case to refer to Alaskan Arctic Slope natives.

4. During pretrial preparation it became apparent that virtually all facts relative to the claim were subject to stipulation. Plaintiff requested a trial proceeding to establish credibility, as

well as, in the interest of fairness. A 5-day trial was held November 13 through 17, 1989, in Seattle, Washington. During the trial, plaintiff called six witnesses and introduced approximately 477 exhibits; defendant called no witnesses and introduced approximately 53 exhibits. At trial, it became apparent that new matters had arisen and matters previously stipulated were incomplete, inaccurate as to detail, or were subject to a different gloss. Changes the parties considered significant were addressed in supplemental posttrial briefs.

ber of the Tee–Hit–Ton band of the Tlingit–Haida Tribes. He was reared mostly in Ketchikan, Alaska, and graduated from Ketchikan High School in 1931. He received a Bachelor of Arts degree in 1939, and a Juris Doctor degree from the University of Washington in 1940. He was admitted to the practice of law in Washington State on October 28, 1940, and in the territory of Alaska in 1941. During the period 1940–61 he became a member of the bars of the United States District Courts for the Western and Eastern Districts of Washington, the United States Court of Appeals for the Ninth Circuit, the United States Court of Claims, and the United States Supreme Court. Frederick Paul has been in the private practice of law in Seattle, Washington, since 1947. His offices were located in Seattle during the period he represented the Inupiat.

During the period January 1, 1966, to December 18, 1971, Frederick Paul was 51–57 years of age, the period normally at an attorney's prime earning years. From the beginning of his practice of law, Frederick Paul has worked in the field of Indian law, with special attention to legal problems pertaining to native Alaska and Indian aboriginal rights. Frederick Paul is a prominent authority on the legal issues involved in, and has been a persistent advocate for, the rights of native Alaskans.

Frederick Paul has sought congressional reference of his claim since 1983. Resolutions and private bills identical to S. 966 (100th Cong.) were introduced in the 98th and 99th Congress, but neither body took final action.[5]

*Inupiat People—Prior to January 1, 1966*

Frederick Paul's legal services to the Inupiat were provided in a unique context.

Alaska's size and physical variety, and its political development, differentiated the status of Alaska natives from other aboriginal groups in the United States. The Indian, Eskimo or Aleut peoples that are included in the term "Alaska Natives" inhabited a geographical area that is exceptionally large, and which included substantial regions that as late as 1966 were affected little by exposure to European cultural penetration.

The problem of Alaska native land claims was unique to that time and place. Although Alaska natives had had contacts with white men from Russia or other European countries since 1741, and had been governed by Russian or American legal systems since 1799, the legal status of the natives' rights to Alaska land had not been resolved. The Russian American Company governed Alaska from 1799 to 1867 under charters issued by the Russian Government. By the Treaty of Session, March 30, 1867, the "uncivilized tribes" became subject to United States law. From 1867 to 1912, the area was designated the District of Alaska, and until September 1884 was administered by the War Department. From 1912–1958, Alaska was administered as a Territory. The Alaska Statehood Act was enacted on July 7, 1958, and accepted by a majority of voters on August 26, 1958.[6]

The laws which were passed in the United States to solve Indian land problems in the lower 48 states were written without broad knowledge of Alaska. Legislation that bore upon Alaska native rights to land essentially was concerned with those non-native business activities that were pursued in limited areas, primarily in the southeastern regions. The legislation that had been designed for Indians in the east-

---

5. In the 98th Congress: S.Res. 432 and H.Res. 571; in the 99th Congress: S.Res. 78 and H.Res. 61. S.Res. 78 (99th Cong.) was reported favorably by the Subcommittee on Administrative Practice and Procedure, but the Congress expired with no action by the Senate Committee on the Judiciary.

6. Information in the record concerning the status of Alaska natives as a consequence of these historical events is provided in *Alaska Natives and the Land,* Report of the Federal Field Com-

mittee for Development and Planning in Alaska, 1969; *Native Land Claims,* University of Alaska, Institute of Social, Economic and Government Research, Vol. IV, No. 6, November 1967. Historical background relative to claims of Southeastern Alaska natives is discussed in *Tee–Hit–Ton Indians v. United States,* 348 U.S. 272, 75 S.Ct. 313, 99 L.Ed. 314 (1955), and *Tlingit & Haida Indians of Alaska v. United States,* 177 F.Supp. 452, 147 Ct.Cl. 315 (1959).

ern states or for plains Indians, if applied to other regions and other natives, at best was ambiguous. In some instances, decision as to its application to Alaskan natives had been consciously deferred.

The "uncivilized tribes" specified in the Russian treaty were omitted from the General Allotment Act, which was a method for American aborigines to attain citizenship. They were omitted from the Homestead Act as being neither citizens nor aliens capable of attaining citizenship. They were forbidden by Congress to enter treaties with the United States for the cession of some lands and the retention of others. By the Citizenship Act of 1924, Alaska natives became citizens of the United States. As citizens of the United States and Alaska, Alaska natives as aboriginal people had special status under federal law. They were not wards of the government. Alaska natives voted, held political office, served in the armed forces of the United States, paid taxes, and otherwise accepted and exercised the rights and duties of citizens.

In 1966, most of the 375 million acres of land in Alaska were still unsurveyed, and nearly 275 million acres (more than ⅔ of the state) were still public domain lands. The Statehood Act confirmed lands that had been given to the Territory, and granted to Alaska a right to select land sufficient to give the state a total ownership of nearly 105 million acres.

Due to its remoteness, rigorous climate, and limited attractions, the population of Alaska, both native and non-native, was sparse. In 1880, the non-native population was less than 300, all but 30 of whom lived in Sitka. When the Citizenship Act was passed in 1924, Alaska natives comprised a majority of the population. It was not until 1939 that non-natives began consistently to outnumber Alaska natives. During and after World War II, increasing numbers of non-natives were attracted to Alaska by the prospect of economic development. By 1960, the approximately 53,-000 Alaska natives accounted for only 20 percent of the total one quarter million people of Alaska.

Although in some regions, primarily around urban places, contact with Europeans had caused Alaska natives to abandon traditional ways, in many regions Alaska natives continued under the subsistence system that had existed for thousands of years. Most Alaska natives lived in widely scattered settlements across the ½ million square miles of Alaska. The economy continued to be based importantly on traditional patterns of subsistence fishing and hunting.

Most Alaskan natives in 1965 lived in poverty. The large majority of Alaskan natives was unemployed, or only seasonally employed. Few families had incomes of $5,000 or more annually. In 1960, almost 7 out of 10 Alaska natives had less than an elementary school education. Of the nearly 25,000 non-white, non-Negro persons, 14 years or older in 1960—nearly all of whom were natives—50 percent had completed no more than the 6th grade; 21 percent had completed the 7th or 8th grade; another 14 percent had gone to high school, but only 8 percent had completed their work; and 2 percent went to college, but only a small fraction of 1 percent had completed 4 years or more.

A Bureau of Land Management (BLM) memorandum dated October 31, 1966, summarized the current status of developments in Alaska native land rights. The section on historical background included:

... The approach taken to native affairs in Alaska for several decades was substantially different than the one taken with respect to the Indians in the other States of the Union. This situation prevailed in the period of Russian rule and in various ways tended to be continued in the early years of American administration. Particularly so in light of the long period from 1867 to 1884 in which Congress gave almost no consideration to Alaskan affairs. In brief, the Russians treated the indigenous population as being either "civilized" or "uncivilized." In the first instance they had the same legal status as white Russians. The criteria were vague and, it can be assumed, the primary consideration was

the adoption of Christianity and association in the Russian Orthodox church. The effect of their status on land rights is very unclear. Except from improved holdings of the Russian American Company, little attention was paid to land ownership and the Indians in general were not disturbed in their traditional system.

In the American period, the situation did not change greatly or rapidly. Pressures on land and the land resources were minimal for a long period. Recognition was had of an obligation to provide minimal educational and health services to the Native population, but the program was carried out from the outset by the Office of Education rather than the Bureau of Indian Affairs and this administrative situation prevailed until 1931. There was no assumption of a trustee relationship during this period. In other respects as well, the natives were treated legally as citizens before the Indians in the States were accorded this status. For the same reason, the Indian liquor laws did not apply in Alaska, and in practice the Native participated or failed to participate much as he did in the Russian period. It is interesting to note that an attorney of Indian blood was a member of and the acknowledged "boss" of the Territorial legislature in the decade of the 1920's. In fact, he was one of only 3 or 4 practicing attorneys in the Territory who was qualified to practice by virtue of holding a degree in law.

Physically, Alaska divides into regions that contain common characteristics. Among the regions, there are substantial variances that are reflected in a diversity in the natives' cultural and economic interests. The Federal Field Committee identified 15 regions that exhibited, for purposes of economic analysis, the greatest degree of homogeneity in physiography, ethnography, biotic provinces, natural resource patterns, and aggregate potential. ANCSA divided Alaska into 12 geographic regions. Each region was "composed as far as practicable of natives having a common heritage and sharing common interests."[7] Regional differences had produced conflicting organizational and political objectives before 1966, and which continued thereafter.

The Arctic Slope Region, as described by the Federal Field Committee, contained 56.5 million acres, which amounted approximately to 15 percent of the area of the state. Its distances and climate had diminished its attraction to non-natives, and foreign impact on the Inupiat people in the region was relatively minor. In 1960, more than 2,500 Alaska natives lived in five villages in the Arctic Slope region: Barrow, Kaktovik, Point Hope, Wainwright, and Nooiksat. They represented 7 percent of the estimated rural native population in the state, and 4 percent of the total native population. The median school years completed by Alaska natives in the Barrow district was 3.7 years.

The Arctic Slope Region includes three major east-west physiographic sections: the Arctic Coastal Plain, Arctic Foothills and the North Slope of the Central and Eastern Brooks Range. It is wholly within the Arctic Circle. The 600–mile long Brooks Range is a topographic barrier separating the forested lands along the Yukon tributaries to the south from the treeless Arctic plain. The mountains are rugged and difficult to cross except for three passes, the Howard, the Survey, and the Anaktuvuk, which have permitted passage of caribou and human movements alike since before recorded time.

The Alaskan Arctic plain was a submerged province until recent geologic time. It has a continuous permafrost. There is a significant seasonal differentiation caused by temperature intensity and length of daylight. The brief summer season is marked by a thaw, and, for a 2–month period, by 24–hour sunshine. The transition from 24 hours of sunlight in late July to the fall equinox is most rapid; and again, the shift from the equinox to the winter solstice involves the change in a short period from 12 hours of daylight to total darkness. At

---

7. 43 U.S.C. § 1606(a) (1982). Provision was made for a 13th region for natives who are non-residents of Alaska. 43 U.S.C. § 1606(c) (1982).

Point Barrow, for example, 72 days of winter darkness, beginning November 15, is the rule.

Winter temperatures while by no means so cold in comparison with the 50° to 70° below zero readings of the deeper interior, may nonetheless be infinitely more severe as a result of intensity of wind. Streams and lakes are ice covered much of the year, as is the ocean. The frigid winters are very long and the summer is brief.

The Eskimos of the Arctic Slope Region were (and are) of three cultures. These include the "taremiut," the essentially sedentary, coastal dwellers dependent upon the maritime environment for subsistence; the "nuuamiut," the inland, nomadic hunters of the caribou for subsistence; and the people of the "thule" culture whose environmental relationships were maritime in Alaska, but whose cultural mores were related to the Canadian–Arctic Basin Eskimo rather than westward towards Asia. Collectively, the Alaska natives on the Arctic Slope are referred to as Inupiat. During the latter part of 1965, natives on the Arctic Slope commenced formation of an organization that became the Arctic Slope Native Association (ASNA). The area occupied by the members of ASNA was coterminous with the Federal Field Committee's Arctic Slope Region. ASNA included natives from the following villages: Kaktovik, Nooiksat, Barrow, Wainwright, Point Lay, Point Hope, Anaktuvuk Pass, Meade River, Wood's Camp and Colville. Barrow had a native population of more than 1,600.

Oil exploration activities began on the Arctic Slope Region in the early 1960's. During this period there were an awareness and concern in the oil industry over the status of land claims of the Alaska natives.

Land selections from the public domain by the State of Alaska, which started in 1960, generated protests by various native groups. Beginning in late 1961, protests filed on behalf of the natives in the Bureau of Indian Affairs (BIA) included approximately 5,860,000 acres, which conflicted with 1,750,000 acres of state selections. In 1962, a number of the protests was dismissed, and subsequently appealed to the Director of BLM. In early 1963, local offices were advised to discontinue decisions at the local level, and to forward the case records to Washington, D.C. for consideration.[8]

On April 16, 1965, the Executive Director of the Association on American Indian Affairs (AAIA), was notified by the Undersecretary of the Interior of the institution of a procedure by which Alaska natives would be notified when there were land filings by private individuals for public domain which the natives might be using and occupying. Under this arrangement, BIA offices at Anchorage and Fairbanks were to check periodically BLM's land office records.

By letter dated July 2, 1965, arrangements began for a conference on the land claim problem between representatives of the Department of Interior and the Governor of Alaska. The Interior Department letter acknowledged that "the 1884 Organic Act and the Statehood Act reserved use and occupancy rights to Alaska Natives, but that provision had not been made by Congress for them to obtain an ownership interest in the land"; and that "[a] considerable portion of the lands the State of Alaska has selected under the Statehood Act have been protested by Alaska Natives as lands they use and occupy that should be exempt from selection."

By memorandum dated September 22, 1965, BLM staff provided background information to the Undersecretary for use in a meeting with Alaska state officials. The memorandum advised that several appeals on behalf of Alaska natives had been pending since December 1962 to state land selections under the Statehood Act. As of April 30, 1965, BLM records showed Alaska had selected 16,174,279 acres, of which 3,249,917 acres had been protested by the natives. The memorandum noted there was now lacking any legislative guideline as to what constitutes native "use and occupancy" of land and any provision to give natives title to such land. The memoran-

8. Federal Field Committee Report, p. 440.

dum emphasized that a congressional definition of native rights was essential for a satisfactory administrative means to resolve the conflicting claims of the state and of the natives. Legislative action was recommended to amend the Statehood Act to provide that lands the state conveyed in fee to the natives in satisfaction of their claims would not be charged against the state selection quota, as well as legislation to provide authority and a standard under which the natives of the state would acquire title to lands they use and occupy. A draft of such legislation had been developed jointly by BIA and BLM over a period of many months, but it lacked agreement on the key question of the extent native groups would receive land being used for their hunting, trapping, and fishing livelihood.

*Claims Attorney Contract*

Frederick Paul's legal services were provided to ASNA and the villages that were its members. ASNA did not come into existence until January 15, 1966. On that date, under the leadership of Charles Edwardsen, Jr., as acting chairman, an organizational meeting was held, the name Arctic Slope Native Association was adopted, and a president, two vice presidents, secretary and treasurer were elected. ASNA operated through the acts of its officers, who were also members of its Board of Directors, as authorized at its general membership meetings. Its constitution and by-laws were adopted formally on July 27, 1967. At that time, its membership was comprised of the following villages and camps: Anaktuvuk Pass; Barrow; Barter Island (Kaktovik); Colville; Meade River; Point Lay; Point Hope; Wainwright and Wood's Camp.

ASNA's legal representation involved William L. Paul, Sr., and his sons, William L. Paul, Jr., and Frederick Paul. William Paul, Sr. had advised on procedures for the January 15, 1966, organizational meeting, and Frederick Paul by January 25, 1966, was pursuing ASNA's interests at the Juneau BIA area office.

Initially there was confusion in ASNA as to the identity of its attorneys. On March 14, 1966, ASNA's president advised the Fairbanks BIA district office that William Paul, Sr. and his son, William Paul, Jr. "are duly appointed attorneys and as such have been given power of attorney to act in all matters pertaining to our land title recognition." On March 23, 1966, William Paul, Sr. notified ASNA that other commitments precluded William Paul, Jr. from taking outside work. William Paul, Sr. advised that Frederick Paul was just as able, and that he was in touch with him daily on ASNA's case. He advised that ASNA's directors could make the substitution by motion.

From the beginning, Frederick Paul sought to clarify with the Juneau BIA Area Director his contractual arrangements for representing Alaska natives. By letter dated January 25, 1966, he sought BIA's support in drafting a contract and suggested the Area Director perhaps would be "willing to meet with me in preparing an equitable contract." Frederick Paul identified the areas which had contacted him as: Unalakleet, Laike Illiamna–Lake Clarke–Bristol Bay, Tanacross, and the Arctic North Slope.

From January 1966 through September 24, 1969, Frederick Paul showed a continuing interest in establishing an approved contractual basis for his services. His concern stemmed in part from his experience in 1944 in the Court of Claims. A special jurisdictional act [9] authorized the Tlingit and Haida Indians to bring actions in the Court of Claims for loss of their lands in southeastern Alaska. The Act specified that the attorney contracts be approved by the Commissioner of Indian Affairs and the Secretary of the Interior. William L. Paul, Jr. and Frederick Paul brought two actions pursuant to contracts with the Indian communities that had been fully executed in accordance with BIA procedures for tribal action. The Commissioner of Indian Affairs and the Secretary, however, specifically refused to approve the employment

---

**9.** Act of June 19, 1935, 49 Stat. 388, Ch. 275, as amended by Act of June 5, 1942, 56 Stat. 323, Ch. 347 and Act of June 4, 1945, 59 Stat. 231, Ch. 173.

contracts. The Court of Claims dismissed the cases because the petitions did not show the Commissioner and the Secretary had consented to the contracts between the Indians and the attorneys of record.[10]

After the January 25, 1966, request, the Juneau area office and Frederick Paul in conferences and in correspondence attempted to develop a usable contract by means of amendments to BIA's form then in use for a claims attorney contract. Paul was aware that typical compensation provisions in claims attorney contracts that provided a percentage of any recovery were not appropriate and were under reconsideration because of the unusual features of Alaska native land claims. As a result of the discussions and correspondence, it became clear that BIA would not participate in drafting amendments that were designed to solve particular problems of individual groups, nor would BIA provide advance "informal approval" of tentative contract language. In the exchanges, the Juneau Area Director and Paul were told that it was not proper for BIA to modify the sample contract form at the request of the attorney to meet his special needs, or to approve a proposed contract prior to its execution by both parties. As a result of these discussions and correspondence, Paul was aware that the provisions in his re-drafts of BIA's sample form for a claims attorney contract had not been approved by BIA when it was submitted to ASNA for execution.

A claims attorney contract in final form for execution, including the provisions drafted by Frederick Paul was submitted to ASNA by letter dated August 1, 1966, signed by William L. Paul, Sr., together with a form of a resolution for ASNA's Board of Directors to authorize the president and secretary to execute the contract. The transmittal letter told ASNA that a formal claims attorney contract was essential for action in court, and stated "Unless we can go into Court with the authorization required by law, the complaint could be, and indeed might be, stricken on the point that we have not complied with the require-

ments of Federal statute covering this subject." William L. Paul, Sr. in the transmittal letter pointed out "that my son Fred is in the contract in lieu of William Paul, Jr. because William ... is not allowed to take outside cases."

The claims attorney contract was executed at Barrow, Alaska, on August 24, 1966 (First Contract, or, August 24 Contract). The parties were "the Arctic Slope Native Association of Alaska composed of the Inupiat natives (commonly called Eskimos), inhabiting the Arctic Slope of Alaska, including the constitute bands thereof," which was referred to as the TRIBE, and William L. Paul, Sr. and Frederick Paul, the ATTORNEYS. The contract was for a 10-year period. The scope of the contract covered all aspects of the Tribe's land claims, including representing it before "all courts, departments, tribunals, committees of Congress, and other officers having any duty to perform" in connection with the claims.

The premises recite that the attorneys were retained and employed "subject to the approval of the Secretary of the Interior or his authorized representative." The contract authorized the attorneys to select associates to work with them under the contract, subject to the approval of the Secretary of the Interior. The contract compensation provision included the following:

It is agreed that the compensation of the ATTORNEYS from the TRIBE for the services to be rendered under the terms of this contract *is to be wholly* contingent upon a recovery for the TRIBE. The ATTORNEYS shall receive such attorney's fees and expenses as the court or tribunal awarding a recovery to the TRIBE shall determine to be equitably due the ATTORNEYS or, if the matter be settled without submission to a court or tribunal resulting in a recovery for the TRIBE, as the Secretary of the Interior or his authorized representative may find to be equitably due the ATTORNEYS. It is specifically understood and recognized that no fund may be created by a successful termination of this claim and

---

10. *Members of the Tlingit Nation & Haida Na-* *tion v. United States,* 102 Ct.Cl. 209 (1944).

the ATTORNEYS may initially seek the aid of foundations and other interested groups in the underwriting of the fees and expenses of the ATTORNEYS; PROVIDED, if a fund is created, it is agreed that in no event shall the aggregate fee awarded the ATTORNEYS exceed ten per cent of any and all sums or property recovered or procured, through efforts, in whole or in part, for the TRIBE, whether by suit, action of any department of the Government or of the Congress of the United States, or otherwise; PROVIDED, further, any grants or funds made available to ATTORNEYS shall be considered in determining the compensation due to ATTORNEYS. [Emphasis in the original.]

Frederick Paul submitted the August 24 Contract to the Juneau BIA area office on September 23, 1966. After delays in the Juneau office, the contract was submitted to the BIA Commissioner in Washington on August 17, 1967, with related papers and comments. The BIA Commissioner formally disapproved the August 24 Contract on January 4, 1968, in a memorandum to the Area Director.

BIA's review of the August 24 Contract was delayed pending (1) collection of information concerning the manner in which delegates to ASNA who resided in Barrow were authorized by certain villages to represent those villages; (2) reluctance of the Field Solicitor to approve an attorney contract in which responsibility for services was divided between two separate attorneys, Frederick Paul and William Paul, Sr.; (3) BIA's concern that the individual villages not only consent to adoption of the contract but also in fact retain continued control of the attorneys; and (4) whether ASNA was an entity whose contract could be approved under 25 U.S.C. § 81.

Throughout its review, BIA did not approve the terms of the contract changes that Frederick Paul had made on the standard form, nor did BIA recognize ASNA as an entity whose contractual relationships were included in 25 U.S.C. § 81 and subject to the approval of the Secretary of the Interior. Throughout this period, Frederick Paul was aware of BIA's concerns, and he recognized that the August 24 Contract would not be approved informally or formally until the BIA was satisfied with Paul's contractual relationship with the natives.

On December 8, 1966, the Field Solicitor advised the Area Director of his concern about having William Paul, Sr. as a responsible attorney in the contract. To avoid diluting responsibility, the Field Solicitor suggested that Frederick Paul be approved as the responsible attorney and that he be given authority to hire such other attorneys as he wished.

ASNA's Executive Director, by letter dated September 3, 1967, advised Frederick Paul that he had learned in Juneau that BIA would not approve William Paul, Sr. as one of the principal attorneys; but there was no objection to the use of William Paul, Sr. under the associate clause. He recommended prompt remedial action to forestall any action by ASNA's Board to change counsel entirely. On September 7, 1967, Frederick Paul requested the BIA's Area Director to "hold in abeyance our attorneys' contract problem until further notice from me."

By memorandum dated October 31, 1967, the Juneau Area Director was told by the BIA Commissioner that the ASNA contract was not within BIA jurisdiction under 25 U.S.C. § 81, and that BIA did not recognize ASNA as an entity in the sense of a tribe or a band. The Area Director was told the contract with ASNA could not be approved.

Frederick Paul prepared a second contract which ASNA executed on November 20, 1967 (the Second Contract, or, the November 20 Contract). The Second Contract recites that it was "made and entered into this 24th day of August, 1966, and reaffirmed this 20th day of November, 1967." The Second Contract names Frederick Paul as ATTORNEY for the TRIBE. The compensation provision is substantially different from the August 24 Contract. The changes (deleted material is in brackets [ ]; new material is in **bold**) are set forth below:

It is agreed that the compensation of the ATTORNEY[S] from the TRIBE for the services to be rendered under the terms of this contract *is to be wholly* contingent upon a recovery **of money or property or both** for the TRIBE. The ATTORNEY[S] shall receive such attorney's fees and expenses as the court or tribunal awarding a recovery **of property or money** to the TRIBE shall determine to be equitably due the ATTORNEY[S] or, if the matter be settled without submission to a court or tribunal resulting in a recovery **of property or money** for the TRIBE, as the Secretary of the Interior or his authorized representative may find to be equitably due to the ATTORNEY[S]. It is specifically understood [and recognized that no fund may be created by a successful termination of this claim and] that the ATTORNEY[S] may [initially] seek the aid of [f]Foundations and other interested groups in the underwriting of the fees and expenses of the ATTORNEY[S]: PROVIDED[, if a fund is created,] **that out of the recovery of money or property or both,** it is agreed that in no event shall the aggregate fee awarded the ATTORNEY[S] exceed ten [per cent] **percent (10%)** of any and all sums or property recovered or procured, **or recognized** through **the** efforts, in whole or in part, **of the ATTORNEY** for the TRIBE, whether by suit, action of any department of the Government or of the Congress of the United States, or otherwise[;]: PROVIDED[,] further[,] any grants or funds made available to ATTORNEY[S] shall be considered in determining the compensation due to **the** ATTORNEY[S.]; **and it is further PROVIDED that, in the event of recovery of property only, the fee paid to the ATTORNEY shall be paid on a prorated basis of income derived from said land until such time as the fee is paid in full.**

On January 5, 1968, the BIA's Field Solicitor at Juneau advised the Area Tribal Operations Officer on the November 20, 1967, claims attorney contract. The Field Solicitor's memorandum stated that he believed that it was improper to compensate the attorney for passage of legislation or for the actions of departments of the Government over which he has no control. The memorandum further stated:

> ... In this case, however, I believe no problem is presented since the provision grants the Secretary or his designated representative the authority to find what may equitably be due the attorney, and the provision also provides that it shall not "exceed" 10% of any and all sums or property recovered. Since the fee anticipated and expected is not a flat 10% but an amount equitably due not to exceed 10%, I believe that there are no problems and that, the Bureau may approve this contract.

The January 4, 1968, memorandum on the August 24 contract from the BIA Commissioner was received by the Juneau Area Director and routed to Tribal Operations on January 8, 1968. The memorandum reiterated that the contract with ASNA could not be approved and advised the Area Director to suggest that any village contract with Paul provide that, in the event recovery is had, no land, property, thing or things of value recovered from the claim, or possessed by the community, may be sold or encumbered, or subject to any restriction, for the purpose of providing funds to pay compensation or other costs to the attorney or to reimburse outsiders for advances.

On January 8, 1968, BIA's Acting Area Director endorsed the November 20, 1967, contract as approved, citing "authority delegated to the Area Director on November 24, 1962." The executed contract was assigned BIA Claims Attorney Contract No. 8EC1420C0032.

This approval action generated considerable confusion and dispute in the BIA. On February 26, 1968, the BIA Deputy Assistant Commissioner requested the Juneau Area Director to inform ASNA that the January 8 approval does not make the contract a tribal one for purposes of 25 U.S.C. § 81. On April 8, 1968, the Interior Department's Assistant Solicitor for Appeals and Litigation wrote the Field Solicitor in Juneau that the January 8 approval of

ASNA's claims attorney contract was in error because it apparently was approved on the theory that the contract was a tribal contract under 25 U.S.C. § 81. To prevent further erroneous approvals, the Field Solicitor was requested to advise the Area Director's office of this memorandum and "that your office give close scrutiny to any attorney contracts submitted for your review to assure that the approvals are limited to contracts that had been properly executed by recognized tribes, bands or communities." If a governing body lacked authority to execute attorney contracts, the matter was to be referred to the Commissioner for approval as an exception to 25 C.F.R. §§ 72.13 and 72.14.

On December 12, 1968, BIA's Acting Assistant Commissioner notified Frederick Paul that there was some misunderstanding as to the official status of his contract with ASNA. The letter reiterated BIA's contention that the "contract is of no effect insofar as it might bind or obligate either this Bureau or the Department of the Interior." BIA advised Paul that a new contract form had been prepared which would meet statutory requirements for Secretary approval and suggested that Paul "may wish to conclude contracts with the several separate members" of ASNA. BIA's new contract form included the following provision as to compensation:

> 5. (a) In the event legislation is enacted which settles and disposes of claims of the [ ... ] or of said native villages or groups, Attorneys shall be entitled to receive out of any funds available therefor under the terms of such legislation or out of funds available to the [ ... ] and such native villages and groups compensation which is determined to be equitably due in accordance with the standards set forth in Canons 12 and 13 of the Canons of Professional Ethics of the American Bar Association, as amended. The determination of compensation under this subparagraph shall be by the Presiding District Judge of the U.S. District Court for the District of Alaska, and shall be subject to the approval of the Secretary of the Interior. Such compensation shall not exceed ten per centum of

the value of lands and money recovered and shall not exceed an amount computed on the basis of three times the usual hourly rates of Attorneys and any other attorneys employed pursuant to Article 3 hereof.

Paul followed the suggestion to make separate claims attorney contracts with each of ASNA's member villages. During the period April 1–14, 1969, Paul with the Tribal Operations Officer from the BIA Fairbanks office and an interpreter, visited seven villages and had new contracts executed (Village Contracts). A new contract was not executed with the village at Point Hope. In his explanation of the contract to the villages, Paul stated that the terms were the same as the first contract in 1966, and that BIA's conclusion that ASNA was not considered to be a tribal unit was wrong.

The Village Contracts did not follow the form suggested by BIA. The contracts each described the arrangement as follows:

> WITNESSETH: The said TRIBE does hereby reaffirm its portion of the contract between said attorney and the Arctic Slope Native Association which they in turn first executed on the 24th day of August, 1966 and re-executed on the 20th day of November, 1967, and which was approved by the authorized representative of the Department of the Interior bearing identification number 8EC1420C0032. The TRIBE understands that the Bureau of Indian Affairs on December 12, 1968 stated that because the Arctic Slope Native Association does "not constitute a tribal unit" that such approval had no legal effect. The TRIBE believes the Arctic Slope Native Association is a tribal unit and reaffirms its desire to work on a regional basis with its sister villages. Nevertheless, the TRIBE is willing to protect itself through the employment of a lawyer on a village basis. It, the TRIBE, is re-executing its Attorney's Contract previously adopted by the Arctic Slope Native Association adapting it only as to the description of the TRIBE, as follows:

Paul did not accept the suggestion to limit compensation to three times the usual hourly rate. The compensation clause in the Village Contracts did not include the provisions recommended in the December 12, 1968, letter. The compensation clause in the Village Contracts was the same as that in the November 20 Contract.

In 1969, Frederick Paul undertook discussions looking toward an association with the firm of Davis, Wright, Todd, Riese & Jones on the Alaska land issue. In a letter to Lisle R. Guernsey of that firm dated May 14, 1969, Frederick Paul described his representation of ASNA as follows:

1. I represent the entire North Slope of the Brooks Range by way of a contract with the Arctic Slope Native Association. The Association has 4,000 members in eight villages. This contract was executed August 24, 1966 and received Interior Department approval in accordance with 25 U.S.Code 81, Revised Statute 2103. In December, 1968, I received a letter from the Bureau of Indian Affairs stating that the Association as such was not a tribal unit and so therefore Bureau approval did not enhance or lessen its efficacy. I now have pending for Bureau approval executed contracts with each of the eight villages on the North Slope which are identical in form to the original one, except that the contracting party is not the Association but rather the respective villages, including all of the village's constituent tribes, bands, clans and individual members thereof. I have been advised informally that the village contracts will routinely be approved.

The letter goes on to state the contract status was not considered to be particularly important, because "I expect that the Congress will set our fee and set up the machinery for the payment thereof." He noted that the contract provided payment on a quantum meruit basis to be fixed by the Secretary of the Interior, but probably in fact would be fixed "by the Congress in the legislative settlement."

The Village Contracts were submitted by Paul with letters dated June 27, 1969 (six—

to the Fairbanks Tribal Operations Officer) and July 2, 1969 (one—to the Juneau Area Director). This correspondence confirms a discussion on June 25, 1969, with the Deputy Solicitor of the Department relative to procedures to be followed after new contract forms were prepared. Paul agreed to a procedure in which, after final approval, of the new forms, new contracts would be executed by the natives to replace outstanding contracts. The June 27, 1969, letter advised that Paul was writing to Point Hope "that a new contract would be submitted as soon as cleared by Washington."

In the June 25 discussion, the Deputy Solicitor told Paul that his executed Village Contracts would not be approved. Paul advised the Deputy Solicitor that even though the Village Contracts were not in the form the Department desired, "I would submit them so that the Department would be informed and my continuing efforts to get proper contracts would be made a matter of record." The July 2, 1969, transmittal letter advised the Area Director that while the Village Contracts are "somewhat abortive" because of the new procedure, I want the Department to understand that "I have a continuing interest in establishing my proper foundation with the tribe and the Department."

On September 19, 1969, the Department's Associate Solicitor, Indian Affairs, recommended to the Assistant Secretary, Public Land Management, that immediate action should be taken to disapprove the seven Village Contracts, in order to prevent their approval by operation of law under the 90-day provision of 25 U.S.C. § 1331. The Associate Solicitor stated approval should be avoided because the substantive provisions provide that the attorney is to receive a contingent fee not to exceed 10 percent of the clients' recovery, and that Paul knew that such a fee arrangement would not receive Departmental approval. The memorandum also noted that Paul's letters of June 27 and July 2 submitting the contracts for consideration, indicated that he was aware that the contracts were defective and did not expect them to be approved in their present form.

On September 24, 1969, Paul was notified by telegram, to be followed by letter, that the seven proposed Village Contracts were disapproved pursuant to Title VI of the Act of April 11, 1968. On February 6, 1970, the Department's follow-up letter explained that the proposed Village Contracts had been disapproved because the Department concluded it would be "inappropriate to approve tribal attorney contracts which provide as a fee a percentage of any settlement which is made with the Alaska natives for their claims to lands." For legal services performed in connection with the proposed legislation before Congress, the Department concluded that only an hourly fee would be acceptable. An approved form of contract for legal services for Alaska native villages on their land claims was enclosed. With respect to the provisions in the approved form relative to compensation, the letter stated:

> You will note that the hourly compensation rate has been left blank in order that you may insert your customary hourly rate. While we will not approve an additional full hourly rate for any additional native villages or communities outside the so-called Arctic Slope Native Association for which you might undertake similar representation to obtain legislation to settle the Alaska native claims, we would consider increments of $5.00 per hour for each such additional village or community so represented. If these increments would result in the new clients paying a disproportionate share of the total fee you would be receiving, provision would have to be made to provide for equal apportionment of the total fee among all the communities and villages represented.

Paul decided to rely on the November 20 Contract and made no effort to have the villages execute new claims attorney contracts on the new forms. At trial he testified he thought the three times hourly limit was unfair, and that the Secretary would have broad discretion under the old contract form to prevent any overreaching.

During the period 1966–71 Frederick Paul's rate in his general practice of law was approximately $75 per hour. During this period, approximately one third of his income from the general practice of law was from clients other than ASNA. Frederick Paul's gross income reported to the IRS from the general practice of law ranged from $28,357 for 1966 to $66,528 for 1970.

*Legal Services*

Circumstances under which Frederick Paul provided legal services during the period January 1, 1966, to December 18, 1971, were unusual and difficult. The Inupiat for the most part were poorly educated and at the beginning there was no organization on which to erect an attorney-client relationship. Their location on the Arctic Slope was in the most remote part of Alaska; the distances from Frederick Paul's location in Seattle, Washington were extensive.

A significant part of the legal services was concerned with advice and assistance to the Inupiat on the formation and operation of organizations needed to protect their political interests and rights to the land. The first organization was a regional association, ASNA, which was founded on January 15, 1966. In assisting in the creation of a regional association, William Paul, Sr. and Frederick Paul brought to the Inupiat a device that had been found to permit the divergent regional interests of Alaska natives to find expression and to be coordinated. By 1967, 21 regional associations had become active in political efforts to advance the various regions' particular interests.

In early 1969, Frederick Paul researched the requirements for formation of a regional corporation under the Indian Reorganization Act (IRA).[11] The Inupiat Community of the Arctic Slope (ICAS) was approved by the Assistant Secretary on June 28, 1971, subject to an election of its members. ICAS was approved by the voters of the Arctic Slope on August 26, 1971. As of

---

**11.** Indian Reorganization Act of June 18, 1934, 48 Stat. 984; Alaska Act of May 1, 1936, 49 Stat. 1250; *see* 25 U.S.C. §§ 476–78 (1982).

December 18, 1971, the Inupiat enrollment was 3,720 persons.

Frederick Paul recognized the Inupiat would benefit from an organization that, as a governmental unit of the State of Alaska, would have power to tax the oil companies and to zone tribal areas. On March 6, 1969, Paul sent letters to ASNA and the various villages on the Arctic Slope proposing the creation of an incorporated borough for that region. The response to the suggestion was favorable, and ASNA's executive director on March 17, 1969, urged him to go ahead on the proposal. During the period March 29–April 3, 1969, Paul presented the plan at town hall meetings held on the Arctic Slope. From April 1969 until incorporated as the North Slope Borough on July 1, 1972, Paul participated in the planning and organization of the Borough effort. Due in part to his work, the petition for incorporation was approved by the Local Boundary Commission, and ratified by the residents of the Arctic Slope.

Throughout the claim period, the distances involved in communications and meetings with the Inupiat involved substantial expenses and created exceptional conditions. Paul's offices were in Seattle, and his legal business roughly was divided ⅔ for the Inupiat and ⅓ for other clients. The office of ASNA's executive director was in Barrow, Alaska, a distance of 1,994 air miles from Seattle. Paul's legal services also required meetings at Fairbanks, Juneau, and Anchorage. Fairbanks is 1,536 air miles from Seattle; Anchorage is 1,451 air miles, and Juneau is 912 air miles. Representation of the Inupiat during the period March 15, 1966, to December 18, 1971, Paul claims required him to be absent from his office for a total of 184 days. During the period he made 17 trips to Anchorage, 7 to Juneau, 8 to Fairbanks, 7 to Barrow, 2 to San Francisco, and 8 to Washington, D.C.

Frederick Paul provided a wide spectrum of legal services to the Inupiat. Detail as to these services is provided in Appendix A, Paul's representation included work or guidance in Inupiat effort, on the following topics:

—preparation of land protests;

—collection of anthropological data;

—public relations work to increase awareness and support for Inupiat claims;

—preparation and organization of witnesses to testify at congressional proceedings;

—legislative representation and presentation of testimony;

—legal research relative to aboriginal rights of occupancy, and validity of Inupiat claims;

—preparation of legal memoranda (58 alleged) and letters (884 alleged);

—fund raising to defray attorney fees or expenses;

—review and analysis of political, economic, sociological, geologic, and environmental studies concerning Alaska oil development and native land claim issues;

—negotiations with other native groups, members of Congress and congressional committee staff, representatives of the State of Alaska, oil companies, and other groups opposed to native claim settlements; and

—litigation.

Paul's legal services of particular significance in the development of ANCSA, and for the benefit of the Inupiat, involve three categories of action: (1) Inupiat participation with other native groups in BLM land protest procedures that culminated in a suspension of oil and gas leases in the Point Hope lease sale; (2) inclusion of large land grants, and distribution of settlement proceeds on a land-lost basis rather than on a population basis; and (3) recognition and organization of regional corporations for Alaska natives.

One of ASNA's first actions after its organization was to give notice to the Governor of Alaska and to BLM, through William Paul, Sr., of its claim to own all of the land of Alaska lying north of the 68th parallel. This notice, made on January 18, 1966, was not accepted by BLM as a formal protest for land office recordation until May 10, 1966. The land office records describe an area with the southern boundary identified as 68° north latitude from the

West Coast of Alaska eastward to 148° west longitude, and 68° 30′ north latitude eastward to the Canadian border. The area comprised approximately 56.5 million acres. Formal acceptance of the protest, however, did not suspend BLM's oil and gas activity in the area, and the State Director was told to proceed with the drawing to be held on May 20, 1966, for mineral leases in the area.

On September 23, 1966, BLM published a notice for the Point Hope lease sale, 31 Fed.Reg. 12,575. The notice solicited offers to lease oil and gas properties covering 4.5 million acres of the Arctic Slope. On September 28, 1966, ASNA by its executive director filed a petition for an injunction in the United States District Court for Alaska, based on aboriginal title, that sought to hold in escrow all funds derived by the State and BLM from the lands until title is resolved or compensation paid for past expropriations.

Frederick Paul, in Seattle, was unaware that ASNA had filed this suit. On September 28 and 29, 1966, he wrote to the Interior Secretary to seek information about the proposed sale, and to offer to negotiate on the land title issue. By letter dated October 4, 1966, Frederick Paul advised ASNA's executive director that the better course for ASNA would be to negotiate with the Secretary rather than to pursue a cumbersome court action. The letter advised that court action involved the Department of Justice, and it is well known that the Department "is absolutely and unalterably opposed to Indian rights."

On October 26, 1966, the case was dismissed pursuant to a motion signed by Frederick Paul. The motion stated that negotiations with the Interior Secretary should proceed prior to a lawsuit, that the State of Alaska should be a defendant in a separate action to recover lands illegally seized, and that the "instant action is meritorious but premature."

On November 7, 1966, the executive director of AAIA, located in New York, sent a telegram to the Interior Secretary that protested the Point Hope lease sale. AAIA's protest was not based on assertion of aboriginal land rights, but on the procedural point that a postponement of the leasing would be in aid of native land rights legislation.

On November 7, 1966, BLM's Associate Solicitor for the Division of Public Land did not know that ASNA's lawsuit had been dismissed. On that date, the Associate Solicitor, with respect to ASNA's lawsuit, prepared a memorandum to BLM's Assistant Director, and a letter to the Assistant Attorney General, Land and Natural Resources Division. These documents were signed on November 8, 1966. The memorandum to BLM noted ASNA's petition was subject to summary dismissal in its present form, but that plaintiffs if they pursued the action could amend it to seek injunctive relief against the Secretary and other Department officials. The letter to the Department of Justice advised that correspondence from Frederick Paul had suggested a voluntary dismissal of the suit, but that nothing in BLM's records indicated Paul was the attorney of record in the litigation. The letter to the Department of Justice also advised that the BLM had instructed the Alaska field office to suspend the issuance of oil and gas leases in the Point Hope lease sale pursuant to the opening of Arctic Slope lands that had been announced on September 23, 1966. The Justice Department was advised that filings for leases would be received until November 18, 1966, and a drawing would establish priorities, but issuance of leases would be suspended, at least until termination of the pending litigation. The Interior Department's suspension of the Point Hope lease sale became known as the "informal land freeze."

On November 11, 1966, Paul prepared a protest and notice of adverse interest on behalf of ASNA with respect to the Point Hope lease sale. The protest was sent to Fairbanks for filing if postponement of the sale did not develop. The protest was based on rights of aboriginal possession, actual use and occupation, and claimed the action of the Secretary was not authorized by any statutory enactment and was *ultra vires* of his authority.

On November 16, 1966, the BLM advised the executive director, AAIA, that final action on the Point Hope leases would be postponed pending further consideration by the Interior Department. BLM's letter stated the lease offers would be accepted on the sale, to determine priorities, but that no final action would be taken on applications on areas where native claims and protests had been received.

On November 17, 1966, ASNA's protest and notice of adverse interest was filed. At that time, ASNA was not aware that the land freeze was in effect and that the protest was unnecessary.

The informal land freeze continued to January 1969. On January 17, 1969, the Interior Secretary published a notice of withdrawal of all public unreserved lands in Alaska from all forms of appropriations and disposition under the Secretary's jurisdiction for the determination and protection of the rights of the native Aleuts, Eskimos, and Indians of Alaska.[12] The formal land freeze lasted until passage of ANCSA.

ANCSA was the product of prolonged and vigorous dispute among contending interests as to settlement of the Alaska native land claims. Frederick Paul's representation of the Inupiat in pursuit of the legislative settlement involved dealing with, and overcoming, the opposition of the State of Alaska, the oil companies and their Trans–Alaska pipeline, elements in BLM and in the Justice Department, as well as other regional associations and the statewide Alaska Federation of Natives (AFN).

In 1966 and 1967, Paul's concept of title through aboriginal use and occupancy was rejected by some of the oil companies and representatives of the state. In a letter dated April 29, 1966, the Humble Oil and Refining Co. rejected Paul's invitation to discuss the Inupiat's claims to the Arctic Slope because its investigation had concluded that the claims had no validity. Sinclair Oil and Gas Company on May 4, 1966, commented on Frederick Paul's Arctic Slope claim, and on William Paul, Sr.'s notice to the Governor of Alaska, and to BLM, about ASNA's claim. Sinclair stated that its review of the treaties, statutes, and cases had revealed no treaties or statutes by which Congress expressly recognized Inupiat title, no lands covered by Sinclair's leases were designated in BLM records as a reservation, and no premise in case law would support a claim against the State of Alaska or the company.

Oil exploration activities on the Arctic Slope were proven with completion of a well at Prudhoe Bay in 1968. The confirmation well drilled in June 1968 established a discovery in a magnitude estimated by BLM of at least 100 billion barrels on the Arctic Slope. The impact of this discovery in the oil industry, and its implications for revenue and development in the State of Alaska, increased pressures for a speedy resolution of the native land claims, and made a legislative settlement a certainty. The value of litigation, or threat of litigation, in light of these pressures, bolstered the Inupiat position substantially in negotiations on the settlement legislation.

By March 6, 1968, BLM's official policy supported legislation that would (1) give the native people of Alaska title to the lands they occupy and need to sustain their villages, (2) give them rights to use additional lands and water for hunting, trapping and fishing to maintain their traditional way of life, and (3) award compensation commensurate with the value of any lands taken from them. The Federal Field Committee in its February 1969 report recognized that the claims based upon aboriginal use and occupation had merit. The report notes that the aboriginal Alaskan natives made use of all the biological resources of the land, interior and contiguous waters, and occupied the land in the sense of being on and over virtually all of it in pursuit of subsistence. Aboriginal possessory rights, based upon continuous aboriginal use, were recognized as valid against all but the Federal Government, and were compensable rights once permission to bring an action for their loss was granted by the Federal Government. The major elements for a

---

12. Public Land Order 4582, 34 Fed.Reg. 1025,  Jan. 23, 1969.

legislative settlement were identified as follows:

(1) The grant or protection of lands and land rights now used by Alaska Natives for townsites, hunting and fishing camps, and subsistence hunting, fishing and other food and fuel gathering areas;

(2) The provision of compensation, either in lands or revenues, for those possessory rights to land taken in the past or to be taken as a result of this legislation; and

(3) The establishment of organizations for the management and administration of lands and revenues and the adjudication of conflict.

In a letter dated May 14, 1969, Paul described the settlement proposal recommended by the Federal Field Committee as follows:

It proposes as a solution three alternatives: The first is protection of the Indian village sites, hunting camps, fishing camps and 100 million dollars for past invasions, together with up to 100 million dollars per year for ten years payable out of the yield of the land. Its second alternative is the same protection for the local problems and for past invasions plus checker-boarding the State with four sections out of the 36 in a township helter-skelter throughout the State yielding confirmed title in the Natives for one-ninth of the whole State or 11%. Its third proposed solution is the same protection for the townships, etc. and 100 million dollars for past invasions plus the first right and priority to select at its option five million acres.

The money would be paid and the land confirmed essentially in a State-wide Native Development Corporation which would be inhibited from paying dividends out of capital for ten years and would be dominated by a board of directors appointed by the President. But after a number of years passes, the Natives would dominate the board and at the end of ten years the corporation would become a more commercial corporation such as a white man has stock in. The stockholders would be the Natives and would be determined by a blood quantum.....

On September 16, 1969, the State of Alaska announced the results of the 23rd competitive oil and gas lease sale. The sale included 1,102 bids on 179 tracts covering 450,858.47 acres of land on the Arctic Slope. The sale data showed that 179 tracts were bid upon, and the total apparent high bonus bid was $900,218,590.21.

The three criteria identified by the Federal Field Committee for a legislative settlement—grant of occupancy land, compensation for lost possessory rights, and an organizational structure for management—were reflected, with wide variances in the component parts, in the legislative recommendations that culminated in ANCSA. The Inupiat, with a claim to 15 percent of Alaska's total area, but with a population of 4 percent of the total native population, following Paul's advice, waged a continuing struggle to avoid a settlement in which land awards and compensation were based on population. Pursuit of a settlement based on a land-claimed-but-lost formula generated conflicts with regional associations from the more densely populated southern and southeastern Alaska areas, and with AFN, the statewide native association.

In April 1970, the Senate Interior Committee reported settlement legislation which provided approximately 9 million acres of land, $500 million in cash and $500 million from a 2 percent royalty on oil and gas revenues from state and federal lands, and an administrative structure composed of two statewide corporations and about 200 village corporations. The proceeds would be distributed on a population basis. On April 19, 1970, ASNA's president complained to the AFN board of directors about the Senate proposal, and about AFN's representation of ASNA's interests. His statement, prepared with Paul's advice, included the following:

Our problem can be stated this way: We came into this Federation bringing with us 56.5 million acres, vast riches in oil—enough to provide and protect the security of the United States—enough to

require the Congress of the United States to settle the claims of all Alaskan Natives—enough to make the State tax free and enough to make the business community of Alaska and the oil companies rich.

\*　　\*　　\*　　\*　　\*　　\*

Our conclusion is that the State of Alaska wants to steal our lands, the Senate Committee wants to buy our lands and to pay the other Natives of Alaska. The other Natives of Alaska are willing and happy to be paid out of our lands. The State is now rich out of our lands. The oil companies want to build a pipeline by experiment over our lands. The United States wants to provide for its own security against foreign enemies out of our land.

\*　　\*　　\*　　\*　　\*　　\*

And now today, we believe the Federation has failed to support the North Slope Eskimos and we are distraught, we are frightened and our people are angry, or will be when we tell them, as we must, what the Senate Committee has done.

By direct orders from the Steering Committee just one year ago, the Federation forbade our own representative from testifying before Senate Committee. We cooperated and this is what we got.

Even what we get we must share some of it with a non-Native who joins our villages, because whatever we get will likely go to a municipal corporation. A newcomer automatically joins a municipal corporation just by moving there. We are not against somebody moving into our villages. But why should a person who is not a North Slope Eskimo be paid for North Slope lands?

On October 20, 1970, ASNA withdrew from the AFN because of AFN's position in advancing the land claims before Congress. Frederick Paul was active in this decision. ASNA's announcement noted that it had supported the AFN in its goal of a settlement that provided 40 million acres, $500 million, and a 2 percent overriding royalty, but had objected continually to the philosophy of the AFN which underlies the settlement. The announcement pointed out that

Congress was acting to settle the claims because separate and distinct regional ethnic groups of Alaska Eskimos, Indians and Aleuts have property rights in their land, which rights are about to be extinguished forever, to permit the natural resources to be exploited. The announcement states:

What are we receiving in return for this treatment? We are being allowed to participate in a settlement whose framework is not based on rights in land, but rather is hinged on social welfare. Both the AFN bill and the Senate-passed bill make population the basis for distributing the cash proceeds and for confirming title to land in the natives. These bills simply do not provide for a fair exchange between what is being taken from us and what we receive in exchange.

At its January 1971, Board of Directors meeting, AFN by a vote of 16 to 6 decided to continue a population-based allocation in its recommended legislation. The recommendation was $404 million of the monetary compensation would be paid on a population basis, and part would be paid by a division to each region.

On June 21, 1971, the Secretary of the Interior met with representatives of AFN and ASNA. The Interior Department settlement proposal at that time was 40 million acres in fee, compensation of $500 million in cash over 20 years, and an additional $500 million through a 2 percent royalty from mineral revenues from state and federal lands, administered through a statewide corporation, and distributed on a population proportion basis. ASNA's president objected to the single statewide corporation as the vehicle to administer the settlement, and emphasized the Inupiat interest in a regional concept. He said:

Alaska has eight major Native ethnic groups, one of which is the Inupiat Eskimos. Our people are different from the other seven. We speak a different language, have different eating habits, different heritages, and different customs. In short, we are a unit within ourselves. Our self-determination is that we want to govern our share to the settlement. We want to make the basic decisions about

the use of the money we receive for our lands that are being taken and the use of the land that is confirmed to us.

The Trans–Alaska Pipeline System (Alyeska Pipeline Service Company) was organized by a consortium of subsidiaries of Atlantic Richfield Oil Company, British Petroleum Company and Standard Oil Company of New Jersey to build a pipeline from the Arctic Slope to Valdez, Alaska. ASNA recognized that in view of the need for a pipeline and for development of oil production, it was not possible to prevent commercial exploitation of the oil. ASNA was concerned that the Interior Department would modify the land freeze and permit the pipeline to be built, thereby diminishing the pressures on Congress to enact legislation that would settle the problem. At the February 1971 Pipeline Hearings, ASNA's statement asserted it opposed any settlement of the pipeline before an overall settlement is achieved. ASNA stated it had no confidence Congress would act once the pipeline was authorized.

Construction of the pipeline was prohibited by court order until enactment of ANCSA. This order was not the product of ASNA or the result of Paul's representation. The Alaska Legal Services Corporation brought an action on behalf of the villages in Alaska's interior, and was successful in obtaining an injunction.

Frederick Paul recognized that the optimal law suit for the pursuit of native aboriginal rights throughout all regions of the State would be one from the Arctic Slope. The quality of aboriginal possession on the Arctic Slope was pristine—the same as when America was discovered. In his efforts to obtain funding for ASNA, Paul emphasized that the funds required to file and prosecute law suits must be sufficient to permit a responsible legal effort, and thus to avoid allegations that suit had been filed only for nuisance value.

ASNA's proposal in 1971 was for 60 million acres in fee; $500 million in cash; a 2 percent royalty on mineral revenues from public lands in perpetuity; administered by regional corporations, and distributed on a land-lost basis. To maintain pressure for a settlement on these terms, a law suit was filed in the District Court for the District of Columbia on October 5, 1971.[13] The plaintiffs included Charles Edwardsen, Jr., individually and as Executive Director of ASNA, ICAS, and certain Arctic Slope native villages. Plaintiffs (1) challenged the validity of certain titles to land and interests in leasable minerals, which defendants allegedly had issued unlawfully, and (2) claimed compensation for trespasses by third parties who entered plaintiffs' lands under color of the allegedly invalid land titles, permits, or licenses unlawfully issued by defendant. An amended complaint was filed after enactment of ANCSA to enlarge and redefine the claims.

ANCSA was enacted December 18, 1971. The regional corporation concept was adopted, and the land-lost concept was accepted partially. ANCSA provides 40 million acres in fee; $462.5 million in cash; $500 million from a 2 percent royalty on State mineral revenues; administered through 12 regional corporations controlled by natives. Land and money was to be distributed partially on population-proportion and partially on a land-lost basis.

*Time*

The number of hours Frederick Paul worked for the Inupiat during the period January 1, 1966, through December 18, 1971, is not supported by evidence in the nature of time sheets or other office records, nor by any audit report with respect to such records. Any office records that Paul had kept were destroyed after an audit report on September 9, 1976, in the Chief Commissioner's proceedings. The audit report was limited to records applicable to Paul's claims for reimbursement of out-of-pocket expenses incurred prior to December 18, 1971.

At trial, Frederick Paul testified he calculated the hours he claims were provided for Inupiat services as follows:

---

**13.** *Edwardsen v. Morton,* 369 F.Supp. 1359 (D.D. C.1973), *dismissed as moot,* Civ.A. No. 2014–71, Feb. 16, 1977.

40 hours per week × 50 weeks = 2,000 hours

2,000 hours per year × 5.5 years = 11,000 hours

⅔ of 11,000 hours = 7,260 hours spent on Alaska work

7,260 hours less 639 hours for Borough work = 6,621 hours

6,621 hours less 1,651 hours compensable under ANCSA = 4,970 hours allegedly not compensated.

This calculation is not consistent with claims Paul made in other proceedings. In the proceedings before the Chief Commissioner, Paul claimed 5,000 hours for the period March 15, 1966—December 18, 1971, in legal services to ANSA. This included 184 days absence from Seattle during the period October 1966 to December 1971, which were charged at 10 hours per day. This calculation is suspect. It results in 1,840 hours for work away from Seattle and 3,160 hours for work performed in Seattle. If Paul's rate in 1966 was $75 per hour, 10 hours per travel day would amount to $750 per day, and if the rate were $100 per hour, a travel day would amount to $1,000.

In *Paul v. Kleppe*,[14] Paul claimed 6,000 hours for legal services personally performed for the Inupiat, plus an additional 9,000 hours for other counsel.

Paul claims 4,970 hours were not compensable under ANCSA in the proceedings before the Chief Commissioner. In those proceedings, however, the $275,095 Paul was paid out of the total $1,900,000 for attorney fees allowed under ANCSA was the product of a stipulation by the contesting attorneys. The application of Paul and the firm Davis, Wright, Todd, Riese & Jones, filed on December 18, 1972, claimed that all of the 5,000 hours provided by Paul were compensable under the Act. The categories of services that tentatively were identified in the trial commissioner's pre-

trial order as ineligible for compensation from the Alaska Native Fund never were established in a final ruling by either the trial commissioner or the review panel. After the stipulation, decision on that issue was unnecessary.

### ANCSA Attorney Fees

In exchange for $962,500,000 and 40 million acres of land in fee simple, ANCSA extinguished all land claims based on aboriginal title.[15] Alaska was divided into 12 geographic regions, based on the areas of existing native associations, one of which was ASNA, and new regional and village corporations were authorized to be organized.[16] The regional and village corporations organized pursuant to the authority in ANCSA were different legal entities from ASNA, and the villages with whom Paul had made contracts for legal representation.

The money which Congress provided Alaska natives in ANCSA flowed into the Alaska Native Fund (the Fund), established in the U.S. Treasury by Section 6(a) of ANCSA.[17] Money paid into the Fund derived from two sources: (1) congressional appropriations which totalled $462.5 million by fiscal 1981; and (2) contributions ultimately totalling $500 million by the State of Alaska and the United States from mineral leasing receipts.[18]

The Arctic Slope Regional Corporation (ASRC) was organized in January 1972 as a business for profit. ASRC's shareholders when it was organized were the same approximately 4,000 Inupiat who had been represented by ASNA.

ANCSA specified precise limitations for any civil actions to contest the authority of the United States to legislate on the subject matter or the legality of the settlement. Any such action (1) had to be filed within one year of December 18, 1971, (2) had to be commenced by a duly authorized official of the State of Alaska, and (3) exclusive

14. No. C 76–424V, filed June 9, 1976, and amended Oct. 5, 1976, in the District Court for the Western District of Washington.

15. 43 U.S.C. §§ 1603, 1605, 1608, 1611, and 1613.

16. 43 U.S.C. §§ 1606–07.

17. 43 U.S.C. § 1605(a).

18. 43 U.S.C. § 1608.

jurisdiction was vested in the United States District Court for the District of Alaska.[19]

ANCSA specifically ruled that contracts which were based on a percentage fee of the value of all or some portion of the settlement revenues or lands could not be enforced against any native, or any regional or village corporation, nor could such revenues or lands be subject to lien, execution or judgment to fulfill such a contract.[20]

Compensation for attorney and consultant fees was to be paid from the Alaska Native Fund in an amount not to exceed $2 million, of which not more than $100,000 was to be available for consultants' fees.[21] Claims were to be submitted to the Chief Commissioner of the United States Court of Claims, within one year from December 18, 1971, and if not so filed "shall be forever barred." Procedures and rules applicable to proceedings before the Chief Commissioner were specified. None of the Chief Commissioner's rules, regulations, rulings, findings or conclusions authorized in the attorney and consultant fees section of the Act are subject to judicial review.

Subject matter for attorney fee claims under the Act was defined as follows:

(b) Claims; submission

A claim for attorney and consultant fees and out-of-pocket expenses may be submitted to the Chief Commissioner of the United States Court of Claims for services rendered before December 18, 1971, to any Native tribe, band, group, village, or association in connection with:

(1) the preparation of this chapter and previously proposed Federal legislation to settle Native claims based on aboriginal title, and

(2) the actual prosecution pursuant to an authorized contract or a cause of action based upon a claim pending before any Federal or State Court or the Indians Claims Commission that is dismissed pursuant to this chapter.[22]

ANCSA specified rules for determination and settlement of attorney fee claims. These rules included in part:

(1) No claim shall be allowed if the claimant has otherwise been reimbursed.

(2) The amount allowed for services shall be based on the nature of the service rendered, the time and labor required, the need for providing the service, whether the service was intended to be a voluntary public service or compensable, the existence of a bona fide attorney-client relationship with an identified client, and the relationship of the service rendered to the enactment of proposed legislation. The amount allowed shall not be controlled by any hourly charge customarily charged by the claimant.

(3) The amount allowed for out-of-pocket expenses shall not include office overhead, and shall be limited to expenses that were necessary, reasonable, unreimbursed and actually incurred.

(4) The amounts allowed for services rendered shall not exceed in the aggregate $2,000,000, of which not more than $100,000 shall be available for the payment of consultants' fees. If the approved claims exceed the aggregate amounts allowable, the Chief Commissioner shall authorize payment of the claims on a pro rata basis.[23]

Proceedings before the Chief Commissioner were assigned to a trial commissioner for hearing. A panel of three commissioners of the Court of Claims reviewed the findings and conclusions of the trial commissioner. The panel, by majority vote,

---

**19.** 43 U.S.C. § 1609(a) states in part: ... The purpose of this limitation on suits is to insure that, after the expiration of a reasonable period of time, the right, title, and interest of the United States, the Natives, and the State of Alaska will vest with certainty and finality and may be relied upon by all other persons in their relations with the State, the Natives, and the United States.

**20.** 45 U.S.C. § 1621(a).

**21.** 45 U.S.C. § 1619. The attorney fee procedures were modeled on the procedures applicable to congressional reference cases in the Court of Claims.

**22.** 43 U.S.C. § 1619(b).

**23.** 43 U.S.C. § 1619(d).

was to adopt or modify such findings and conclusions.[24]

Contracts with Alaska natives were voided by ANCSA. The restrictions and penalties placed on contracts were as follows:

(1) No remuneration on account of any services or expenses for which a claim is made or could be made pursuant to this section shall be received by any person for such services and expenses in addition to the amount paid in accordance with this section, and any contract or agreement to the contrary shall be void.

(2) Any person who receives, and any corporation or association official who pays, on account of such services and expenses, any remuneration in addition to the amount allowed in accordance with this section shall be guilty of a misdemeanor and, upon conviction thereof, shall be fined not more than $5,000, or imprisoned not more than twelve months, or both.[25]

Bona fide native associations were authorized to file claims with the Chief Commissioner for actual costs incurred in filing protests, preserving land claims, advancing land claims settlement legislation, and presenting testimony to Congress on proposed native land claims. The Act provided:

... The claim must be submitted within six months from December 18, 1971, and shall be in such form and contain such information as the Chief Commissioner shall prescribe. The Chief Commissioner shall allow such amounts as he determines are reasonable, but he shall allow no amount for attorney and consultant fees and expenses which shall be compensable solely under subsection (b) through (e) of this section. If approved claims under this subsection aggregate more than $600,000, each claim shall be reduced on a pro rata basis.[26]

*Release*

Frederick Paul was hired to be ASRC's general counsel in March 1972. During the probationary period, ASRC's Board of Directors concluded the relationship was not satisfactory, and on October 5, 1972, terminated his services. ASRC retained Lisle R. Guernsey and the firm Davis, Wright, Todd, Riese & Jones, as counsel. Frederick Paul had been lead counsel for ASRC in *Edwardsen v. Morton*, and he executed a consent to substitute the firm in that case.

Following Frederick Paul's termination, ASRC's executive vice president negotiated with Paul over the fee due for his services. In addition to paying for the services for 6 months as ASRC's general counsel, Paul requested payment for other legal services rendered to the Inupiat before ASRC was chartered. During the negotiations, ASRC on April 17, 1973, drew check No. 703 on the Alaska National Bank in the amount of $23,500 payable to Fred Paul, and described on ASRC's records as "Fees Due Under Edwardsen vs. Morton, Section 20G." On April 24, 1973, a final settlement was reached by Paul and ASRC.

On April 24, 1973, Lisle Guernsey met with Paul and exchanged the $23,500 check for a receipt and acknowledgment executed by Paul on that date. The receipt and acknowledgment, which had been drafted by Paul, in full, states:

Receipt is hereby acknowledged from the Arctic Slope Regional Corporation of the sum of $23,500.00 as payment in full for all of my services rendered to any and all Inupiat Eskimos in whatever individual or corporate form he or they may align themselves, particularly, Edwardsen vs. Morton and the application pending under Section 20(g) of the Alaska Native Claims Settlement Act of 1971, except:

---

24. The hearing officer in this congressional reference case was a member of the panel in the ANCSA attorney and consultants' fee proceedings before the Chief Commissioner. The January 27, 1989, pretrial order required plaintiff to file a statement that set forth any objection to Kenneth R. Harkins serving as hearing officer. Plaintiff filed a praecipe on February 21, 1989,

that Frederick Paul had no objection. Defendant stated it had no objection. The hearing officer concluded recusal was neither necessary nor appropriate.

25. 43 U.S.C. § 1619(f).

26. 43 U.S.C. § 1619(g).

(1) The liability of any and all parties to me for my services in connection with the application and creation of the North Slope Borough, and

(2) This payment is not intended as compensation for services rendered prior to December 18, 1971 which may be recoverable under Section 20(b), (c) and (d).

DATED this 24th day of April, 1973.

/s/Frederick Paul

On April 25, 1973, Lisle Guernsey forwarded the receipt to ASRC's Treasurer. The transmittal letter included the following explanation:

I enclose the original executed receipt from Fred Paul regarding the payment to him of $23,500 in full satisfaction of all fees, except those relating to the Borough. Of course Mr. Paul retains full rights to whatever amounts may be awarded by the Court of Claims under Section 20(b), (c) and (d).

The receipt and acknowledgment was intended by the parties to release any and all claims Paul had against ASRC, the Inupiat Eskimos and all Inupiat organizations for legal work done before April 24, 1973, except (1) for claims against any party for services in connection with the formation of the North Slope Borough, and (2) claims against the United States under ANCSA for services rendered prior to December 18, 1971.

When the receipt and acknowledgment were executed, Paul's application for attorney fees, which had been filed on December 15, 1972, pursuant to Sections 20(b), (c) and (d), and the application of ASNA for actual costs incurred, which had been filed on June 16, 1972, pursuant to Section 20(g), were pending and had not been determined in the proceedings before the Chief Commissioner.

*ANCSA Attorney Fee Proceedings*

In proceedings before the Chief Commissioner, some 30 separate attorney or consultant claims for fees and expenses were

filed under 43 U.S.C. § 1619. The total amount claimed was in excess of $7 million. The claim of Frederick Paul and Davis, Wright, Todd, Riese & Jones, filed December 15, 1972, (No. F–15) was a combined claim of $3,350,000 for fees, and $61,371.36 for expenses.

The total of all attorney and consultant claims greatly exceeded the aggregate $2 million allowable under ANCSA. As a result, proceedings were required to determine appropriate payments on a pro rata basis. The Act specified that notice be given to all parties who appear to have an interest in any claim. Notice also was required to be given to entities on whose behalf the services allegedly were incurred, to the Attorneys General of the United States and the State of Alaska, and to the Secretary of the Interior. Allegations in the 30 claims that had been filed overlapped in terms of geographical interests and subject matter of services. Some attorney claimants had filed more than one claim, and there ultimately were 19 different attorney claimants for the $1.9 million, which after deduction of $100,000 for consultants, was the total amount available for attorney fees.

On October 26, 1973, the trial commissioner issued a pretrial opinion and order that identified the parties that were entitled to participate in further proceedings to contest each claim. Except for claimant No. F–1, each attorney claimant was eligible to participate in further proceedings on claims of one or more other claimants. Seven claimants were identified as contestants eligible to participate in proceedings on No. F–15, the claim of Frederick Paul and Davis, Wright, Todd, Riese & Jones.[27] In further proceedings on a claim, all other identified parties to that claim were to be served with all papers filed in the Clerk's office.

The October 26, 1973, opinion and order also identified particular legal services or out-of-pocket expenses that may not be

**27.** No. F–2, Wyman, Bantzer Rothman & Kuchel; No. F–3, Paul, Weiss, Rifkind, Wharton & Garrison; No. F–8, Lester W. Miller, Jr.; No. F–23, Roger G. Connor; No. F–26, Jackson & Fenton, Barry W. Jackson & Thomas E. Fenton; and No. F–29, John W. Hendrickson and Hendrickson & Rowland.

within the compass of Section 1619. Preliminary rulings were made as to the term "out-of-pocket expenses," services in "preparation" of the Act, "identifiable" client, and time spent in establishment of a client entity. The order noted that a detailed enumeration of each kind of "service" falling outside the scope of Section 1619(b)(1) was not necessary or possible, and that the outer boundaries of the section were not fixed. The order provided that proof of a clear and direct relationship between all claimed services and "preparation" of the Act would be required, and listed 24 categories of services that were presumptively noncompensable in the absence of a clear showing that compensation was justified.[28]

The panel, after requests for review by ten claimants and the Attorney General of the United States, issued its opinion and order on May 3, 1974. The panel affirmed some of the trial commissioner's rulings, and changed to December 18, 1971 (date of enactment) the trial commissioner's determination that December 14, 1971 (date of conference report) was the cutoff date for services in "preparation" of the Act. As to the trial commissioner's rulings on presumptively noncompensable categories of services, the panel denied interlocutory review; such matters were deferred for further action. The panel stated:

A request for review of a procedural order issued by a trial commissioner must set forth with particularity the circumstances relied upon as showing that the order adversely affects substantial rights of the parties.... Since the trial commissioner's order states that the claimants' right to submit proof at trial on these claims will not be restricted in any way, and the claimants do not assert that any outstanding pretrial order adversely affects the presentation of such

claims, the claimants have not shown the adverse effect on their substantial rights required for review of a procedural order. There is no present need for interlocutory review of the rulings on the 24 categories of claims, and review may more properly and profitably await the full submission of the evidence and the final order of the trial commissioner on such claims.

It was apparent that further proceedings on the attorney fee claims would be complex and burdensome in terms of time and effort. Some claimants already had 5 years delay in compensation for their services. In order to avoid further proceedings, the attorney claimants negotiated a settlement stipulation among themselves, which was filed December 26, 1974. The stipulation recites that the total consultant claims exceeded $200,000, and that the attorney claimants consented to $100,000 being set aside for consultants. The balance, $1,900,000, was noted as constituting "less than one tenth of one percent of the gross amount of both land and money awarded the Native people of Alaska under the terms of ANCSA." The parties stipulated and agreed "as amongst the claimants that such fee is not unreasonable as to the Native people of Alaska" and is within the parameters set by Congress in ANCSA.

The compromise amount for No. F-15, Frederick Paul and Davis, Wright, Todd, Riese & Jones, was $697,739. This was the largest amount to a claimant, and is 36.7 percent of the total fund available. The trial commissioner, on March 10, 1975, recommended attorney fees be allowed in the amounts stipulated, and on April 15, 1975, the panel adopted the recommendation. The Chief Commissioner's report to Congress and certification to the Treasury for payment of the attorney fees was filed

---

**28.** Presumptively noncompensable services were listed in categories (a) through (x). The list included items such as:

    a. "services" in connection with (1) the formation of a Native Association, borough, corporation, village, or other entity, (2) the general corporate affairs of such an entity (including its tax status), and (3) meetings of the entity or its governing body (except to the extent, if any, time spent in meetings is shown

to be directly related to "preparation" of Federal legislation satisfying Section 20(b)(1)'s terms);

    b. any "services", not heretofore excluded, in connection with the Alaska land freeze order;

    *    *    *    *    *    *

    j. "services" in explaining the meaning of Acts of Congress to Native entities;

May 6, 1975. Paul was a signatory to the stipulation, and was paid $275,095 on May 15, 1975.

The application in No. F–15, filed December 8, 1972, included in Part I (Frederick Paul) a claim of $8,269.88 for unreimbursed out-of-pocket expenses, and in Part II (Davis, Wright, Todd, Riese & Jones) a claim of $53,101.48 for such expenses. The expense claims were amended, pursuant to a May 12, 1975, order of the trial commissioner, to claim $17,300.90 under Part I and $47,847.06 under Part II. The total claim for out-of-pocket expenses was $65,147.96.

The attorney out-of-pocket expense claims were audited by an auditor of the Court of Claims. The auditor, in a report filed September 9, 1976, was able to verify $3,749.83 of the amount claimed in Part I, and $47,847.06 of the amount claimed in Part II. The auditor did not undertake to verify that the expenses were incurred incident to the performance of legal services "in connection with" the preparation of ANCSA or previously proposed Federal legislation to settle native claims based on aboriginal title, as distinct from other legal services, or generally to express an opinion that the expenses were or were not reimbursable under the Act.

In further proceedings on Part II, the law firm portion of the claim, the Department of Justice agreed not to contest allowance of the claim in total amount of $47,525.33, and on July 7, 1977, the trial commissioner recommended allowance of that amount. In his report, the trial commissioner found that Frederick Paul's contract of employment by ASNA was disapproved by the Interior Department on February 26, 1968. In its review, the panel noted that ASNA, in its answer to a law suit that had been filed by Paul on June 9, 1976, had asserted that none of the legal services provided by Paul in any way benefited or was intended to benefit ASNA and that Paul's alleged contract with ASNA was void and illegal. On August 22, 1977, the panel invited Frederick Paul, the Attorney General, ASNA and other parties of record to state their positions with respect to the claim in Part II, particularly as affected by

the attorney-client relationship requirement of 43 U.S.C. § 1619. The panel's opinion filed October 20, 1977, contains the following statement with respect to this issue:

In their responses to the order of August 22, 1977, the claimant contended and the Attorney General conceded that the Department of Interior's disapproval of Mr. Paul's contract with ASNA was based on the Department's position that groups such as ASNA do not constitute a tribal unit within the meaning of 25 U.S.C. § 81 and therefore any contracts ASNA may enter into are not subject to the approval of the Secretary of the Interior. The Attorney General also conceded that the law does not require secretarial approval of such contract and that "the absence of such approval does not indicate the lack of a bona-fide attorney-client relationship between Mr. Paul and ASNA or between Mr. Paul, the claimant firm and ASNA." On October 17, 1977, an affidavit filed by Joseph Upicksoun, president of ASNA from 1969 to date, acknowledged the existence of a *direct* attorney-client relationship between ASNA and the Davis, Wright law firm and stated that the affiant had personal knowledge of countless instances in which lawyers in the Davis, Wright firm performed services on behalf of ASNA in connection with the preparation of the Alaska Native Claims Settlement Act. This evidence supports the proposition that, independent of Mr. Frederick Paul, the present claimant had the client connection with ASNA required by 43 U.S.C. § 1619(d)(2).

The review panel affirmed the trial commissioner's recommendation in the amount of $46,526.63 for unreimbursed out-of-pocket expenses of the law firm.

In further proceedings on the amended Part I (Frederick Paul) expense claim, the review panel noted that the auditor had reduced the $17,300.90 claim by (a) $9,109.84 for which Paul had been reimbursed by the law firm or by ASNA, (b) $1,842.46 which represented travel expenditures paid for or on behalf of ASNA officials and claimed by ASNA, (c) $2,598.77 in

unsubstantiated or otherwise unallowable items. On May 17, 1978, the Assistant Attorney General notified Paul that the Department would not contest a claim in the amount of $3,286.02, and on May 22, 1978, Paul accepted that result. The trial commissioner made two adjustments that reduced the net allowance to $2,893.83. The review panel on August 18, 1978, stated it was unable to endorse allowance of the claim on the merits. The review panel accepted the amount recommended by the trial commissioner with the following statement:

> ... However, as stated in the review panel's opinion on the Davis, Wright expense claim (No. F–15, filed October 20, 1977), in the absence of objection from any other interested party the review panel believes that the Attorney General's agreement as to the amount that he will concede is entitled to be carried out except as it may affirmatively appear from the available evidence that such allowance would offend the statutory criteria governing the same. Since the trial commissioner's recommended allowance of $2,893.83 is less than the $3,286.02 conceded by the Attorney General, and since there is no exception by claimant or any other interested party, the review panel affirms the trial commissioner's recommended allowance of $2,893.83.

The Chief Commissioner certified Frederick Paul's attorney expense claim in the amount of $2,893.83 to the Treasury Secretary on September 18, 1978. This was the final certification under ANCSA. The final report to Congress, on September 18, 1978, summarized the Chief Commissioner's previous reports on attorney and consultant fee claims as: 22 claims for attorney fees, 11 attorney expense claims; six native association claims, and five consultant claims.

*Attorney Fee Litigation*

Frederick Paul has been plaintiff, or counsel for plaintiff, in five law suits to recover attorney fees additional to the amounts he recovered in the proceedings before the Chief Commissioner. In one case, Paul was paid for legal services performed for ASNA during the period April 15, 1969, to October 10, 1972, relating to the organization of the North Slope Borough. In each of the other cases, no recovery was allowed.

1. On April 4, 1974, Paul filed a complaint in the Alaska State Superior Court naming as defendants ASNA, the Cities of Barrow, Kaktovik, Point Hope, Wainwright and Anaktuvuk Pass, and the North Slope Borough.[29] The complaint sought payment for legal services performed for ASNA and the Borough. Paul submitted two exhibits that described legal services during the time period April 12, 1966, to February 27, 1973.

These exhibits indicated that Paul had spent 2,017.63 hours on behalf of his Arctic Slope clients from April 12, 1966, to April 15, 1969. Paul was released by his clients on October 10, 1972. The trial court found that Paul had 504 hours compensable work before April 15, 1969, and 639 hours of work after that date to October 10, 1972. On appeal, the Alaska Supreme Court found that only 4 hours during the period prior to April 1969 had been related to the creation of the Borough and concluded that the trial court's finding that 504 hours had been spent on the Borough before April 1969 was clearly erroneous. The court concluded that the Borough was liable jointly with ASNA for Paul's fees, and awarded, at a rate of $125 per hour, $79,875 for the 639 hours worked from April 15, 1969, to October 10, 1972. The court also reduced the trial court's fee award to Paul for litigating the case. The award of $55,080.51 was reduced to $20,000 as a reasonable fee for litigating the case. This amounts to approximately $50 per hour.

2. On June 9, 1976, Paul filed a complaint in the District Court for the Western District of Washington alleging a breach of contract. The complaint named as defendants the Secretary of the Interior, several other federal officials, ASNA, several Arctic Slope communities, ASRC and several

---

**29.** *See Arctic Slope Native Ass'n v. Paul,* 609 P.2d 32 (Alaska, 1980).

regional corporations.[30] The district court on August 10, 1977, held that the action was barred by the venue and time limitations of 43 U.S.C. § 1609(a). The Ninth Circuit noted the complaint was filed nearly 3 and ½ years after the limitations period and that it was not filed in the District of Alaska. The district court judgment was affirmed.

3. On December 16, 1977, Frederick Paul filed a complaint in the Court of Claims alleging that ANCSA effected a taking of contract rights. After a period of suspension pending resolution of *Paul v. Andrus*, the case was decided on August 25, 1982, on cross-motions for summary judgment.[31] The court assumed, without deciding, that all of the fee arrangements claimed to have been made in the contracts with the Alaska native groups were valid, and that the contracts were accepted by the Interior Department. The court also assumed, without deciding, that Paul performed substantial legal services worth more than was received under ANCSA, and that his clients received benefits in an amount which could sustain a greater recovery than he obtained under ANCSA.

The Court of Claims found the ruling in *Paul v. Andrus* precluded consideration of the constitutionality of ANCSA. Further, the Court of Claims agreed with the Ninth Circuit's holding on that issue on the merits. The Court of Claims determined that the limitations in attorney fees in ANCSA were constitutional, that the abrogation of plaintiff's contracts was within the power of the United States, and that plaintiff had no vested interest in the fee arrangements of a type that could be taken only on payment of just compensation. The court dismissed the complaint, noting that nothing in ANCSA or its legislative history supports a taking claim enforceable in the Court of Claims.

4. On December 19, 1977, Frederick Paul, as counsel for plaintiffs Barry W. Jackson and Thomas E. Fenton, filed a complaint in the District Court for the District of Alaska.[32] The named defendants, in addition to the United States, included AFN, ASRC, and various city and village corporations and associations.

The complaint was based upon attorney client contracts with various Alaska native villages and regional associations entered into between the years 1967 and 1969. Some of the contracts had been approved by the Interior Secretary pursuant to 25 U.S.C. § 81, and some had been disapproved. Plaintiffs had recovered payments for attorney fees from the Chief Commissioner under the ANCSA procedures, and had filed the complaint to obtain additional fees. Plaintiffs sought equitable compensation in connection with passage of ANCSA.

The court dismissed the complaint. The court stated, with respect to the argument that plaintiffs could be paid for services that were noncompensable under ANCSA:

Indeed, with respect to Section 20 of the Act (43 U.S.C. § 1619(f)(2)), above, which makes it a criminal offense for a claimant to receive, or for a contracting party to pay, any remuneration in addition to that allowed pursuant to the Act, plaintiffs assert that in the context of their pleadings, their claim was neither one which had been "made" or which "could be made" *under* the Act. This argument appears to be based upon certain preliminary rulings made by the Chief Commissioner prior to passing upon the claim submitted to that court. Plaintiffs' position is that some part of their services were not compensable as attorneys' fees "rendered * * * in connection with" the Act's passage and therefore compensation for such services lies entirely outside the Act and payment is not barred by the Act. The reasoning is entirely circular. Since the constitutionality is not challenged, the Court is

---

30. *Paul v. Kleppe*, No. C76–424V; during the litigation as government officials were substituted, the style changed to *Paul v. Andrus*, 639 F.2d 507 (9th Cir.1980).

31. *Paul v. United States*, 687 F.2d 364, 231 Ct.Cl. 445 (1982), *cert. denied*, 461 U.S. 927, 103 S.Ct. 2086, 77 L.Ed.2d 297 (1983).

32. *Jackson v. United States*, 485 F.Supp. 1243 (D.Alaska, 1980).

bound to give to the Congressional enactment the full meaning required by its common sense language, meaning the inclusion of all legal services involved, as are these, with the passage of the Act. Moreover, if plaintiffs' claims *never* were claims under the Act, the Chief Commissioner would have been without jurisdiction to take any action concerning them, or to have made the payments which plaintiffs sought and got; nor would the Fund be obligated for paying such claims.[33]

With respect to disapprovals under 25 U.S.C. § 81, of the contracts with the native associations and villages, the court stated:

For the same reasons plaintiffs' claims that the Secretary's disapproval of three of their contracts amounted to arbitrary and capricious action in violation of their due process rights, must also be dismissed. Plaintiffs conceded during oral argument on this motion that the Secretary's approval of the attorney-client contracts under 25 U.S.C. § 81 was not a condition precedent to their filing claims for attorneys' fees under the Alaska Native Claims Settlement Act. The latter statute completely superseded the operation of Section 81 with respect to these particular contracts. Furthermore, it rendered the contracts entirely inoperative whether or not they had been previously approved by the Secretary. Thus, the Secretary's disapproval of the contracts was irrelevant and could not have injured the plaintiffs. * * *[34]

5. In December 1977, Paul filed a contract action in the Western District of Washington.[35] The defendants were the United States, ASNA, and ASRC, and eight villages, seven of which had executed the contracts with Paul which the Secretary disapproved. Paul sought a determination (by an appropriate agency of the United States appointed by the court) of the amount due under his contract, for attorney services. Paul also sought an order requiring the Secretary of the Treasury to pay him that amount from the equitable interest of ASNA and/or ASRC in the Fund. Paul requested the court to enter the judgment against the non-federal defendants. On motion of the United States, the court stayed the case, pending the outcome of the appeal in *Paul v. Andrus*. No further action is shown in the record.

## II.

The congressional reference statute authorizes either House of Congress to refer a bill, except a bill for a pension, to the Chief Judge of the Claims Court for a report.[36] When a bill is referred, the Chief Judge must designate one of the judges of the court as a hearing officer, and a panel of three judges to serve as a reviewing body. The hearing officer is directed to determine the facts, including facts relating to delay or laches, facts bearing upon the question of whether the bar of any statute of limitation should be removed, or facts claimed to excuse the claimants for not having resorted to any established legal remedy. The hearing officer also is directed to append to the findings of fact, conclusions sufficient to inform Congress whether the demand is a legal or equitable claim, or a gratuity, and the amount, if any, legally or equitably due from the United States to the claimant. The statute does not require information as to any amount of compensation to be reported for a gratuity.[37]

A congressional reference procedure has existed since creation of the United States Court of Claims. The judges of the Court of Claims accepted and acted upon congressional references until June 25, 1962. After that date, bills referred by Congress for a report were returned by the Court of Claims on the ground that, as an Article 3 court, it lacked jurisdiction, pursuant to

---

33. *Id.* at 1248.

34. *Id.* at 1254.

35. *Paul v. United States,* No. C77–399V, W.D. Wash.

36. 28 U.S.C. § 1492.

37. 28 U.S.C. § 2509 (1982).

*Glidden Co. v. Zdanok*, to give advisory opinions to Congress.[38]

In 1966, Congress remedied this jurisdictional question by enacting a new procedure in which advisory opinion jurisdiction on congressional reference cases was vested in the commissioners of the Court of Claims. The reference by either House of a bill was to the Chief Commissioner, who then designated a trial commissioner and a panel of three commissioners. In this new procedure, only the location of responsibility in the Court of Claims was changed. The statute made no changes in the standards applicable to a report to Congress.[39] Since 1982, congressional references have been acted upon by Claims Court judges.[40]

Frederick Paul contends that the language of the Senate resolution and the bill, when considered with the report that accompanied the resolution, establish that Congress has determined it acted wrongfully and has recognized an equitable obligation exists. He argues the hearing officer is virtually required to rule favorably on the claim. This argument is based upon a misunderstanding of Congressional procedures, as well as a misstatement of the reasons a bill is referred to the court for a report.

■ Paul's argument is that: (1) S.Res. 187 by its terms does not include the word "gratuity" in the matter to be reported upon, but only asks for a report that gives findings of fact and conclusions of law sufficient to inform Congress whether the claim is legal or equitable, and the amount legally or equitably due, (2) that the report on S.Res. 187 "recommended the resolution be considered favorably," and (3) that the bill S. 966 would appropriate money "notwithstanding the limitations and restrictions contained in Section 10, 20, and 22(a) of" ANCSA.

The recommendation to consider favorably in a report on a resolution to refer a bill does not apply to, or imply acceptance of the language of the bill itself. The recommendation applies only to favorable action on the Senate resolution itself, which in this case the Senate acted upon favorably on October 12, 1988.

■ The terms of S. 966, the bill that was referred, would set aside major provisions of ANCSA on limitations of actions, restrictions on attorney and consultants' fees and restrictions on contracts that included provisions that allowed a percentage fee of all or some portion of the settlement. The reference of the bill for a report under 28 U.S.C. § 2509 does not amount to adoption of the language of the bill to be referred or to a rejection of previously enacted law that would be changed by the bill. It reasonably cannot be construed to suggest, as Paul argues, "recognition on the part of Congress that ANCSA created a 'wrong' to be redressed, and intent to do so by taking away three important defenses."

A bill is sent to the court under the reference statute only in those situations where there is a serious question as to the merit of the claim. In claims where merit is obvious, or sufficiently noncontroversial, the Houses of Congress are able to act directly upon a private bill for the claim in the first instance, without a reference to the court. The merit in Paul's claims is not so obvious that either House of Congress could take expeditious action. It took three Congresses to get either House to agree to refer a bill for a report.

There are several reasons for a House of Congress to refer private claims, and thus defer action until a report is received: (a) the facts and the applicable law are complex and the matter can be illuminated

---

**38.** *Glidden Co. v. Zdanok*, 370 U.S. 530, 82 S.Ct. 1459, 8 L.Ed.2d 671 (1962). *See generally* Glosser, *Congressional Reference Cases in the United States Court of Claims: A Historical and Current Perspective*, 25 Am.L.Rev. 595 (1976).

**39.** Pub.L. No. 89–681, § 2, 80 Stat. 958, Oct. 15, 1966.

**40.** Federal Courts Improvement Act of 1982, Pub.L. No. 97–164, Tit. I, § 139(h), 96 Stat. 42, Apr. 2, 1982. On Oct. 1, 1982, with the creation of the Claims Court, the reference statute was amended to substitute "Chief Judge" for "Chief Commissioner," "hearing officer" for "trial commissioner," "presiding officer" for "presiding commissioner," and "judges" for "commissioners."

through a court proceeding; (b) the claim should be established by competent evidence, as evaluated by a court; (c) the cognizant congressional committees lack the time, facilities, and expertise necessary to hear the evidence and make determinations on the issues; (d) trial proceedings may be needed, which may be protracted and held in locations other than Washington, D.C.[41]

The function of the congressional reference procedure that is most beneficial to Congress is the clarification and determination of the many tenuous and frequently complex facts that a claimant alleges to apply to equities in the claim. The facts, once clarified, provide a basis on which Congress can predicate action on the bill referred, or on a substitute bill in a later Congress.

■ The report to Congress on the bill referred is advisory, and any conclusions as to whether the claim is legal or equitable, and any conclusions as to compensation due, are recommendations only. In each case, the facts are *sui generis.*[42] Inasmuch as the conclusions are recommendations, as distinguished from judicial decisions, the court-made rules of *stare decisis* and *res judicata* do not apply. Congressional reference cases have no binding value as precedent.

Paul argues that Congress, in S. 966 and S.Res. 187 with its accompanying report, defined a government "wrong" and prescribed the standard under which the claim is to be scrutinized. He cites *Lance Industries,*[43] *Burt,*[44] and *Hulsey*[45] as support for this remarkable proposition. The argument is based on a fallacious premise, and the cases cited are neither apposite nor dispositive.

■ The court's obligation in a congressional reference case is founded on statutory law.[46] Language added or omitted in the reference resolution, or addition of supplementary language by one House of Congress at the time the reference resolution is under consideration, does not have the force and effect of an amendment to the basic law. It can neither add to nor subtract from the requirements of the reference statute.

The reference statute creates a procedure through which Congress is to be informed "whether the demand is a legal or equitable claim or a gratuity." The reference statute specifically directs that the report include conclusions sufficient to inform Congress whether the demand is a legal claim, an equitable claim, or a gratuity, and the amount of compensation, if any, to be furnished if legally or equitably due.

In *Burt,* a floor amendment to the House resolution added the standard of "good conscience" to the standards of 28 U.S.C. § 2509(c). The majority of the panel concluded that there was no legal or equitable basis for the claim, within the meaning of the statute, but allowed the claim on the basis of considerations of sovereign honor and good conscience. The President vetoed the bill that resulted from the report; one reason was because the panel majority had not followed the statutory standards.[47]

In *Lance Industries,* the hearing officer specifically found: "This court cannot entertain a reference that conflicts with the jurisdiction conferred by the statute establishing jurisdiction in this court to hear a reference."[48] In *Hulsey,* the resolution that referred the bill defined the procedure and contents of the court's report with no change in the statutory language. The

---

**41.** Glosser, *Congressional Reference Cases in the United States Court of Claims: A Historical and Current Perspective,* 25 Am.L.Rev. at 605.

**42.** *Merchants Nat. Bank of Mobile v. United States,* 7 Cl.Ct. 1 (1984).

**43.** *Lance Indus., Inc. v. United States,* 3 Cl.Ct. 762 (1984).

**44.** *Burt v. United States,* 199 Ct.Cl. 897 (1972).

**45.** *Hulsey v. United States,* 6 Cl.Ct. 593 (1984).

**46.** 28 U.S.C. §§ 1492, 2509 (1982).

**47.** Veto Message, Oct. 29, 1974, 10 Pres.Doc. 1387 (1974). Another reason was the bill was amended in the House, for income tax purposes, to designate the payment as a "gratuity."

**48.** *Lance Indus., Inc. v. United States,* 3 Cl.Ct. at 777.

committee report on the resolution to refer contained a statement of facts, and a suggestion that facts would justify waiver of the statute of limitations, with final determination to be made by Congress. The claim was dismissed after the plaintiff failed to respond to defendant's assertion as to facts that allegedly were not within the scope of the reference. The matter was so reported to Congress.

The House that refers a bill for a report pursuant to 28 U.S.C. §§ 1492 and 2509 cannot in the resolution to refer, or in its report on the resolution alter the statutory standards. When there is the addition of a time limitation in which the report is to be made, as in this case, the limitation at most is an admonition to accelerate. There still must be compliance with court rules that apply to a congressional reference. Time needed for due process concepts to be applied, and for the facts to be ascertained, may or may not dovetail with the time limitations of the resolution. In this case, the quality of the stipulation in Appendix A demonstrates that acceleration may result in lack of completeness and inadequacy for a statement of the claim.

The report on a referred bill must contain conclusions sufficient to inform Congress "whether the demand is a legal or equitable claim or a gratuity." The terms are not defined in the statute, presumably because a legal claim, an equitable claim and a gratuity are long established concepts in adjudication. Although there is little dispute as to the content of a "legal claim" in the congressional reference procedure, there has been considerable confusion between the concept of an "equitable claim" and the concept of a "gratuity."

The distinction between an "equitable claim" and a "gratuity" has an additional refinement in congressional reference cases because the political branches have the power to recognize, and to make a monetary award for, an obligation " 'based upon considerations of a moral or merely honorary nature, such as are binding on the conscience or the honor of an individual, although the debt could obtain no recognition in a court of law.' " [49] A private bill, duly enacted, may compensate obligations to citizens that have arisen from circumstances that are beyond powers delegated to either the executive or judicial branch to recognize or compensate. If only private parties were involved, judicial power could not compensate such a claim. Compensation for such obligations variously has been described as being based upon "broad moral principles of right and justice," "upon the conscience of the sovereign," or "upon considerations of a moral or merely honorary nature." This class of cases contain features that are at once both equitable in nature and in the nature of a gift, grant, bonus, or gratuity.

The Court of Claims defined "gratuity" as synonymous with the term "equity" when compensation was found to be owing although no court as a matter of equity could recognize and compensate on the facts involved.[50] The court recommended an amount to be paid by Congress, "in their discretion," on a claim where the government official had requested action beyond the scope of delegated authority. The court gave the following explanation:

We believe the term "gratuity" as used in the congressional reference statute is synonymous with the term "equity" as used in its moral sense. In its broadest and most general signification, equity denotes the spirit and habit of fairness, justness, and right dealing which would regulate the intercourse of men with men—the rule of doing to all others as we desire them to do to us; or as it is expressed by Justinian—"to live honestly, to harm nobody, to render to every man his due." It is therefore the synonym of natural right or justice. But in this sense its obligation is ethical rather than jural, and its discussion belongs to the sphere of morals. It is grounded

**49.** *Estates of Armiger v. United States*, 339 F.2d 625, 628, 168 Ct.Cl. 379 (1963) (*citing United States v. Realty Co.*, 163 U.S. 427, 440, 16 S.Ct. 1120, 1125, 41 L.Ed. 215 (1896)).

**50.** *Gay Street Corp. v. United States*, 127 F.Supp. 585, 130 Ct.Cl. 341 (1955).

in the precepts of the conscience, not in any sanction of positive law.[51]

From the standpoint of the exercise of judicial power, an "equitable claim" is limited to court recognized concepts that determine rights and obligations and authorize the expenditures of public money. The political branches have no such limitation on the power to recognize obligations that may be compensated from the public treasury. The Supreme Court has established that the power "to pay the debts" of the United States under the Constitution encompasses the power to recognize debts or claims which "result upon a merely equitable or honorary obligation, and which would not be recoverable in a court of law if existing against an individual."[52] A claim that is not judicially enforceable but which invokes an obligation that the Congress and the Executive undertake to pay, would involve an "equitable claim" and not a gratuity, bonus, gift, or bounty. Any limitation on the power of the political branches to recognize extra judicial obligations, if there be any limitation, would be found only in such circumstances where payment to the claimant would be arbitrary and without any public purpose whatsoever.

A private bill is an appropriate device to compensate extraordinary factual situations. Unlike statutory law, it has no general application. It permits the political branches of government to recognize meritorious obligations a court could not rectify.

The congressional reference statute itself implies the court should conclude and report that an equitable claim exists when the facts include reasons for delay that would justify a waiver of the bar of statutory limitations or equitable doctrine of laches. Relief in this court is barred by the doctrine of sovereign immunity when a statute fixes a limitations period. In appropriate cases, the court has not hesitated to recommend compensation for claims barred in court for these reasons.[53]

An equitable claim may be found in fact situations where, if private parties only were involved, there would be no recovery in court. The judicial doctrines of assumption of risk or contributory negligence may be overcome by affirmative action by government agents.[54] An equitable claim also may be found in situations where the United States otherwise would be unjustly enriched, or where government agents have acted beyond the scope of authority.[55] Where the claimant and the Department of Justice by stipulation agree compensation is owing, an equitable claim routinely is found.[56]

Throughout the history of the congressional reference procedure, the court's treatment has varied, with differences of opinion as to the concept of an equitable claim.[57] During the Court of Claims period, an early case[58] delineated the task in a congressional reference, reported findings of fact only, and made the following explanation:

* * * They are a separate class of cases designed to supply information so full and exact as to leave to the legislative body nothing to do but determine the justice of the complaint (usually transmitted in papers accompanying the bills)

---

51. *Id.,* 130 Ct.Cl. at 350 n. 1.

52. *United States v. Realty Co.,* 163 U.S. at 440, 16 S.Ct. at 1125.

53. *Abbott v. United States,* 175 F.Supp. 917, 146 Ct.Cl. 272 (1959); *Dickson v. United States,* 159 Ct.Cl. 185 (1962); *Knight v. United States,* 202 Ct.Cl. 1043 (1973) and 213 Ct.Cl. 663 (1977).

54. *Burt v. United States,* 199 Ct.Cl. 897; *Messina v. United States,* 193 Ct.Cl. 993, 1019 (1970); *Estates of Armiger v. United States,* 339 F.2d at 630.

55. *See Merchants Nat. Bank of Mobile v. United States,* 7 Cl.Ct. 1; *Gay Street Corp. v. United States,* 127 F.Supp. 585, 130 Ct.Cl. 341 (1955).

56. *Chapman v. United States,* Cong.Ref. No. 1–86, Sept. 28, 1989; *Marlin Toy Products, Inc. v. United States,* 218 Ct.Cl. 630 (1978).

57. *See California Canners & Growers v. United States,* 9 Cl.Ct. 774, 786 (1986); *Merchants Nat. Bank of Mobile v. United States,* 7 Cl.Ct. at 9 n. 6.

58. *Alleman v. United States,* 43 Ct.Cl. 144, 151 (1908).

as a legal or equitable demand against the United States; or, as one resting upon no law but depending upon moral considerations of such character as may or may not fairly appeal to the *bounty* of the Government. The endeavor of the court is to frame the findings with accuracy such as to enable Congress to discriminate between a meritorious claim and an application for a gift as a mere matter of favor. In the class of actual "claims" so reported with an amount stated, it will generally be found that our findings rest upon an actual benefit either received by the Government or a liability assumed by the United States and where no equity exists there is generally something to show a want of merit.

In some references, the Court of Claims classified any claim that did not meet the test of an equitable claim or a legal claim, in accordance with principles applied by a court, as an application for a gratuity.[59] Other references, on the other hand, applied a broader concept to the "equitable claim." [60] These differences have continued in the congressional reference procedure in the Claims Court.

■ In the application of the congressional reference procedure, certain elements are constant. An "equitable claim" is not reported unless the facts create an obligation that the United States should recognize. The obligation may arise from some unjustified government acts that caused damage to the claimants,[61] or it may arise when the government acquires benefits through overreaching by its agents or by misleading representations by government agents that are beyond the scope of delegated authority.[62] In every case when an "equitable claim" was reported with a recommendation for payment of compensation, the particular facts involved reasonably spell out a government obligation.[63]

### Legal Claim

■ Frederick Paul has sought additional compensation for his services to the Inupiat in the courts of Alaska and Washington, in the Ninth Circuit and in the Court of Claims. Decisions in these courts have established that ANCSA's venue and time limitations, limitations on attorney fees, and nonenforceability of attorney contracts with native Alaskans that provide for compensation based on a percentage of recovery, are constitutionally valid. The Court of Claims decided that the abrogation of plaintiff's contracts with ASNA, if any legally existed, did not constitute a taking which required compensation under the Fifth Amendment. Any legal claims Paul may have had against the Inupiat, and their regional or village corporate entities, were released on April 24, 1973.

Accordingly, Frederick Paul has no legal claim against the United States that could be compensated through additional proceedings in court.

### Equitable Claim

Equitable remedies under court established doctrines, such as reformation of contracts, or mandamus orders to government officials who have failed to follow

59. *Elmers v. United States,* 172 Ct.Cl. 226 (1965); *Georgia Kaolin Co. v. United States,* 145 Ct.Cl. 39 (1959); *Electric Ferries, Inc. v. United States,* 137 Ct.Cl. 400 (1957); *Torti v. United States,* 135 Ct.Cl. 214 (1956); *Gay Street Corp. v. United States,* 127 F.Supp. 585; *Cusimano v. United States,* 125 Ct.Cl. 351 (1953); and *Fidelity Trust Co. v. United States,* 101 Ct.Cl. 831 (1944).

60. *Burkhardt v. United States,* 84 F.Supp. 553, 113 Ct.Cl. 658 (1949); *see also Rumley v. United States,* 169 Ct.Cl. 100, 105 (1965); *Town of Kure Beach, N.C. v. United States,* 168 Ct.Cl. 597 (1964).

61. *Merchants Nat. Bank of Mobile v. United States,* 7 Cl.Ct. at 9 n. 6; *Wounded Knee Inno-*

*cent Victims v. United States,* Cong.Ref. No. 4–76, p. 32–33, June 10, 1981; *Wong v. United States,* Cong.Ref. No. 3–74, p. 12–13, Nov. 23, 1977, *rev'd on other grounds by Review Panel,* May 16, 1979, synopsis at 220 Ct.Cl. 750.

62. *Gay Street Corp. v. United States,* 127 F.Supp. 585.

63. *See* Appendix B. In view of its extra judicial posture, reporting of congressional reference cases has not been consistent. Appendix B lists the cases starting in January 1952 by docket number, and shows a citation, if the case has been reported, and any compensation recommended.

statutory commands, are not appropriate, and are not available to Paul in any court with respect to this claim.

The compensation provisions of Paul's contracts with the Inupiat do not result from mutual mistake, or from uninformed unilateral mistake on the part of Paul. When he undertook to represent the Inupiat, Paul was a specialist with long experience in the law that applies to Indian contracts. He knew that the Indians, Eskimos, and Aleuts in Alaska were subject to the policy of the United States designed to safeguard the interests of culturally unsophisticated peoples, and that no contract with the Inupiat would be valid in the absence of review and approval by the requisite government officials.

His discussions with BIA officials in January 1966 made him aware that a compensation provision based on a percentage of recovery was then under reexamination. Experience with the formula that had permitted attorney compensation not to exceed 10 percent of the recovery, which formula had been used in the Indian Claims Commission Act and in special jurisdictional acts for suits in the Court of Claims, had produced criticism, and that formula no longer was acceptable to Congress.

The terms of Paul's August 24, 1966, contract with ASNA differ from the terms of his November 20, 1967, contract. The terms of his contracts in 1969 with the various villages differ from the terms in the August 24, 1966, contract, which allegedly was being reaffirmed. The various contracts are ambiguous as to their terms and as to their effective dates. Paul is the cause of these ambiguities.

No principle of equity would warrant reformation of these contracts for the purpose Paul desires. No principle of equity would require the contracts to be approved by a government official.

Paul knew, when the November 1967 contract and the 1969 village contracts were executed, that the compensation provisions were not acceptable and would not be approved. Paul agreed to replace all of

his contracts when the new forms based on an hourly rate rather than a percentage of recovery, had been approved and were available. He so informed the Inupiat at Point Hope. Paul did not follow through with this agreement. He refused to accept the hourly rate formula because he thought it was unfair, even though he knew it was standard, and a contract on that basis would be approved by BIA.

Finally, Paul did not rely on the contracts with the Inupiat to be the basis for his compensation. During his negotiations in May 1969, with the Davis, Wright, Todd, Riese & Jones firm, he took the position that the status of the contracts was not particularly important because he expected Congress to set the fee, and establish the machinery for its payment.

On April 24, 1973, Frederick Paul released the Inupiat in whatever individual or corporate form they may align themselves because at that time his application in No. F–15 before the Chief Commissioner was pending and he intended only the United States should compensate him for the legal services he had rendered to the Inupiat. Frederick Paul did not challenge the constitutionality of the ANCSA provisions that abrogated his contracts with the Inupiat during the first year after December 18, 1971, because he was waiting to see how No. F–15 would fare in the ANCSA attorney fee proceedings. Disregard of the release or of ANCSA's statute of limitations would not permit or justify legal or equitable relief on the contracts with ASNA or the Inupiat villages.

All of these considerations militate against a conclusion that somehow abrogation of Paul's contracts in ANCSA creates an obligation for an "equitable claim" as that term is used in the reference procedure. When Congress enacted ANCSA it was aware that the $1,900,000 allotted for attorney fees was low when compared to the 10 percent formula in an adjudicated determination. The chairman of the House Committee on Interior and Insular Affairs protested the amount was "niggardly." [64] Some members of Congress thought a

---

**64.** Cong.Rec., Daily Ed., H.12457, Dec. 14, 1971.

"new low" in fees attorneys for Indian cases was a "definite step in the right direction." [65] Although a subsequent Congress may disregard ANCSA's attorney fee limitations, revisiting the matter, even in a private bill, would be contrary to the stated objective that the Act would settle all Alaska land claims. A private bill also would be contrary to the principle of legislative finality on statutory enactment.

Paul's assertion that his work for the Inupiat conferred substantial benefits on the United States is derived from the values realized by passage of ANCSA itself. He claims that, although he may not have been the sole driving force in the settlement, his efforts were a substantial factor that contributed to the benefits Congress recognized in the Act, and ANCSA would not have been the same without his work. Paul argues that the following benefits were attained by enactment of ANCSA:

1. Satisfaction of Alaska natives' claims against the United States;

2. Alaska natives' aboriginal rights were extinguished, and Alaska natives were placed on equal footing with other citizens;

3. Moral obligations of the United States to the natives were met, and United States integrity in world affairs was preserved;

4. Economic resources provided to natives lessened their dependency on government;

5. A system of government for rural Alaska was created;

6. Alaska State resources were opened for development, and the economy was invigorated;

7. Alaska State benefited from the protection of rights that had accrued under mining and public land laws;

8. National security interests in oil production and reserves were advanced; and

9. Parks and wilderness areas were created.

The substantial contribution Frederick Paul conferred to the process that resulted in ANCSA is identified as:

1. Articulation of a legal basis for the natives' aboriginal rights claims;

2. Inclusion of large land grants as part of settlement;

3. Distribution of benefits partially on a land-lost basis; and

4. Organization of regional corporations, rather than a statewide corporation.

It is clear that Paul's work, to the extent it is reflected in ANCSA, resulted in substantial gains for the Inupiat. The interest of the Inupiat, however, is not synonymous with the national interest. Paul's work, moreover, is no more responsible for the benefits the United States population as a whole gets from ANCSA than the contribution of any of the other groups that were working for the Alaska natives, such as AFN and the other regional associations that were concerned with a population-based distribution in the settlement. Further, the driving force for enactment of ANCSA was not limited to the contributions of native Alaskans. It is more than probable that ANCSA would not have materialized in the absence of the substantial pressures that resulted from the interests of the State of Alaska, and from the oil and pipeline companies.

The benefits to the United States that Frederick Paul cites as justification for additional attorney fees, in relation to his work for the Inupiat, are attenuated and insufficient causally. Paul's work for the Inupiat, moreover, essentially involves the normal services a lawyer routinely performs in work for a client.

The Court of Claims in 1982 considered the $275,095 fee received by Paul in Claim No. F–15 as amounting to $10–$12 per hour, present value. The court concluded that amount did not seem to be "outrageous." [66] In the proceedings before the Chief Commissioner, the total claim made by Paul and the firm in No. F–15 was valued at $3,350,000. This amount was

---

**65.** Cong.Rec., Daily Ed., H.12461, Dec. 14, 1971.

**66.** *Paul v. United States,* 687 F.2d at 368 n. 9.

based on 5,000 hours work by Paul and 9,774.6 hours work by the firm, a total of 14,774.6 hours. Under the stipulation, Frederick Paul was paid an attorney fee of $275,095, of the total $697,739 allowed on the claim. The contentions before the Chief Commissioner and their resolution show:

—The claimants in F–15 asked for payment at the rate of $226.75 per hour; they realized $47.22 per hour in the stipulated payment.

—Paul realized $55.01 per hour in the stipulated payment for the 5,000 hours he claimed to have worked. In this proceeding Paul asserts he worked a total of 6,621 hours for the Inupiat. On this basis he realized $41.55 per hour in the stipulated payment.

—Claim No. F–15 was paid 36.7 percent of the total available for all attorneys, and 20.8 percent of the amount that Paul and the firm claimed.

—Frederick Paul realized 39.7 percent of the amount paid on No. F–15, and 14.5 percent of the amount paid to all attorneys.

These payments are not unreasonable for the work done.

### III.

It is concluded that Frederick Paul does not have a legal claim or an equitable claim, in the juridical sense or as used in a congressional reference. On the facts of this case, the United States has no obligation that would warrant monetary compensation to Frederick Paul in a private bill. Frederick Paul, however, made a contribution to the enactment of ANCSA, and his work was of particular benefit to the Inupiat. Recognition of this contribution by resolution of either House of Congress may be appropriate. In the event the Congress and the Executive Branch concur in recognizing Paul's contribution and make a monetary award, such monetary award would be payment of an equitable claim and would not be a gratuity.

### APPENDIX A

Congressional Reference No. 2–88

Frederick Paul, Plaintiff,

v.

The United States, Defendant.

MEMORANDUM RE: STIPULATIONS

1. In 1966, Frederick Paul was a Seattle attorney practicing Indian law. On July 12, 1977, the Alaska Superior Court, Third Judicial District found that Frederick Paul "was one of the nation's foremost authorities on Indian law"; on April 4, 1980, the Alaska Supreme Court found Frederick Paul to be "a prominent authority on the pertaining to Native Alaskans." Both courts were referring to the 1966–1972 time period.

2. Frederick Paul was reared mostly in Ketchikan, Alaska. He graduated from Ketchikan High School in 1931.

3. Paul was admitted to the practice of law in the State of Washington on October 28, 1940; in the territory of Alaska in 1941; to the United States District for the Western District of Washington on October 28, 1940; to the United States District Court for the Territory of Alaska on January 6, 1941; to the United States Court of Appeals for the Ninth Circuit on April 30, 1946; to the United States District Court for the Eastern District of Washington in 1958; to the United States Court of Claims in 1959; and to the United States Supreme Court on January 10, 1961.

4. From 1941 to 1943 Paul was in the private practice of law in Petersburg, Alaska. From 1943 to 1945, he was an Assistant Attorney General for Alaska at Juneau with an authorization to practice privately. From 1945 to 1947, he was an attorney for the United States Department of Labor in Seattle, Washington. Paul has been in private practice in Seattle, Washington, since 1947.

5. Paul is a member of the Tee–Hit–Ton band of the Tlingit and Haida nations. His family was very active in Indian civil rights issues, especially voting rights issues. Paul's father, William Paul, Sr., was admitted to practice law in Alaska. During the

course of his upbringing, Paul met frequently with members of other Alaskan native tribes.

6. From the beginning of his practice, Paul worked in the field of Indian law, with special attention to the legal problems pertaining to native Alaskan and Indian aboriginal rights.

7. In 1941, the Tlingit and Haida employed Frederick Paul and William L. Paul, Jr., to bring an action in the United States Court of Claims pursuant to a 1935 jurisdictional act, authorizing suit against the United States for money damages resulting from the loss of their aboriginally-owned lands in Southeast Alaska. William Paul, Jr., and Frederick Paul submitted fully-executed attorney contracts to the Commissioner of Indian Affairs and the Secretary of the Interior for approval. The Commissioner and the Secretary never acted to approve or reject the contracts. William Paul, Jr., and Frederick Paul filed two actions in the Court of Claims, *Members of the Tlingit Nation of Indians v. United States*, 102 Ct.Cl. 209 (1944), and the *Members of the Haida Nation of Indians v. United States*. The Court dismissed these actions, holding that it was without jurisdiction where the provision in the jurisdictional act required that the contract between the plaintiff Indian Tribes and the attorneys be approved by the Commissioner of Indian Affairs and the Secretary of the Interior. In 1946, the Tlingit and Haida employed James E. Curry as chief counsel and William L. Paul, Jr., and Frederick Paul as associate counsel. These contracts were approved by the Department of the Interior. *Tlingit and Haida Nations of Alaska v. United States*, Ct.Cl. No. 47900, was filed in 1947. Frederick Paul continued as associate counsel through 1956 with Mr. Curry and Mr. I.N. Weissbrott. The Tlingit and Haida eventually recovered $7.6 million from the United States for loss of their timber land.

8. The Inupiat people have lived for at least 3,000 years on the North Slope of the Brooks Range in Alaska, from the Canadian border to the Chukchi Sea, an area comprising approximately 56 million acres. The North Slope is an arctic desert, with an average annual precipitation of 4 inches, and a mean annual temperature of 10°F. The Inupiat have generally had little contact with western civilization. Their culture was formerly based on subsistence hunting and fishing and their cultural norms were very different from those of western civilization.

9. In 1966, the Inupiat population was 4,500 people. The North Slope had a subsistence economy based on traditional patterns of hunting, fishing and whaling. The average life expectancy of the Inupiat was 34.5 years. Average educational attainment was mid-third grade. There were no high schools in the North Slope. Only one village had a junior high school.

10. The Arctic Slope Native Association (ASNA) was an unincorporated association comprised of a "group of Inupiat Eskimos living together in the lands of [their] ancestors on the Arctic Slope of the state of Alaska and banded together as one association * * *." It was formed to secure the Inupiat's rights to their lands to promote their political, educational, cultural and economic interest.

11. The ASNA encompassed all of the lands of the Arctic Slope Inupiat. Membership was open to all Natives residing in or who were from the Arctic Slope area. The ASNA was divided into local districts. Each district had a representative who voted for the district at ASNA general meetings.

12. The ASNA was founded in a general meeting of over 100 Inupiat people on January 15, 1966. Its three founding members were Charles Edwardsen, Jr., Guy Okakok and the Reverend Samuel Simmons. The three founding members of ASNA had written to William Paul, Sr., the father of Frederick Paul, on January 5, 1966, requesting that William Paul, Sr., represent the ASNA with respect to land claims.

13. In a memorandum dated June 29, 1966, John Crow, Acting Director, Bureau of Land Management, Department of the Interior, stated:

The enclosed Native protest filed is transmitted for your information. The Protestants are asserting an aboriginal claim to all the land north of the 68 parallel. The gross area under protest has been estimated to be approximately 56 million acres. The protest is against all claims and apparently includes oil and gas leasing, in addition to the 1,618,000 acres of lands covered by Alaska State selections.

The activities of Amos Hopkins–Dukes and William L. Paul, Sr., suggest that we should be prepared for adventuring and irresponsibility in this field of "native claims" and "native rights." The potential for embarrassment of administration seems huge. Increasingly, these questions are becoming the subject of public discussion and controversy. This will undoubtedly be true in Alaska if filing of protests and claims leads to cessation of public land resource disposal activities.

14. In a letter dated August 14, 1967, from Richard A. Bradley, Field Solicitor, Juneau to the Area Director, Bradley wrote:

I offer no comments to you on the desirability of the selection of Frederick Paul as claims attorney for the Association. To my knowledge he is a member of both the Washington State and the Alaska Bar Associations, and again, so far as I am aware, is in good standing in both Associations.

Regarding the selection of William L. Paul, Sr., as co-counsel with Frederick Paul, I offer the following comments. Earlier this year I corresponded with the Washington State Bar Association and was advised that Mr. William L. Paul was not then a member of that Association. I am sure that the Washington Bar Association is an integrated bar association, and accordingly all attorneys in Washington who are authorized to practice are members of that Association. Mr. William L. Paul has in the past been a member of the Alaska Bar Association but is presently on a nonresident, inactive status and would be required to file a petition for readmission to active status prior to any practice of law in Alaska. Accordingly, it appears that he is not at the present time an active member in good standing of a Bar Association and would not be entitled to approval by this Department of his status as a claims attorney.

15. Section 7 of the Alaska Native Claims Settlement Act of 1971 (ANCSA), 43 U.S.C. § 1606(a) (1986), provides in pertinent part:

For purposes of this chapter, the State of Alaska shall be divided by the Secretary within one year after December 18, 1971 into twelve geographic regions, with each region composed as far as practicable of natives having a common heritage and sharing common interests. In the absence of good cause shown to the contrary, such regions shall approximate the areas covered by the operations of the following existing native associations: (1) Arctic Slope Native Association (Barrow, Pt. Hope).

The Arctic Slope Regional Corporation, established pursuant to ANCSA, has regional boundaries that cover the same general area as the ASNA. 43 U.S.C. § 1606(a) (1986).

16. In 1973, the United States District Court for the District of Columbia found that the Arctic Slope Native Association had standing to assert a claim of aboriginal title to North Slope land in the case of *Edwardsen v. Morton*, 369 F.Supp. 1359 (D.D.C.1973). The Court also found that, as a result of the passage of ANCSA, Alaskan Natives could not challenge title to aboriginal lands selected by Alaska and tentatively approved by Secretary of Interior, nor could they challenge oil leases on such land sold by the state to various companies. However, the court also found that the Natives' pre-settlement trespass claims did represent accrued causes of action for trespass and breach of fiduciary duty against the federal officers who authorized such trespass and that insofar as these claims represented accrued cause of action for trespass and breach of fiduciary duty, they were vested property rights pro-

tected by the Fifth Amendment. *Edwardsen v. Morton*, 369 F.Supp. 1378–1379 (D.D.C.1973).

17. On June 28, 1971, the Department of the Interior approved the formation of the Inupiat Community of the Arctic Slope (ICAS), an Indian Reorganization Act Corporation, organized by Frederick Paul.

18. Frederick Paul assumed the role of attorney for the ASNA in January, 1966. At this time, Paul became involved at the request of his father, William Paul, Sr. On or about January 5, 1966, the ASNA's founder, Charles Edwardsen, Jr., asked William Paul, Sr., to represent the ASNA. In 1966, William Paul, Sr., was 81 years old. The Inupiat and other Native leaders later requested that Frederick Paul be made co-counsel to assist his father.

19. On January 25, 1966 Frederick Paul wrote a letter to the Area Director of the Bureau of Indian Affairs in Juneau, Alaska, regarding his intent to execute an attorney contract with the Arctic Slope Inupiat. Paul requested a form of attorney contract from the Department. On April 26, 1966, Area Director Owen D. Morken wrote to Paul and enclosed "a suggested draft of a contract which you may wish to discuss with the Indian and Eskimo groups concerned." The letter further stated:

We all recognize that the injuries for which you are seeking a remedy are of an unusual nature and that there may have been no "taking" in the traditional sense until the land is either selected by the State or is entered by a homestead entryman. I believe we also recognize that a successful conclusion to your efforts might result in no fund being created as occurs in a typical claims case, but rather in a determination that the respective Indian groups have Indian title to some or all of the lands they have claimed. For this reason typical provisions in attorney claims contract relating to percentages of the recovery are inadequate.

Although in certain cases the Department has agreed to the payment of expenses of the attorney as opposed to the attorney's fees, prior to a final judgment we believe that such an approach in this case could well be inappropriate since we believe it would be generally acknowledged that the Indian groups involved do not have adequate resources to support such an undertaking. However, as you may be aware, the Association of American Indians has expressed great interest in protection of the Native possessory rights in interior Alaska and they may be willing to make some arrangement with you for the prosecution of this case. Consistent with these conclusions we are enclosing a suggested draft of a contract which you may wish to discuss with the Indian and Eskimo groups concerned.

20. The Department of the Interior's April 26, 1966 form of contract provided, in relevant part, that: (a) compensation was to be "wholly contingent"; (b) in an amount found to be equitably due"; (c) as determined by a "court of tribunal," making an award on behalf of the Tribe; (d) or in its absence by the "Secretary of the Interior or his authorized representative"; (e) that in "no event [could] the aggregate fee award * * * exceed 10% from sum received; (f) "through efforts, in whole or in part, for the Tribe, whether by suit, action of the Department of the government or of the Congress of the United States, or otherwise * * *."

21. On May 28, 1966, Frederick Paul submitted his re-drafted attorney contract to the Area Director.

22. 25 C.F.R. § 72.18 (1966) states in part, "proposed changes [in the form of an attorney's contract with an Indian tribe] should be submitted through the superintendent to the Area Director for approval as to form prior to execution of a contract."

23. In a letter dated June 9, 1966, Acting BIA Commissioner James E. Officer instructed Area Director Owen D. Morken not to issue approval as to form prior to the execution of an attorney contract, but stated, "[o]ur sample contract form is available to groups and attorneys for use as a guide. The form may be modified as believed necessary by the group and the at-

torney it selects. The appropriate procedure is for a group and the attorney to negotiate a contract with provisions both understand and which are agreeable to them. Appropriate modifications in the sample contract form can be made by the attorney. The resulting contract should be executed and then submitted to you for consideration."

24. On the same day, Field Solicitor Richard A. Bradley wrote to the Area Tribal Operations Officer and stated:

Mr. Paul points out properly enough that American and Alaska Bar Associations view with disfavor the financing by attorneys of litigation. In point of fact, the canons of ethics on the point are quite pious; however, this is one of the greatest areas of deviation of practical necessity from the written rule. Technically, contingent fee contracts constitute a financing by attorneys of lawsuits but since they represent the only method of getting that class of case tried, we wink at the rule.

The question as to what the Bureau should do on this point is for Bureau determination. The problem of the attorney in bringing his clients' cases to the proper forum and still feeding his children is a real one, but is not solved by quoting antediluvian and unrealistic canons. As I pointed out in my memorandum to you of April 22, 1966, the Bureau does recognize a practice whereby expenses may be advanced. I doubt that this case comes within examples where it should be allowed; particularly is this case inappropriate until the foundations and Indian associations have rejected his requests. The tribes certainly do not seem to possess any obvious assets.

He also amends the provision relating to fees [located in his draft at the bottom of page 2 and top of page 3] by adding the clause, "or a property interest in real estate is confirmed." The addition is desirable and clarifies the section; however, I am still at a loss to understand how practically speaking he can get paid

anything unless a fund is created or unless he gets foundation support.

25. In a letter dated June 20, 1966, Area Director Owen D. Morken wrote to Paul stating that "[o]n May 31 we received a redraft of your proposed draft of a suggested attorney's contract between various groups in the interior and yourself. Since your redraft deviates in some parts from the sample contract form, we reserve comment to avoid prior approval, however informal."

26. In a letter dated March 14, 1966, Sam Taalak, President of ASNA, informed Mr. O.L. Williamson, Realty Officer, Bureau of Indian Affairs, Fairbanks, that William Paul, Sr. and William L. Paul, Jr. had been "duly appointed attorneys * * * [,] given power of attorney to act in all matters pertaining to [ASNA's] land title recognition [, and had] been duly ratified by enrollment of members in all Arctic Slope villages at the general meeting."

27. On March 23, 1966 William Paul, Sr. wrote the ASNA membership stating:

I notice that you have named William L. Paul, Jr. as one of your attorneys. He is the assistant chief Deputy Prosecutor of King (Seattle) County and cannot take outside work. His brother is just as able and is in private practice, also a graduate of Washington Law School in 1939, was for several years assistant attorney general for Alaska, is licensed to practice in all the courts of the land both State and federal including the Supreme Court of the United States, has piloted several cases thru the United States Supreme Court. We are daily touch with each other on your case. Your directors can make the substitution by motion.

28. William Paul, Sr. sent a letter to the ASNA dated August 1, 1966 stating:

You will notice that my son Fred is in the contract in lieu of William Paul, Jr., because William has a County attorney job and is not allowed to take outside cases; whereas Frederick is a private practicing attorney, certified to practice in all the Courts of the United States, including the Supreme Court. I am very happy to recommend him, and while I don't antic-

ipate being promoted to the next world soon, such things occur, especially when my present age is taken into account, although I am in perfect physical condition at this time.

Frederick, however, "was reluctant to get into the claim because of [his] awareness of the amount of drain in time and money in the prosecution of one of these cases."

29. On August 24, 1966, Frederick Paul presented the proposed attorney contract to the Arctic Slope Inupiat at an ASNA meeting in Barrow, Alaska. The contract was executed in the name of:

[T]he Arctic Slope Native Association of Alaska, composed of the Inupiat Natives (commonly called Eskimos) inhabiting the Arctic Slope of Alaska, including constituent bands thereof, hereinafter referred to as the Tribe * * *.

Frederick Paul submitted the executed contract to the Department for approval.

30. In a letter to Hugh Nicholls, Executive Director, ASNA, dated November 3, 1966, Roy Peratrovich, Area Tribal Operations Officer, referenced the October 13, 1966 letter, also to Mr. Nicholls, which requested certain information regarding the manner in which delegates to ASNA were authorized by their village to represent them in the claim filed in their behalf. The October 13, 1966 letter stated in part:

Mr. Roy Peratrovich informed me by phone today that the Claims Attorney Contract between the Arctic Slope Native Association and William L. Paul, Sr. and Frederick Paul of Seattle, Washington is being held up at Juneau. As soon as they receive additional information from you by letter, the contract will be approved.

In the November 3, 1966 letter, Mr. Peratrovich informed Mr. Nicholls that "[f]inal action on a Claims Attorney Contract between [ASNA] and William L. Paul, Sr. and Frederick Paul [would] not be taken until [that] information [was] supplied to [his] office."

31. There was an exchange of interdepartmental memoranda and correspondence within the Department of the Interior regarding the authority of the ASNA to act for the Arctic Slope Inupiat. In a memo dated July 7, 1967, the Superintendent of the Fairbanks agency said to the BIA Area Director that:

"The Arctic Slope Native Association has forwarded or caused to be forwarded to Juneau statements from said participants, removing the question of actual representation, at least as far as this office is concerned.

"We again urge the immediate approval of this contract * * *."

32. Five Arctic Slope Inupiat villages sent statements to the Department of the Interior authorizing the Arctic Slope Native Association to act on their behalf. In addition, a 13–page petition containing 375 individual Arctic Slope Inupiat, residing throughout the Arctic Slope and designating the ASNA as the proper entity to prosecute the aboriginal claims, was submitted to the Department.

33. On February 16, 1967, the BIA Area Director sent Frederick Paul a letter, advising him on the status of their investigation of the Arctic Slope Native Association's authority to officially represent the Arctic Slope Inupiat people:

Subsequent to receiving the proposed Claims' Attorney Contract, we polled all the villages involved, requesting specifically if they had authorized the Arctic Slope Native Association to file a claim in their behalf. The majority of these villages have now responded by letter advising that they did authorize the Arctic Slope Native Association to act in their behalf.

34. On September 3, 1967, Frederick Paul was informed that the Department's delay in approving his contract was caused by the presence of William Paul, Sr., his father, as co-counsel on the contract. Frederick Paul then prepared a second contract for execution by the Arctic Slope Native Association. This second contract was in the identical form as to the previously submitted contract, with the exception that it removed William L. Paul, Sr., as co-counsel for ASNA.

35. In a letter dated September 7, 1967, to the Area Director, Frederick Paul requested that disposition of his attorney contract be held in abeyance until further notice.

36. On November 20, 1967, the second claims attorney contract was executed by the ASNA in the presence of Wallace Craig, a monitoring Bureau of Indian Affairs' official, and submitted to Department of the Interior Field Solicitor Richard A. Bradley. Solicitor Bradley wrote a letter regarding the November 20, 1967, attorney contract to the Area Tribal Operation Office, stating:

I agree that the contract is proper for execution for the tribe and approval by the Bureau.

\* \* \* \* \* \*

In this case, however, I believe no problem is presented since the provision grants the Secretary or his designated representative the authority to find what may equitably be due the attorney, and the provision also provides that it shall not "exceed" 10% of any and all sums or property recovered. Since the fee anticipated and expected is not a flat 10% but an amount equitably due not to exceed 10%, I believe that there are no problems and that the Bureau may approve this contract.

37. In a letter dated January 4, 1968, to the Juneau Area Director, Assistant Commissioner William E. Finale stated, "[i]n our memorandum addressed to you on October 31, 1967, the Commissioner stated that approval of the ASNA is not within the jurisdiction of this Bureau. Therefore we do not recognize the Association as an entity in the sense of a·tribe or band \* \* \*. Therefore, the contract with ASNA may not be approved. Furthermore, the Assistant Commissioner stated:

As you know, many of the tribes, cities, villages, communities, and groups are poor and have so little income that they are hard pressed to meet necessary operating obligations. The proposed contract indicates that a claim may result in recovery in the form of land, property, thing or things of value other than a monetary award. The possibility exists that a monetary recovery may be less than the costs of litigating the claim. Precautions should be taken to protect the community or group. Accordingly, you may want to suggest that the contract provide that, in the event a recovery is had, no land, property, thing or things of value recovered from the claim or otherwise owned or possessed by the community or group may be sold, title encumbered, or be subject to any lien or similar instrument of restriction whatsoever for the purpose of providing funds to pay compensation to the attorney and other costs of litigating the claim or to reimburse outside individuals, groups, or institutions for litigation costs which they financed.

38. In a letter dated January 5, 1968, to the Area Tribal Operations Officer, Field Solicitor Richard A. Bradley stated, with regard to the proposed claims attorney contract between ASNA and Paul, that generally "it [is] improper to compensate the attorney for passage of legislation or for the action of departments of the government over which he has no control."

39. On January 8, 1968, BIA Acting Area Director R.E. McLean approved Frederick Paul's attorney contract, effective as of August 24, 1966, to extend for a period of 10 years.

40. BIA Tribal Operations Officer Peter Three Stars wrote to Hugh Nicholls, Executive Director of the Arctic Slope Native Association, on January 16, 1968, stating:

Congratulations for having achieved two important documents which will be of great benefit to your Association and its goals:

1. The Constitution and Bylaws, though not formally approved, has gained your Association recognition by the Commissioner of Indian Affairs.

2. The Claims Attorney Contract, No. 8EC1420C0032, between ASNA and Frederick Paul, approved January 8 by the Assistant Area Director.

41. 27 Fed.Reg. 11560 (1962) states, in part, "The Commissioner [of Indian Af-

fairs] may exercise the authority of the Secretary in relation to the following classes of matters:

\* \* \* \* \* \*

(f) The approval of attorney contracts with Indian tribes \* \* \* pursuant to 25 U.S.C. § 81, 82, 84 and 476."

42. 27 Fed.Reg. 11559 (1962) states, in part,

## ATTORNEY CONTRACTS

### Redelegation of Authority

Order 551 (16 F.R. 2939), as amended, is further amended by the addition of a new section under the heading "Functions Relating to Funds and Fiscal Matters," to read as follows:

Sec. 272. *Attorney contracts.* Except for those matters concerning proposed compromises and settlements of claims before the Indian Claims Commission and the Court of Claims, payment of fees and reimbursement of expenses from an award of the Indian Claims Commission and the Court of Claims, and directly related contracts with technical specialists, the approval of attorney contracts and other contracts with Indian tribes and the payment of fees and expenses thereunder pursuant to 25 U.S.C. 81, 82, and 84, and section 16 of the Act of June 18, 1934 (48 Stat. 984, as amended; 25 U.S.C. § 476).

43. In a letter dated February 26, 1968, the Commissioner of Indian Affairs requested that the Juneau Area Director inform Frederick Paul that the Department of the Interior did not recognize the ASNA as an Indian Tribe or band. The Commissioner's letter stated that the Department's January 8, 1968 letter of approval, "does not constitute recognition by the Bureau that the ASNA has authority to represent the claims of any particular Tribe, band, or community or to incur expenses under the contract on their behalf." The Commissioner reminded the Area Director that in the "memorandum of January 4 [, 1968] we advised you that we do not recognize ASNA as an entity in the sense of its being a tribe or band and that \* \* \* we know of no authority which permits representative contracts to be made under 25 U.S.C. § 81."

44. On March 1, 1968, the Juneau Area Director, Owen D. Morken, with the approval of the Tribal Operations Officer Peter Three Stars, the Field Solicitor Richard A. Bradley, and the Acting Area Director R.E. McLean, wrote the Commissioner stating "that the authority of the Commissioner under 25 U.S.C. § 81 which talks about 'agreement \* \* \* with any tribe of Indians' may not be, strictly speaking, applicable." Furthermore,

\* \* \* we call your attention to Bureau practices in the past where the Tlingit and Haidas were recognized as a tribe prior to the August 19, 1965 act which granted Congressional recognition to the Central Council of the Tlingit and Haida Indians of Alaska. The Bureau has dealt with and recognized the defacto Central Council as authorized to enter into claims attorney contracts prior to the 1965 act. It is this same recognition which was extended to the Arctic Slope Native Association.

We also believe that additional reasons exist for our approval of this contract. We believe the Secretary or the Commissioner have inherent authority to regulate and grant legitimacy of native groups if the groups are to protect themselves from the loss of their lands, and we believe that recognition of the Arctic Slope Native Association in this situation is desirable.

As you realize, the Arctic Slope Native Association is asserting an aboriginal claim and a claim for use and occupancy of all Eskimos residing east of Kotzebue and north of Fairbanks, an area of some 50 million acres.

45. Another interdepartmental communication concerning the Arctic Slope Native Association's claims attorney contract was a telephone call from the Tribal Operations Office in Washington, D.C., to the Juneau Tribal Operations Officer, Ray Peratrovich, instructing him to prepare a letter from the Area Director addressed to ASNA disap-

proving its claims attorney contract because of the lack of authority from the villages. Mr. Peratrovich refused to do so because he considered that the basis upon which he had previously recommended contract approval was legitimate.

46. In a letter dated April 8, 1968, to Richard A. Bradley, Field Solicitor, from Duard Barnes, Assistant Solicitor, Appeals and Litigation, it was reiterated "that since the Arctic Slope Native Association is not recognized as a tribe or band, the contract which it executed with Mr. Frederick Paul is not a tribal contract and therefore is not subject to 25 U.S.C. § 81." Assistant Solicitor Barnes continued,

> To prevent further erroneous approvals of attorney contracts entered into by unrecognized Alaska native associations, it is requested that you advise the Area Director's office of the contents of this memorandum and that your office give close scrutiny to any attorney contract submitted for your review to assure that approvals are limited to contracts which have been properly executed by recognized tribes, bands, or communities.

47. In a letter dated December 12, 1968, Acting Assistant Commissioner of the Bureau of Indian Affairs wrote to Frederick Paul stating that the Bureau of Indian Affairs considered the approval of his attorney contract of no effect insofar as it might bind or obligate either BIA or the Department of the Interior. The Acting Assistant Commissioner stated that "[i]t has long been the position of [BIA] that groups such as [ASNA] do not constitute a tribal unit within the meaning of 25 U.S.C. § 81."

48. The Department enclosed a new form of contract with its December 12, 1968, letter. The Department suggested that future contracts be made with each separate Arctic Slope village. The Department of the Interior's December 1968 recommended form of contract provided for an equitably determined contingent fee and "such compensation shall not exceed an amount computed on the basis of three times the usual hourly rates of attorneys."

49. After receiving the December 12, 1968 letter, Frederick Paul prepared individual attorney contracts with each of the villages comprising the Arctic Slope Native Association. Each of these contracts provided in part:

WITNESSETH:

The said Tribe does hereby reaffirm its portion of the contract between said attorney and the Arctic Slope Native Association which they in turn first executed on the 24th day of August, 1966 and re-executed on the 20th day of November, 1967 and which was approved by the authorized representative of the Department of the Interior bearing identification no. 8EC1420C0032 * * *. The Tribe believes the Arctic Slope Native Association is a tribal unit and reaffirms its desire to work on a regional basis with its sister villages.

In April, 1969, Paul travelled to the ASNA villages. Peter Three Stars, a BIA Tribal Operations Officer, accompanied Paul. All seven villages executed contracts. On June 27, 1969, Frederick Paul submitted six executed village contracts to the Fairbanks office of the Bureau of Indian Affairs.

50. Two days prior to these submissions, on June 25, 1969, Frederick Paul met with Ray Coulter, Deputy Solicitor, who advised Paul that the Solicitor's Office was preparing two forms of contract: a general counsel contract and a legislative contract. Paul was further advised that the Solicitor's Office would circulate these forms to the various counsel for comments and suggested revisions. Thereafter, the Department would produce a final draft which would then be submitted to the natives for execution. Paul agreed to this procedure.

Nevertheless, Paul informed the Deputy Solicitor that even though they were not in the form the Department desired, Paul was still going to submit his executed contracts. In a transmittal letter to the attention of Peter P. Three Stars, dated June 27, 1969, Paul submitted five completed contracts. A copy of this letter and two other contracts which Paul characterized as "somewhat abortive" were submitted to the Area Director, Juneau, via letter dated July 2,

1969. In a memorandum to the Assistant Secretary, Public Land Management, dated September 19, 1969, Earl D. Gross, Associate Solicitor, Indian Affairs, advised against approval of these contracts, noting that Deputy Solicitor Coulter advised Paul that his fee arrangement would not receive Departmental approval, and noting further that Paul indicated in his letter that he is aware of the defects in the instant contracts and does not expect them to be approved in their present form.

51. The 1968 Indian Civil Rights Act, Title VI, 25 U.S.C. § 1331, required the Department of the Interior to approve or disapprove a Section 81 contract within 90 days, or the contract would be deemed approved by the operation of law. On September 24, 1969, Assistant Secretary of the Interior Harrison Loesch telegraphed Frederick Paul to inform him that all seven contracts submitted were disapproved.

52. In a letter dated February 6, 1970, Assistant Secretary Loesch explained the reasons for disapproval:

> These contracts were disapproved because the Department has concluded it would be inappropriate to approve tribal attorney contracts which provide as a fee a percentage of any settlement which is made with the Alaska natives for their claims to lands. Instead, since it appears there will be a legislative rather than judicial resolution of these claims, we have decided to give approval only to attorney fees which are proper for legal services performed in connection with proposed legislation before the congress. For that kind of legal representation for the Alaska Natives we find that only an hourly fee is acceptable.

The Assistant Secretary suggested that the contract be rewritten to provide for a fee based upon Paul's customary hourly rate of compensation. The contract was not rewritten.

53. Organized Native protest of State land, began in 1961. "When the first of the pending Native claims was filed, by the Bureau of Indian Affairs on October 3, 1961, for approximately 207,300 acres of land in the Minto area in opposition to a State land selection, it was soon followed by BIA protests to state selections in the areas of Northway, Tanacross and Lake Aleknagik, "totaling approximately 5,860,-000 acres and conflicting with 1,750,000 acres of state selections."

54. "In 1961, the Land Office Manager received from the natives of Tanacross a protest to the allowance of certain State selection, stating that the selections were on lands used by them and their ancestors in 'following their way of life', and that allowance of the selection would, in effect be infringing upon their livelihood. The Land Office Manager rejected the protests. The decision was appealed to the Director, Bureau of Land Management. Upon receipt of the appeal, the then Assistant Secretary requested that all Native protests be referred to his office."

55. The state director of the Bureau of Land Management for Alaska was instructed in December, 1961, to dismiss the protests unless the claims were within the definition of regulations which provided that: "lands occupied by Indians, Aleuts, and Eskimos, in good faith are not subject to entry or appropriation by others." An opinion of the regional solicitor for the Department of the Interior was given on February 20, 1962, asserting that the issues raised involved the fact of "Indian title" and that a determination of the facts must be made; managers were instructed not to adjudicate protests of this type. The Opinion concluded with the suggestion that the protests be dismissed on jurisdictional grounds in that the only occupancy authorized to be recognized in the regulations of the Bureau of Land Management was that leading to the issuance of allotments under the Alaska Native Allotment Act.

56. In 1962 a number of the protests were dismissed and subsequently appealed to the Director of the Bureau of Land Management, where they remained pending until the passage of the Alaska Native Claims Settlement Act in 1971.

57. The seriousness of the existence of these protests to the program of the State of Alaska for orderly land selection was

pointed out in a memorandum of February 7, 1962, from the Chairman of the Alaska Field Committee to the Director of the Resources Program Staff which made reference to a communication on the same subject from the State Director of the Bureau of Land Management of December 1, 1961. The Field Committee Chairman quoted minutes of the Committee of December 14, 1961, as follows:

"The largest single problem confronting BLM in Alaska today and possibly the Department, is that relating to Native possessory claims in Alaska. The BIA is currently filing on behalf of Native villages and tribes protests against State selections made in four major areas of Alaska."

58. "Since that time additional protests [were] submitted to the Bureau of Land Management field offices, usually through the BIA, on behalf of the natives to the Director, and have been transmitted along with reports to the Assistant Secretary."

59. As of March 1, 1965, Art Lazarus, Attorney for the Association on American Indian Affairs, Inc., had requested Newton Edwards, Staff Assistant to the Assistant Secretary, Public Land Management, to arrange for the establishment of procedure or notifying Alaska Natives of applications to the Bureau of Land Management in areas that the Natives might want to claim as theirs.

60. As of March 14, 1965, Bureau of Land Management records showed that 16,-990,568 acres had been protested by Natives.

61. As of April 16, 1965, William Byler, Executive Director, Association on American Indian Affairs, and Art Lazarus had both requested Kenneth Holm, Under Secretary of the Interior, to make arrangements for Alaska Natives to be notified when there were land filings for public domain which the natives might be using and occupying.

62. As of April 30, 1965, Bureau of Land Management records showed Alaska had selected 16,174,279 acres, of which

3,249,917 acres had been protested by the Natives.

63. On July 2, 1965, John A. Carver, Jr., Under Secretary of the Department of Interior, acknowledged to Governor William A. Egan of Alaska, that "the 1884 Organic Act and the Statehood Act reserved use and occupancy rights to Alaska Natives, but that provision had not been made by Congress for them to obtain an ownership interest in the land." As of this date, "[a] considerable portion of the lands the State of Alaska [had] selected under the statehood Act [had] been protested by Alaska Natives as lands they use and occupy[.]"

64. On September 21, 1965, Under Secretary Carver held a conference on Alaska Native land problems attended by representatives of the Bureau of Land Management (BLM), Bureau of Indian Affairs (BIA), Solicitor's Office, and the Office of the Assistant Secretary, Public Land Management. Among the conclusions reached was the assignment to BIA of the primary responsibility for future development of a legislative proposal granting title to agreed upon Native used and occupied lands. In his October 6, 1965 memorandum to Under Secretary Carver, marked *"ADMINISTRATIVELY CONFIDENTIAL"*, Newton W. Edwards, Staff Assistant to the Assistant Secretary, Public Land Management, noted that discussion during this conference indicated that "[s]uch legislation should permanently close the books on Native land claims in the area[,] in consideration of the land being received and the special Federal services that have and will be received."

65. In an earlier memorandum to Under Secretary Carver, dated September 22, 1965, it was recommended that once agreement was reached between the Natives and the State "as to lands properly belonging to the Natives[,] follow-up legislation could be sought giving the group of Indians fee title to the land. Trust title and reservations would not be necessary * * *."

66. On December 20, 1965, Alaska Senators E.L. (Bob) Bartlett and Ernest Gruening, Alaska Governor William A. Egan, and Robert Bennett, Deputy Commissioner of

the BIA, met with and at the request of Peter John, President of Minto Village, and William Byler, Executive Director of the Association of American Indian Affairs, to consider a proposal relating to Native land claims in Alaska by the Association on American Indian Affairs. "After considerable discussion, it was agreed that no further action would be taken pending a full and complete report from the State of Alaska on its position."

67. On January 18, 1966, William Paul, Sr., filed on behalf of ASNA what was finally acknowledged on May 10, 1966, as a formal protest to all claims covering the northernmost portion of Alaska, comprising approximately 56,000,000 acres. In response, the Fairbanks District and Land Office was instructed to proceed on a normal basis.

68. Prior to May 19, 1966, a proposed draft bill authorizing the Secretary to convey fee title to natives to land they used and occupied has been developed jointly by BLM and BIA. The draft did not have agreement on the key question of the extent to which native groups would receive land being used for their hunting, fishing, and trapping livelihood. The draft bill was one of five legislative alternatives being considered along with administrative and judicial alternatives by the Department of the Interior at that time.

69. As of May 24, 1966, the most recent assertions of rights by Natives other than ASNA were from the Anaktuvuk Pass, File–035252, Huslia, Hughes and Allaket, File F–035268, and Kaltag, Nulalo and Kogukuk, File–035271.

70. On June 1, 1966, the Alaska Congressional Delegation conferred with BIA, BLM, and the Assistant Secretary, Public Land Management, regarding legislative resolution of Alaska Native land problems.

71. On August 13, 1966, Stewart L. Udall, Secretary of the Interior, notified Alaska Senator Ernest Gruening of the Department's intent to initiate new discussions with Alaska State Government Officials and Native leaders produce consensus legislation on the native land claims issue.

72. On November 16, 1966, the Department of the Interior acknowledged its concern for the land claims and rights of the natives of Alaska in a letter from Harry R. Anderson, Assistant Secretary of the Interior, to William Byler, Executive Director, Association on American Indian Affairs, when assurance was given that no final action would be taken on any applications filed within areas where native claims and protests had been filed. On November 25, 1966, Robert E. Vaughn, Deputy Assistant Secretary of the Interior sent Fred Paul and Hugh Nicholls a similar letter.

73. The State of Alaska, under the Statehood Act, selected approximately 2,050,000 acres on the North Slope adjacent to Naval Petroleum Reserve No. 4, including the area of Prudhoe Bay. On September 11, 1969, the State of Alaska sold oil rights to 412,000 acres within the selected land on non-recourse for leases for more than $900,000,000.

74. On January 5, 1966, Charles Edwardsen, Jr., informed William Paul, Sr., that "[i]t [could] be factually shown that [Eskimo] ancestors [had] historically used this entire area for the past 5,000 years for hunting and fishing." Further, "[i]t [could] also be shown that from time immemorial, they [had] made use of the pitch and coal of the area and that the mineral deposits of the lower slope of the Brooks Range were also known to them in that they used raw gold to make small toys and fish hooks for their use."

75. On or about April 13, 1966, Frederick Paul began requesting that anthropological data on the North Slope and the economy, habits, and lifestyle of the Inupiat be assembled. Paul sought this information for the purpose of demonstrating the Inupiats' continued occupancy, use and domination of the land. Paul prepared a questionnaire regarding use and occupancy for ASNA to use in collecting evidence. At Paul's direction, Hugh Nicholls, then Executive Director of the ASNA, conducted numerous recorded interviews and prepared a map of the North Slope to mark hunting trails, fishing camps, hunting cabins and alike as further evidence of domination.

This map was presented to the Senate Interior Committee in hearings in Anchorage, Alaska in February 1968.

76. As of July 27, 1967 the Eskimos were in the process of reducing a great mass of information on tape recordings, and they were going to rehearsals of place names, uses of area, and usufructs. Paul had certain misgivings about releasing the information in raw form.

77. In April 1966, Paul prepared letters placing the oil companies involved in North Slope exploration on notice of the Inupiat claim to North Slope lands. These letters were sent to Humble Oil and Refining Company, Atlantic Refining Company, Sinclair, British Petroleum, Richfield and Colorado Oil and Gas. Paul proposed to meet with legal counsel for each of the oil companies to discuss the possibility of an agreement between the companies and the Inupiat that would permit exploration to go forward, while at the same time providing at least some royalties to the Inupiat. Four of the six companies responded and expressed their view that the Inupiat possessed no cognizable aboriginal rights.

78. On October 21, 1966, Frederick Paul was in attendance at a Statewide Native Conference where William Bennett, Commissioner of the Bureau of Indian Affairs announced that a legislative proposal would be developed for Congress regarding Native rights to land in Alaska. Commissioner Bennett stated that his purpose in being at the Statewide Native Conference was to obtain ideas and suggestions for the development of such a legislative proposal.

79. On September 23, 1966, the Department of the Interior issued a "Notice of Filing of Protraction Diagrams for Northern Alaska and of Availability of Lands for Non–Competitive Oil and Gas Leasing." 31 Fed.Reg. 12575. The notice solicited offers to lease oil and gas properties covering 4.5 million acres on the North Slope of Alaska, including lands claimed by the Inupiat as aboriginally held. The department's proposed action was commonly known as the Point Hope lease sale. On September 28, 29 and October 13, 1966,

Frederick Paul prepared three letters to the Secretary of the Interior, Stewart Udall, protesting the proposal for leasing and asserting the Inupiat claims to the area, as well as the doctrine of aboriginal title.

80. On September 28, 1966, Hugh Nicholls, Executive Director, ASNA filed a pro se petition for an injunction against BLM "to prohibit them from any further selling, leasing or subletting or in any way of further disposing of the land, resources, of the revenue from said land, resources, or the exploratory rights to, or any other interest derived from said land" to which William L. Paul, Sr., had on January 18, 1966, filed a claim of protest and an assertion of rights.

81. As of October 4, 1966, Frederick Paul was unaware that this suit had actually been filed in court. In a letter to Hugh Nicholls, Paul counseled against filing such a suit at that time stating that "courts are simply too cumbersome for an Indian-type case", that ASNA could not then fund such a lawsuit, and that they should pursue administrative agencies instead of courts because "the Secretary [was] not going to deny all Indian claims," but Paul had "seen courts do so." Paul questioned whether an injunction against further disposition of the area claimed by ASNA would assist ASNA in negotiating with oil companies for money to fund its legal and administrative efforts. Finally, Paul told Nicholls that "[i]t is well known that the Department of Justice is absolutely and unalterably opposed to Indian rights."

82. In an October 13, 1966 letter, Paul informed the Department of the Interior that he was dismissing on behalf of his clients an action for injunctive relief filed in the United States District Court District of Alaska by Hugh Nicholls, a non-attorney and the Executive Director of the Arctic Slope Native Association on September 28, 1966. Paul advised his clients that lawsuit was tactically unwise at that time given ASNA's financial inability to pursue such a lawsuit and the need to explore and exhaust administrative remedies with the Department of the Interior. As counsel for

ASNA, Paul eventually moved for a voluntarily dismissal of the suit without prejudice.

83. Before Hugh Nicholls Petition for Injunction was dismissed, Thomas J. Cavanaugh, Associate Solicitor for Public Lands, contacted the Assistant Director, Land and Minerals, BLM, November 8, 1966, regarding Hugh Nicholls' Petition for Injunction, advising that if the plaintiffs wish to press the action they will probably amend it to seek injunctive relief against the Secretary and other Department Officials. On the same day, the Associate Solicitor also contacted Edwin L. Weise, Jr., Assistant Attorney General, Land and Natural Resources Division, Department of Justice and "advised that BLM [had] instructed their Alaska field office to suspend the issuance of oil and gas leases pursuant to the opening of Arctic Slope lands announced in the *Federal Register* of September 23, 1966 (31 F.R. 12575). Under this notice simultaneous filings for such leases [were] being received until November 18, 1966. The Bureau's instructions [would] permit a drawing to establish priorities, but issuance of leases to the successful drawers [would] be suspended at least until the pending litigation [had] been terminated.

84. On April 22, 1966, the Field Solicitor, Juneau, suggested to the Area Tribal Operations Officer, Peratrovich, that Frederick Paul should contact the Association on American Indian Affairs to see if they might underwrite his expenses.

85. On September 29, 1966 Frederick Paul wrote to the Association on American Indian Affairs, seeking financing.

86. Paul wrote to the Association on American Indian Affairs again on October 13, 1966 and informed them "that the Secretary of the Interior propose[d] to lease several hundred square miles or Eskimo aboriginally held lands on November 18th." Paul advised that "it would be a lot easier to prevent this happening by way of an injunction than to undo it once it has been done."

87. On October 24, 1966, Paul wrote directly to William Byler, Executive Director, Association on American Indian Affairs, stating that he has asked the people of ASNA to collect cultural data and asking for AAIA's help. In addition Paul states, among other things, "[w]e have already asked your help on our postponement efforts. Please keep me and ASNA informed."

88. In a letter dated October 27, 1966, Hugh Nicholls tells Paul that he came to an agreement with William Byler, Executive Director of the American Association on Indian Affairs, and Dr. O'Conners, in which they will commit themselves and their money to a pool of attorneys if it is necessary to go to court. The pool of attorneys consisted of:

| | |
|---|---|
| Clifford Groves | Tyonek |
| Frederick Paul | A.S.N.A., Fbks., N.A. |
| Stan McCutcheon | Tyonek, etc. |
| Herb Soil | Cook Inlet |
| Conner | Aleutians, Pribiloffs |
| Lazarus | A.S.N.A., Amer. Indians |
| Boggis | A.S.N.A. & Fbks. (Not yet under Contract) |
| Stepovich | A.S.N.A. & Fbks. |

89. On October 28, 1966, the Tlingit and Haida Indians of Alaska filed an ownership claim and a protest against any selection by the State of Alaska of 2,600,000 acres of land located in southeast Alaska and outside their formerly recognized boundaries.

90. On October 18–21, 1966, various leaders and representatives of Alaska Native groups and their attorneys, including Paul, attended a statewide Native conference. Also in attendance were various state and federal officials, including "Senator Gruening who was asked whether he would be willing to call the Secretary of Interior and ask to oppose the planned oil and gas sales in the Arctic Slope, and the Senator agreed he would do so." On the same day (October 21, 1966) "Mr. Hugh Nicholls * * * asked to have read into the record the following telegram addressed to Stewart Udall, Secretary of the Interior, Washington, D.C., quote:

At the meeting of the Statewide Native Conference held in Anchorage, October 20 and 21, I was requested to send you the following telegram:

Respectfully, request postponement of Federal Registered Notice Page 125755, September 22, 1966, relating to availability for leasing for oil and gas for 4½ billion acres on the Arctic North Slope. To allow time to develop an equitable method for the protection of the Eskimos of that Area.

Senator Ernest Gruening
United States Senator, Alaska

91. In a letter dated November 11, 1966, Hugh Nicholls tells Paul that he has not received word from the Secretary of the Interior regarding the Point Hope lease sale. In addition, Nicholls tells Paul that "[m]aybe we were wrong in taking our suit out of court at the time we did. * * * It is obvious that Udall will not negotiate with us in any way, and we now have only *seven* days within which to get any sort of injunction. * * * [W]e must now make a move quickly."

92. The Point Hope lease sale was scheduled to take place on November 18, 1966. Having received no response from the Secretary of the Interior by November 11, Paul prepared a Protest and Notice Adverse Interest with respect to the lands covered by the sale. Hugh Nicholls, unaware that William Byler had already received word that no final action would be taken on the sale, filed the protest unnecessarily with the Bureau of Land Management on November 17, 1966. Paul had prepared the protest for the purpose of invoking the administrative procedures that would delay the ultimate sale.

93. In a letter dated November 29, 1966, William Byler, Executive Director, Association on American Indian Affairs, wrote to Hugh Nicholls, Executive Director, ASNA:

I am enclosing a copy of the letter from Harry R. Anderson, Assistant Secretary of the Interior, dated November 16 in response to my telegram of November 7 regarding the North Slope leasing.

It is in response to this telegram that final action on the leases has been postponed by the Department of Interior.

The Department did not regard previous communications on the subject as providing an acceptable basis on which to withhold final action. Further it considered Senator Gruening's communication as a transmittal and not as his endorsement of your protest.

You will note that our protest was based not on the substantive issue—assertion of aboriginal land rights—but on the procedural point that a postponement of the leasing would be in aid of Native land rights legislation.

The letter sent to William Byler from Harry R. Anderson states in pertinent part:

I am personally concerned, as are the Bureau of Land Management and the Bureau of Indian Affairs, with the matter of land claims and rights of the natives of Alaska to which you refer in your telegram of November 7.

Although lease offers will be accepted for the lands listed in the Federal Register Notice of September 23, 1966 and drawings will be held to determine priorities for any tracts for which multiple offers are received, no final action will be taken on any applications filed with areas where Native claims and protests against other dispositions have been recorded until the matter has been given further consideration.

We recognized the urgency of the problem regarding native claims and that the interest of the State of Alaska and all of its citizens "can only" be adversely affected by delay. The matter, however, is complex and careful consideration must be given to it. We appreciate your interest and will cooperate to the fullest extent with all interests in an endeavor to reach an equitable settlement of Alaska land claims.

94. On November 25, 1966, Robert E. Vaughn, Deputy Assistant Secretary of the Interior sent Hugh Nicholls and Paul each essentially the same letter as the Assistant Secretary of the Interior sent to William Byler on November 16.

95. The Department of the Interior's disposition of the Point Hope lease sale issue became known as the "informal land

freeze," under which the Department stated that no final action would be taken on any applications filed within areas where Native Claims and Protests had been filed until the matter had been given further consideration. Senate Report No. 91–925 (June 11, 1970) described the adoption of the land freeze as follows:

In September, 1966 the Bureau of Land Management announced the opening of large blocks of land on the North Slope of the Brooks Range for oil and gas leasing. This action was protested by Native groups and resulted in Secretary Udall announcing in November, 1966 that lease issuances would be suspended pending further consideration of the protests.

96. In a September 22, 1967 letter from the Secretary of the Interior, Stewart Udall, to Frederick Paul, Udall wrote:

The Secretary of the Interior is in the difficult position of having to administer the several laws which contemplate various dispositions of Alaska lands, while, at the same time, having to observe the admonition of Congress not to disturb the natives in possession of lands claimed by them pending its determination of what titles it will recognize. He finds himself in the position of one who has been commissioned to preside over the cutting and division of a Pie while forbidden to disturb a undefined piece of unknown size.

I am keenly aware that the present situation is intolerable and, while I can understand the need of those who are caught in it and to vent their frustrations on someone, it is gratifying to know that there are some people who appreciate that it is neither of my making or within my power to remedy. The problem has now been placed before Congress where it must be resolved. I have every hope that it will be addressed very soon and that it will be disposed in a way which accommodates the legitimate interests of all Alaskans.

97. Throughout the remainder of his time in office, Secretary Udall maintained the "informal land freeze" pending the resolution of Alaskan Native Land Claims. On January 17, 1969, Secretary Udall withdrew unreserved Alaska lands, pending Congressional determination and protection of the rights of the Native Aleuts, Eskimos and Indians of Alaska. The formal notice of withdrawal was published as Public Land Order 4582, 34 Fed.Reg. 1025, on January 23, 1969. This so-called "formal land freeze" was continued until the passage of the Alaska Native Claims Act in 1971.

98. On October 18, 1966 a convention of Alaskan Native leaders was held in Anchorage, Alaska. More than 150 Native leaders had gathered from throughout Alaska. Paul was appointed to the conference's land committee along with two Alaska lawyers, Clifford Groh and Stanley McCutcheon. William Byler, executive director of the Association of American Indian Affairs and Hugh Nicholls were also appointed to the committee. The Land Committee discussed a proposed bill drafted by Mr. McCutcheon and Mr. Groh which would, in effect, extend the Indian Claims Commission Act to Alaska. At Paul's suggestion, the proposed bill, known as the "Anchorage" bill, was amended to include language "giving the Court of Claims authority to define the area of presently owned lands and to issue a judgement defining such area." Alaska Senator Ernest Gruening said "that the legislation as proposed is such that he could, and would support, and that every effort would be made to resolve the problem that has existed for over 82 years."

99. At the Statewide Native Conference, Mr. Robert Peratrovich, President of the Tlingit–Haida Group of Anchorage, was called on to make a brief presentation. Mr. Peratrovich addressed the group and pointed out that from 1935 to 1949 he was the secretary of the Klawock ANB Group and as such became familiar with their land claim. He stated that in 1935 a claim was brought against the United States Government. Last month Mr. Peratrovich was advised that there had been an award of a little over fifteen million dollars which was far less

than what had been expected in terms of the vast amount of land and the value of land encompassed by the claim. Mr. Peratrovich pointed out that this demonstrated to a certain extent some of the problems faced by Alaskan Natives in connection with property rights. He reviewed some of the history, pointing out the Act of May 17, 1884 which recognized the Ancestral Rights of Natives to their land in terms of their actual use and occupancy, and that subsequently various acts of Congress have recognized and respected these rights. Mr. Peratrovich reminded the conference that early in the 20th Century Governor Bradley and Secretary of Interior Hitchcock made clear that Native Alaskans were not citizens or aliens they were not even considered Indians and that laws affecting Indians did not apply to the Indians in Alaska. There were many reasons given why the Natives were unable to secure little to land in Alaska including the lack of surveys, and the lack of administrative capacity on the part of the Department of Interior to make the title available to them. Mr. Peratrovich emphasized that no matter what the forms of restrictions the government put on, these restrictions have not extinguished the rights of the Native to the land which the Native may claim.

He recommended that the Native Conference make a united stand on this one policy that the Federal Government has not extinguished the claims of Native people, to the lands that we people, and our ancestors have used and occupied.

100. "indicated that the State had been the recipient of a Federal Grant of $362,000 to provide legal services for all citizens of Alaska who can't afford the services of a private lawyer. There is a thirteen man board, five members of the board are Natives. The intent of the program is to have six offices in the State be located at Ketchikan, Juneau, Anchorage, Fairbanks, Bethel, and Nome. Bethel and Nome probably will not have full time lawyers in the beginning. The program is designed to bring legal services to the graphs work level, and to make attorneys available in the villages. Something which has never been available before. The type of services that are under consideration are quite varied including such things as divorce, adoption, land claim problem, dispute with State Welfare people, Bureau of Indian Affairs, and things of this sort. The intent of the program is to start out with nine lawyers on the statewide basis."

101. The Alaska Legal Services Corporation filed an action seeking an injunction against the Alaskan Oil Pipeline on behalf of the villages of the Interior. This suit was successful and the injunction against the oil companies remained in force until the enactment of ANCSA.

102. Walter J. Hickel became governor of Alaska in January, 1967. He held a conference of Native leaders, in Juneau on January 17, 1967. Frederick Paul attended the conference on behalf of his clients.

103. On February 10, 1967, the state of Alaska filed an action in the U.S. District Court in Anchorage, Civil No. A–21–67 entitled *The State of Alaska v. Stewart Udall.* The purpose of the suit was to require the Secretary of the Interior to issue a patent to the state of Alaska for state-selected lands in the vicinity of Nenana, Alaska. Paul advised ASNA not to intervene in the case, because the state of Alaska had chosen for its test case the Nenana area near Fairbanks. Because the Fairbanks area had been widely explored during the 1900 Alaska gold rush, Paul believed that issues of abandonment and current occupancy could adversely affect the outcome of the aboriginal rights claims because the Natives' proof of use and occupying might not be sufficiently established. Paul also believed that such an intervention would be prohibitively expensive without a "war chest." Paul urged attorneys for other Native groups to decline to intervene so that the case would not be converted into a test case.

104. Despite Paul's urging, Barry Jackson, attorney for a number of Indian organizations, intervened in the case *State of*

*Alaska v. Udall* on behalf of the Natives of Nenana.

105. \* \* \* the United States Court of Appeals for the Ninth Circuit decided *State of Alaska v. Udall*, 420 F.2d 938 (December 19, 1969); *cert. den.*, which involved the "land freeze" imposed by the Department of the Interior to preserve the *status quo* pending settlement of Natives' aboriginal land claims. The State sought by the litigation to compel the Secretary of the Interior to issue a patent for a tract of selected public land which had received tentative approval and to compel the Secretary to tentatively approve its selection of another tract. Arguing similarly to the arguments it presented to the Committee, the State contended that the Statehood Act vested selection rights absolutely in the State regardless of Natives' claims of aboriginal occupancy. The United States District Court for the District of Alaska agreed with the State's theory and granted the State's motion for summary judgment. Upon appeal, the District Court's judgment was reversed.

The Ninth Circuit Court of Appeals held that the State's selection rights could not attach until the natives' claim of aboriginal title had been adjudicated. Consequently, the court held that summary judgment should not have been granted. "The only escape from this conclusion," said the Court of Appeals, "is to hold that under no circumstances could Indian trapping, hunting and camping \* \* \* constitute a condition which would deprive the selected lands of the status of being 'vacant, unappropriated and unreserved'. We are unwilling to so hold.".

It is apparent from this holding by the Ninth Circuit Court of Appeals that Alaska's selection rights under section 6 of the Statehood Act are subordinated to a determination of the Natives' aboriginal land rights. The decision strongly supports the Committee's conclusion that the Congress, by reason of section 4 of the Statehood Act, retained its full jurisdiction with respect to lands in Alaska which are claimed by the Natives and that this jurisdiction may be exercised by providing for revenue sharing for the benefit of the Natives in respect of all such lands.

106. According to his own records, Paul attended the Alaska Federation of Natives (AFN) Board meeting on June 30 and July 1–2, 1967.

107. On December 4, 1967, Paul articulated the ASNA's position to the governor and his staff. Paul provided factual information and legal analysis to Victor Fisher, director of the Institute of Social Economic and Government Research at the University of Alaska. Some of Paul's comments were incorporated in the Institute's publication, *Native Land Claims*, published in November of 1967. According to Paul's records, Paul sent this same information and legal analysis to the Alaska Federation of Natives Board of Directors, the members of the state legislature, and members of the United States House and Senate Interior committees.

108. In late 1965, various legislative and administrative proposals began to be made within the Department of the Interior and by Indian Organizations for resolution of the Native claims issues. S.2020 and HR 11164, were bills proposed by the Alaska Native Chiefs which Paul requested Howard Pollock, Alaska's sole Congressman, to introduce even though Pollock had advised Paul that the bill did not stand a chance. Paul responded that they should be introduced because it would set forth the native viewpoint and be consolidated for hearing purposes with the administration bill. According to Paul's records, Paul attended Task Force meetings on November 17–22, 1967, in Anchorage with Secretary Udall and his staff. The members of the Task Force were charged with reviewing, evaluating and preparing legislative proposals. For example, Secretary Udall proposed allocating to the Natives revenues derived from oil and gas leases on the federally-owned Outer Continental Shelf in waters adjacent to Alaska outside the three-mile limit. Paul supported the idea of regional Native Corporations and main-

tained that regional corporations would be superior to village corporations in managing the settlement proceeds.

109. Paul solicited funds from church and social groups to pay the expenses of ASNA leaders in attending hearings and meetings, and to support lobbying efforts. Paul sought funds or prepared grant applications to the Ford Foundation, the Hazen Foundation, the National Endowment for the Humanities, and the Presbyterian Church, among others.

110. In 1967, Paul began to contact Washington D.C. law firms with expertise in Indian law. Paul sought to associate a suitable law firm with experience in legislative representation in anticipation of legislative action on Native land claims bills.

111. In January of 1968, the United States Court of Claims issued its second Tlingit and Haida decision concerning aboriginal rights in southeast Alaska. *Tlingit and Haida Indians v. United States*, 389 F.2d 778 (Ct.Cl.1968). This case held that aboriginal title had not been extinguished to an area of 2.6 million acres. Paul did not participate in this phase of the case. Paul prepared letters to the attorneys for other Alaskan regional groups, the Alaskan Federation of Natives, and his own client, explaining his view of significance of this decision.

112. The United States Senate Interior Committee held hearings on S. 2906, S.1964, S.2690 and S.2020 on February 8–10, 1968 in Anchorage. Six Inupiat witnesses testified before the committee.

113. The Senate Committee heard a range of testimony with respect to Native land rights. Alaska Governor Walter Hickel testified against the land freeze. George Moerlein, a representative of the Alaska Miner's Association, testified:

I submit to you that neither the United States, the State of Alaska, nor any of us here gathered as individuals owe the Natives one acre of ground or one cent of the taxpayer's money * * *.

Paul submitted his prepared statement to the Committee which stated, in part:

We can and will sue to enjoin further encroachments, and here is the blue print.

There are those who misread the Tee–Hit–Ton case and assert from the language of the Supreme Court that aboriginal rights have no dignity in the law. It is true that in judging the full extent of Congressional power over aboriginal rights, aside from its political and moral inhibitions the Tee–Hit–Ton case tells us that the Congress can do as it pleases. But each case has to be read in the context of its own facts and the context there was the Indian versus the Federal Government. This is a wholly different problem than the Indians versus their parties, including the State of Alaska. Just because the Congress can do something does not mean that private persons or the state can.

Senator Lee Metcalf stated:

Senator Metcalf. I think a strong point that has been made here is that we have a different situation than we have had in some of these other cases, especially on this northern slope in accordance with the testimony that we had. There has never been a taking. There is the same occupancy that there has been at all times. We do not have an analogous situation as you pointed out when you incorporated the national forest * * *. These people are using, occupying, hunting and fishing over this northern slope just as they have been for the last two thousand years. So it seems as if you have a stronger claim if the time of taking is now or if there has not been taking yet.

114. Alaska business interests and Governor Hickel's administration opposed the land freeze. According to Paul's records, Paul represented his clients' views in meetings with State officials in Juneau on February 25–27, at the Alaska Federation of Natives Convention on October 2–6 in Fairbanks, and at the Tlingit–Haida Central Council Meeting on November 8–10 in Juneau.

115. Paul wrote on July 24, 1968 to the Board of Directors of the Alaska Federation of Natives:

But none of us, and I include myself, has the ability to lobby a bill through Congress. This is not a criticism of any of us. It is merely recognition of the fact. I am not saying that a lobbyist in Washington, D.C. to coordinate all our efforts should be without our assistance. He cannot supply the local color nor can he speak from the bottom of his heart the way we can.

* * * Already our national drive has been delayed many, many months. The Udall land freeze is now almost two years old; and our national campaign essentially is nothing. Even if we were to hire a qualified person, it will take him many months to digest the material and get his campaign underway. Let's move toward a professionally managed endeavor.

116. Paul counseled his clients at the Alaska Federation of Natives Convention in October, 1968. Paul advised his clients as to the nature and strength of their legal position and how it might be used in working with other Alaska Native groups, the Congress, and the State of Alaska.

117. In late 1968, ASNA's Board of Directors passed a resolution, condemning the legislative proposals and withdrawing from the Alaska Federation of Natives because the proposed distribution of the settlement would be on the basis of population rather than on the basis of the land claimed by each Native group. Paul agreed that the distribution of the settlement should be based on the land claimed by the respective Native groups. Paul travelled to Alaska to meet with his clients in Anchorage, Barrow and Fairbanks on December 8–14, 1968. Paul wrote to Eben Hopson, then Executive Director of ASNA, on November 22, 1968:

As I indicated in my general letter, we simply have to have a united front for the Congress. We have to achieve an agreement amongst the other groups. We cannot go it alone. Perhaps these are bitter words to you and I agree: they are better to me, but those are the facts of life. We have a problem and we have to solve it. I insist that we enter into a dialogue with the other groups. When I get to Barrow, we can have a broad discussion with the entire Board and perhaps in a general meeting of all of the Arctic Slope people on our over all strategy. But in the meantime, I want you to encourage a dialogue with the other groups. As to this, I have never been more earnest in anything in my life.

Unable to resolve its differences with the AFN, the ASNA ultimately withdrew from that organization on October 20, 1970.

118. Paul continued to solicit funds from charitable organizations to support ASNA's activities in 1968.

119. President Richard Nixon announced his appointment of Walter J. Hickel as Secretary of the Interior on December 12, 1968. Almost immediately after his appointment was announced, Governor Hickel stated his intention to remove the land freeze imposed by Secretary Udall. Ultimately, Governor Hickel continued imposition of the land freeze for two more years.

Following Hickel's confirmation as Secretary, Paul continued to provide information regarding ASNA's position to the Department of Interior and to lobby Secretary Hickel for a favorable result. According to Paul's records, Paul prepared statements of his clients' policy position with respect to Governor Hickel's confirmation.

120. On February 11, 1969, the Trans–Alaska Pipeline System, a consortium of subsidiaries of Atlantic Richfield Oil Company, British Petroleum Company and Standard Oil Company of New Jersey, announced plans to build a $900 million pipeline to move Arctic Slope oil to the ice-free port at Valdez, Alaska. The Alaska Legal Services Corporation successfully enjoined the construction of this pipeline until the enactment of ANCSA. Paul gathered information regarding the pipeline and its environmental impact in order to advise his clients accordingly.

121. On February 20, 1969, the Federal Field Committee for Development Planning in Alaska, ("FFC") a group established by Senator Henry Jackson, released its massive study, *Alaska Natives and the Land.* Paul traveled to Juneau, Alaska on February 25 to join the committee's meeting with the Governor's Native Claims Task Force. The Federal Field Committee's "preferred alternative" for a settlement was to provide the Natives a 10 percent share of revenue income from all public domain lands over a 10–year period, with a ceiling of $100 million in any one year. Paul objected to the FFC's preferred alternative which contained little provision for land grants to the Natives, transferring only the surface rights to 23,000 acres to each Native village. Paul also objected to the establishment of an Alaskan Native Development Corporation, administered by a Board of Directors, a majority of whom would be appointed by the President and who would be non-Natives. Finally, Paul objected to the absence of a guaranteed $100 million annual payments in the plan which could be reduced or eliminated by action of the Federal Government. Paul prepared written objections to the FFC proposal which he sent to his clients, to other Native groups, to State and federal legislators and to the *Tundra Times,* an Alaskan newspaper distributed on the North Slope, which carried the article.

122. Paul advised his clients to support the adoption of the Federal Field Committee's alternate recommendation that four sections of each township be awarded to the Native people along with mineral rights. This recommendation was also published in the *Tundra Times.*

123. According to Paul's records, Paul traveled to Anchorage, Alaska on March 27, 1969. Paul then proceeded Barrow and other Native villages on the North Slope to report on the Native land claims settlement proposals, his proposal for a North Slope Borough, and to present attorney contracts.

124. On April 27, 1969, Paul traveled to Washington, D.C. to attend hearings before the United States Senate Interior Committee. Paul and a few other regional counsel wrote to Goldberg, complaining about Goldberg's unwillingness to coordinate with and seek input from regional counsel. Paul stated to Justice Goldberg, in part, "It is as if we were incompetent to express worth while ideas, and not worthy of you[ ] or your staff's time. * * * I cannot believe that your background or your staff's is sufficiently expert[ ] to assay the rights of my clients to the exclusion of some six or seven lawyers who have spent many years studying this problem. * * * I am at a loss as to how to proceed until a better method of cooperation is established between you and us." Citing disunity among the regional counsel, Goldberg withdrew from his representation of AFN. Paul made a trip to Anchorage on May 14, 1969. He prepared a press release for the Arctic Slope Native Association regretting Justice Goldberg's resignation but emphasizing importance of the aboriginal title issue on which the Native claims struggle was based. The release stated, in part, "However, we have no doubt that his thinking and ours was not attuned, and we only wish that we had been able to strike an understanding before he found it necessary to resign. * * * Consequently, the departure of Mr. Goldberg can only return our efforts to the proper course and re-emphasize the conviction we hold for our position." Despite these problems, Justice Goldberg and Ramsey Clark, the retiring United States Attorney General, later resumed their representation of the Alaska Federation of Natives.

125. On March 21, 1969, Congressman Howard Pollack of Alaska introduced a bill in the Congress to exempt from the land freeze areas in Eastern Alaska containing asbestos deposits.

126. In the spring of 1969, the AFN favored a population based distribution of legislative settlement benefits. Paul sought to retain a law firm with a national reputation and substantial resources to be his co-counsel in representing ASNA. In May, 1969, the Seattle law firm of Davis, Wright, Todd, Riese & Jones accepted Paul's offer to act as co-counsel for ASNA.

127. Shortly following retention of the Davis, Wright firm, the State of Alaska offered non-recourse leases on over 400,000 acres in the immediate vicinity of the Prudhoe Bay oil discovery. The State realized slightly over $900 million from the sale.

128. As of the summer of 1969, there were three basic proposals before the Congress for settlement of the Native claims issue. The first was the "preferred alternative" of the Federal Field Committee; that is, up to $100 million per year, primarily in mineral royalties, plus surface title in fee to about 5 million acres of land. Under this proposal, the North Slope, with its eight villages, would have received, at most 184,320 acres of land. The Department of the Interior's proposal, introduced as a amendment in the nature of a substitute to S.1830, provided $500 million in federal appropriation over a 20–year period, plus the surface and locatable mineral estate of up to two townships for each Native village, a maximum total of 10 million acres. Under this bill, the North Slope would receive about 370,000 acres of land. The Alaska Federation of Natives proposal, introduced by Senator Gravel as S.3041 (House version H.R. 14212) and by Senator Stevens as an amendment in the nature of a substitute to S. 1830, provided for grants of 40 million acres in full fee to Native villages and regional corporations and for monetary compensation of $500 million.

129. In early 1969, Paul researched the formation of a regional corporation under the Indian Reorganization Act (IRA). The Inupiat Community of the Arctic Slope was approved by Assistant Secretary of the Interior Harrison Loesch on June 28, 1971, subject to an election of its members. ICAS was approved by the voters of the North Slope on August 26, 1971.

130. Paul began working in early 1969 on the creation of the North Slope Borough, a governmental unit of the State of Alaska, to provide zoning and taxing powers to the Inupiat. Paul reported to his clients regarding land claims and Borough matters through town hall meetings held on the North Slope on March 29 through April 3, 1969. The Inupiat strongly supported the regional concept. The North Slope Borough was ultimately created in 1972. Paul's award of attorney fees for services rendered in the creation of the North Slope Borough was cut in half when the Supreme Court of Alaska found the lower court's finding of hours worked by Paul on the North Slope Borough to be clearly erroneous, and reduced the total number of hours devoted to Borough matters to 604 hours. *Arctic Slope Native Ass'n v. Paul*, 609 P.2d 32 (1980).

131. The Indian Affairs Subcommittee of the House of Interior Committee held hearings on August 4–6 and September 9, 1969 in Washington, D.C., on companion legislation to S. 1830. The Senate Interior Committee also conducted two days of hearings on August 7–8, 1969. At the hearings, Governor Keith Miller of Alaska opposed the proposed two percent mineral royalty override which would provide $500 million as part of the legislative settlement package. At the request of Washington Congressman Lloyd Meeds, Paul and his co-counsel prepared eight interrogatories which were posed to Governor Miller. The prepared testimony of the AFN at these hearings made reference to the legal rights of the Natives, poverty, ill-health, past injustices, and equity.

132. On November 26, 1969, Paul wrote to Secretary Hickel, Senator Jackson and Congressman Aspinall advising them of ASNA's opposition of issuance of the pipeline permit unless ample protection was afforded the Eskimos (as by means of indemnity) for any loss resulting from construction or oil spills. Letters written to oil industry representatives to settle the right-of-way dispute were exchanged.

133. The House Indian Affairs Subcommittee held field hearings in Alaska on the Native claims issue in October, 1969. Paul travelled from Seattle to Barrow and spent over a week there prior to the hearings to assist in the preparation of testimony. Twenty Inupiats prepared statements, which were presented to the subcommittee during its hearing in Barrow.

134. According to Paul's records Wickwire and Hutcheson traveled to Washington, D.C., on November 12–20, 1969 to attend Senate hearings. Paul and the two Davis, Wright attorneys again went to Washington, D.C. on December 12–18, 1969, to attend the Senate mark up sessions on S.1830. In addition, Paul and his co-counsel conferred with other Senate and House members, as well as other Natives' counsel. Congressman Lloyd Meeds advised that only a legal, aboriginal title approach would be successful in the House. Paul and Eben Hobson of ASNA conveyed to committee members their client's position against the use of population-distribution formula.

135. By the beginning of 1970, Paul and the Davis, Wright lawyers had formed a team to work on the Alaska Native claims issue and had allocated responsibilities within that group. Paul and Lisle Guernsey of the Davis, Wright firm focused their attention on overall policy, client relations, managing relations with other Native groups, fund raising, and generating public support for ASNA. James Wickwire and Mark Hutcheson, as legislative specialists, focused on reviewing and analyzing the legislative proposals being introduced into the Congress and on preparing amendments and legislative proposals to protect the interests of ASNA.

136. In early 1970, Paul, Guernsey and Wickwire prepared grant applications for the Episcopal and Presbyterian churches. ASNA received grants of $10,000 from the Episcopal Church $10,000 from the Presbyterian Church, and after further lobbying by Paul, whose family had long been prominent in the Presbyterian Church, an additional $85,000 grant on September 24, 1971. According to Paul's records, Wickwire, working with Eben Hobson, who on March 25, 1970 had become Executive Director of the AFN, arranged a loan of $225,000 from the Yakima Tribal Council of AFN. "This possibly marked the first time a loan of Indian trust funds was made to an outside Native organization."

137. In late 1969 and early 1970, the oil companies constructing the Trans-Alaska pipeline began to seek waivers from Native groups to permit pipeline construction. The pipeline companies made various promises with respect to the availability of jobs and the prospects for Native groups to bid on labor and service contracts. The Arctic Slope Native Association was the only Native group to refuse to execute such a waiver. Some Native groups sued to rescind their waivers.

138. In February, 1970, Paul and Guernsey planned to fly to San Francisco to meet with the national leadership of the Sierra Club to discuss cooperation and to seek funding for a proposed lawsuit to block the Secretary of the Interior's issuance of a right-of-way permit for the Trans-Alaska oil pipeline.

139. According to Paul, throughout this time period, the Trans-Alaska pipeline project was moving through various regulatory and permit steps. Paul and his co-counsel prepared written statements and speeches to be delivered by their clients, including Eben Hobson's (Executive Director of AFN) Earth Day speech of April 1970, which was written by Paul. Paul and his co-counsel also met again with oil industry representatives and industry attorneys.

140. Paul and his co-counsel secured the services of Keith Anderson k Associates, a Bellevue, Washington consulting firm. Paul and his co-counsel also obtained the services, on a contingent fee basis, of the Innova Corporation, a Seattle-based consulting firm, which prepared a position paper calling for adoption of a regional corporate structure, rather than the statewide Native corporation that would have been established by S.1830. Paul and his co-counsel requested the services of Professor Richard Kummert of the University of Washington Law School, Professor Kummert ultimately served as consultant to the Senate committee on the corporation provisions of Native claims legislation. Finally, Professor Guy Gordon, a department chairman at the University of Washington School of Business Administration, agreed to prepare a series of letters which sug-

gested that the present value of S.1830's billion cash compensation provisions was only $375.4 million. Professor Gordon's findings were submitted to members of the Senate prior to the July 14–15, 1970 floor debate.

141. By April of 1970, the Senate Interior Committee, led by Senator Jackson, was not in favor of ASNA's Native land award position. Also, the Alaska Federation of Natives continued to adhere to a population-based formula for distribution of any settlement proceeds. Because the ASNA had such a small population, yet were asserting aboriginal title to the largest and most valuable lands, Paul argued that a population-based distribution would be grossly inequitable as to them.

142. In April, 1970, the Senate Interior Committee, meeting in executive sessions, reached a tentative agreement on the main elements of settlement legislation, which would provide the Natives roughly $1 billion, about 9 million acres of land and an administrative structure composed of two statewide corporations and 200 village corporations. The plan was that the proceeds would be distributed on a population basis. Paul's co-counsel met with Senator Jackson and key committee staff members but were unable to obtain changes to the proposed bill in committee. "The committee, however, in an apparent effort to mollify the Arctic Slope Eskimos, adopted language which would grant to the Arctic Slope Eskimos an additional 500,000 acres of surface rights only. Title to the surface rights would be held by a separate regional corporation composed of Arctic Slope Eskimos." Although the amount of land was far from satisfactory to the Inupiat, Paul and his co-counsel believed that this separate recognition of the Arctic Slope Eskimos created a precedent "by which it [might] be possible to convert all or a portion of the additional 500,000 acres into fee simple lands as opposed to merely surface rights." Thereafter, Paul and his co-counsel decided to draft and seek introduction on the Senate floor of an amendment that would provide 500,000 acres of lands on the North Slope out of the 56 million claimed to the Inupiat in fee. The amendment was adopted on the Senate floor, and the version of S.1830 which passed on July 15, 1970, provided for 500,000 acres of land in fee to the Inupiat and the establishment of a separate North Slope Native Corporation to manage the lands.

143. A number of meetings were held with the AFN board in Anchorage, Juneau, and Washington, D.C. Paul and Ais co-counsel, working with the leaders of ASNA, supported a formula whereby both land and monetary compensation going to each Native regional group would be allocated on the basis of the proportion of each region's land area to the total land area of all Native regions in the State of Alaska. When the AFN did not change its position, Charles Edwardsen, the Executive Director of ASNA, unilaterally withdrew ASNA from the ASN. Paul and his co-counsel explained the decision to other Alaska Native groups.

144. According to Paul's records, in December, 1970, Paul and Wickwire spent four days in negotiations on behalf of ASNA with AFN. According to Paul's records, after the negotiations, AFN modified its previous position to increase the amount of acreage sought and to call for distribution of settlement benefits on a partial land claim basis. According to Paul's records Paul and Wickwire flew to Juneau again in late December, 1970.

145. At a January 22, 1971 board meeting of the Alaska Federation of Natives, the AFN voted to reverse its previous decision to allocate federally appropriated funds on a proportional land area basis. A majority voted for distribution on a population basis.

146. At the same time, Congressman Wayne Aspinall and James Haley, chairman, respectively, of the House Interior Committee and its Indian Affairs Subcommittee introduced H.R. 3100. H.R. 3100 provided for a cash compensation package of $1 billion and conveyance to the Natives of about 80,000 acres in fee simple. The cash compensation offered by the bill was not a certain amount, since it depended

almost completely on mineral leasing revenues that might or might not be realized.

147. James Wickwire and Charles Edwardsen, Executive Director of ASNA, lobbied the Nixon White House through Bradley Patterson, a Special Assistant to the President. The ASNA also supported the introduction of the Alaska Federation of Natives bills, S.835 and H.R. 7039, into the Congress. In February, 1971, Paul prepared a statement for Charles Edwardsen for delivery in the February 1971 Pipeline Hearings saying in part:

Sadly, we recognize that the demands of western society for oil are so huge that to prevent the exploitation of the oil is possible. The next best thing, therefore, is that the oil industry or the government pay us. The Congress has neglected us for more than 100 years and if the oil development proceeds, we except the Congress will neglect us for another 100 years. We therefore oppose any settlement of the pipeline before the overall settlement is achieved. We have no confidence that the Congress will act once the pipeline is authorized.

148. In his February, 1971 testimony before the Senate Interior Committee, Charles Edwardsen acknowledged the conflict between ASNA and AFN over the distribution of any settlement benefits. Edwardsen said in part:

Since this is a settlement extinguishing property rights, it is our deep conviction that the settlement's land and money should be distributed on the basis of the quantum of land within each Native region. This is to us the most fair allocation for it directly relates that which is received to that which is taken in exchanges.

Edwardsen also raised the prospect of court action to protect the Inupiats' legal rights.

149. Charles Edwardsen, Executive Director of ASNA, and James Wickwire, a Davis, Wright attorney, began to work for ASNA in Washington. They wrote Nixon Administration officials including Vice President Agnew and Mr. Patterson, the Special Assistant to the President, supplying them with legislative proposals and background memoranda explaining ASNA's position and its differences with AFN. In a hearing before the Senate Interior Committee on April 29, 1971, Secretary of the Interior Rogers C.B. Morton testified in support of S.1571, the Administration's new bill, which would provide the Alaska Natives with up to 40 million acres of land in fee.

150. Hearings before the House Interior Committee were held in May, 1971. Paul traveled to Washington, D.C. to prepare testimony for Joseph Upickson, President of ASNA, to give before the committee. Upickson's testimony emphasized the Inupiat's claim of legal right to their lands, which could be eliminated only by Congress. Paul and Upickson presented the ASNA's legislative proposal and position on the three pending bills before the committee.

151. According to Paul's records Paul participated in a number of AFN board meetings including a special meeting in Barrow, Alaska devoted to the land claims effort.

152. Paul made a second trip to the North Slope on August 19–28, 1971 to coordinate handling of the Inupiat election for the ICAS, and to report on the North Slope Borough and the Native claims battle.

153. On September 24, 1971, Paul was notified by the United Presbyterian Church in the United States that ASNA's application for a $100,000 grant was accepted to the extent of $85,000.

154. The Arctic Slope Native Association filed *Edwardsen v. Morton*, 369 F.Supp. 1359 (D.D.C.1973) in the U.S. District Court of the District of Columbia on October 5, 1971. The suit was essentially an action to eject the oil companies from the North Slope on the basis that Alaska's selection of North Slope lands in 1964 had violated Native rights, and that the oil company leases from the State of Alaska on those lands were invalid. The Court held:

"[p]laintiffs' rights based on aboriginal title are rights to undisturbed use and occupancy. These rights entitle the hold-

ers to protection against all manner of physical intrusions into their lands, but they do not include ownership of alienable interests in exploitable resources such as oil and gas. These use and occupancy rights can be extinguished only by the United States acting through Congress, and until they are thus extinguished they remain as an encumbrance on the fee regardless of who holds it."

155. The Arctic Slope Regional Corporation, created by the Act, received $46,888,936. ASNA received no funds under the Act. ASRC distributed $24,407,475 to Inupiat shareholders and village corporations, and retained $22,535,404 as capital. As of June 30, 1988 the ASRC had received full fee title to 3,582,000 acres of land, subsurface rights to an additional 731,000 acres of land and surface rights to 132,000 acres of land. ASRC has, received approximately $97,861,612 in oil exploration fees and oil and gas leases through June 30, 1988, on those lands.

156. The 1987 annual report of the Arctic Slope Regional Corporation states:

Historically, our inseparable ties to the land have formed our culture, our personal values, the image of how others see us and, of course, provided our sustenance through the ages. In the traditional sense, through a subsistence life style that we continue to pursue and value even today, we know well how the land provides. In recent years, however, we have added a new dimension to our view of how the land can provide for us. Since the discovery of vast oil and gas wealth in our region, we have begun to experience, in a modern sense, how the land's resources can provide us with improved health care, education, job opportunities and cash to meet the realities of contemporary life.

157. The Alaska Native Claims Settlement Act of 1971 signed into law on December 18, 1971. Section 20 of the Act, 43 U.S.C. § 1619, created a $1.9 million fund for payment of attorneys' fees, and a $100,000 for payment of consultants' fees. The Act provided a procedure for claims to be made to the Chief Commissioner of the United States Court of Claims. The Act further provided that "if the approved claims exceed the aggregate amounts allowable, the Chief Commissioner shall authorize payment of the claims on a pro rata basis."

158. H.R. 10367, the House version of the Act, passed the House on October 20, 1971. (117 Cong.Rec. 3798 (Oct. 20, 1971)). Section 16(d)(4) of HR 10367 limited attorneys' and Consultants' fees and expenses to $1 million. The Senate version, S. 35, was reported to the Senate on October 20, 1971. Section 26(h) of S. 35 limited such fees to $2,500,000. That provision was amended into the House bill, and passed by the Senate on November 1, 1971. (117 Cong.Rec. 38472 (Nov. 1, 1971)). The two versions were sent to Conference Committee. The bill was reported out of committee with a $2 million limit on attorneys' and consultants' fees. In the debate on passage of the bill Congressman Wayne Aspinall, Chairman of the House Committee, characterized the amount of the fund created by Section 20 as "quite niggardly".

159. Pursuant to 43 U.S.C. § 1619, Paul filed an application with the Chief Commissioner of the United States Court of Claims on December 18, 1972, Cause No. F15. Paul's application was filed with that of Davis, Wright, Todd, Riese & Jones, associated counsel for the ASNA.

160. The Review Panel (Philip R. Miller, Presiding Commissioner, George Willi and Kenneth R. Harkins, Commissioners) stated that:

since the Government does not have an interest adverse to that of the claimants in the limited fund, under the existing posture of the trial commissioner's order some of the claims may be completely unchallenged with respect to the hours spent in claimed services, the relative importance of the services, the amount of the fees sought and allowed for the services, and the qualifying nature of the services under the statute.

161. The Review Panel upheld the Trial Commissioners ruling that no compensation should be awarded for services rendered

prior to the formation of the bona fide client relationship or for services in establishing a client relationship.

162. The Review Panel stated that "[i]f their claims are of a kind which is not compensable under section 20, the attorneys and consultants are still free to pursue them against individual or other clients without statutory sanctions."

163. The Review Panel stated that "[b]oth the statute and good procedure require that the individual claims, as well as the aggregate of all claims, be supported by determinations that the respective amounts to be paid are commensurate with the services rendered."

164. The Review Panel stated that:

The Trial Commissioner [did] not make a specific finding of fact that the value of the services rendered by each claimant [was] at least the amount stipulated to be allowed for each respective claim. He states:

> While there are in many claims grave questions as to components thereof, and some few claims are of doubtful validity in substantial part, or more, it is clear that when Section 20 is viewed as a whole, such questions do not obscure either the magnitude of those tasks performed by attorney (and consultant) claimants which are plainly and properly within the ambit of either Section 20(b)(1) or Section 20(b)(2), or the impressive results achieved by the Alaska Natives represented by the attorney (and consultant) claimants by legislative settlement of Native land claims.

165. The Review Panel stated:

[s]ome of the claimants contend however, that the litigation in which they engaged was in connection with the preparation of the Act, because it was designed to preserve the status quo pending congressional action on Native claims, and because it was designed to embroil and frustrate the efforts of the State of Alaska in granting leases, and the oil and pipeline companies and others in seeking grants, so that they would actively support Federal legislation to settle the claims.

It may well be that such litigation can be shown to have furthered enactment of claims settlement legislation. However, the same may probably be said of every Native claim filed or litigated over a period of many years; but Congress apparently wanted a more direct connection to the preparation of the Act.

166. With respect to claims for fees and services under ANCSA, Trial Commissioner Harry E. Wood stated "[i]t will not suffice (nor will it profit) to assert, as some claimants do, the performance of 'services * * * on behalf of all the Native People of Alaska in general * * *.'"

167. On December 26, 1974 a "Settlement Stipulation Among Attorney Claimants For Attorney's Fees Pursuant to Section 20(b) of P.L. 92–203" was filed with the Clerk of the Court of Claims. The stipulation, executed by or on behalf of all attorney claimants whose claims were pending before the trial commissioner provided in part that:

> each signatory to the stipulation 'certifies that they[sic] have not been otherwise reimbursed for their claim filed in this proceeding' that 'each certifies that it had a bona fide attorney client relationship with an identified client', that each 'certifies that the amount prayed for did not include time that was intended to be voluntary public service' and that the amounts claimed (and those agreed to in the said stipulation) were for time and services intended to be compensable. Finally, each signatory has expressly disavowed any 'contravention of Section 20(f)' of the Act.

168. The Review Panel stated:

In his opinion of October 26, 1973 (pp. 19–20), the trial commissioner held that the allowance of out-of-pocket expenses was not subject to the fund limitations of 43 U.S.C. § 1619(d)(4) and the review panel affirmed that holding in its opinion of May 3, 1974 (pp. 5–9).

Title 43 U.S.C. § 1619(d)(3) directs in part that: 'The amount allowed for out of pocket expenses shall * * * be limited to

expenses that were * * * unreimbursed * * * "the attorneys' settlement stipulation states in part (p. 10): 'Each claimant certifies that they have not received, or made application for any other remuneration of the time and services claimed in these proceedings." * * * In his opinion of March 10, 1975, the trial commissioner has tabulated all pending claims for expenses by attorneys. Those claims total $182,584.52.

169. In pretrial proceedings, the trial commissioner identified twenty-four categories of noncompensable claims and services which could not be paid out of the fund established by Congress. The attorney claimants stipulated to division of the $1.9 million fund. Judge Wood, the trial commissioner, in his opinion of March 10, 1975, found that the aggregate allowable value of the attorney claims for compensable services under the restrictions of Section 20 were at least $2 million, the maximum allowable amount. He then approved the division of fees set out in the stipulation. The review panel affirmed on April 15, 1975. As a result of the stipulation, Frederick Paul received $275,095 in attorneys fees on May 15, 1975.

170. Paul did not keep hourly time records of his attorney work.

171. Paul worked on his client's land claims between 1966 and 1971.

172. On June 9, 1976, pursuant to ANCSA Paul filed suit against his former client in the case of *Paul v. Kleppe* in the United States District Court for the Western District of Washington. On October 4, 1980, the Ninth Circuit Court of Appeals affirmed the District Court's dismissal of the action, based on lack of jurisdiction and the ANCSA statute of limitations, 43 U.S.C. § 1609.

173. On December 16, 1977, Paul sued the United States under the Tucker Act for ANCSA's taking of his rights under his attorney fee contract with the Inupiat in violation of the Just Compensation Clause of the Fifth Amendment. In November of 1981, plaintiff moved for summary judgment, and defendant United States cross moved. On August 25, 1982, the Court of Claims granted the United States' Motion for Summary Judgment, dismissing plaintiff's complaint, 231 Ct.Cl. 445. The Supreme Court denied certiorari on April 16, 1983.

174. S.Res. 187 (100th Cong.) was adopted by the Senate on October 12, 1988.

APPENDIX B

Congressional Reference No. 2-88

Frederick Paul, Plaintiff,

v.

The United States, Defendant.

CONGRESSIONAL REFERENCE CASES

| DOCKET NO.—CASE NAME [1] | REPORTED [2] | RECOMMENDATION FOR PAYMENT [3] |
|---|---|---|
| 1-52 *J.A. Zachariassen & Co.* | 141 F.Supp. 908<br>136 Ct.Cl. 63 | 6/5/56<br>None. |
| 2-52 *Claire Phillips Clavier* | 153 F.Supp. 451<br>139 Ct.Cl. 98 | 7/12/57<br>$1,349.21 |

1. Judges of the United States Court of Claims accepted congressional reference cases until June 25, 1962. From that date to October 15, 1966, all references were returned to Congress. Docket Nos. 1-67 to No. 1-80 were references to the Chief Commissioner. All subsequent docket numbers are references to the United States Claims Court.

2. Not all cases were reported. Some reports include only final action by the court or review panel. Asterisk (*) denotes synopsis only is in report.

3. Two asterisks (**) denotes bill vetoed by President.

| DOCKET NO.—CASE NAME [1] | REPORTED [2] | RECOMMENDATION FOR PAYMENT [3] |
|---|---|---|
| 3–52 Gay Street Corp. | 127 F.Supp. 585<br>130 Ct.Cl. 341 | 1/11/55<br>$3,145.94 |
| 4–52 Frank C. Torti | 135 Ct.Cl. 214 | 5/1/56<br>Benefits under the VA Act. |
| 5–52 P. Diacon Zadeh | 131 Ct.Cl. 182 | 4/5/55<br>$170,000 |
| 6–52 Winston Bros. Co. | 130 F.Supp. 374<br>131 Ct.Cl. 245 | 4/5/55<br>$127,141.82 |
| 7–52 V.A. Virkei | | 12/3/52<br>Dismissed. |
| 8–52 Dewey J. Crites | 132 F.Supp. 469<br>132 Ct.Cl. 544 | 7/12/55<br>None. |
| 9–52 John J. Braund | 130 Ct.Cl. 691 | 2/8/55<br>$15,000 |
| 10–52 Cooper Tire & Rubber Co. | 150 F.Supp. 840<br>138 Ct.Cl. 539 | 5/8/57<br>None. |
| 11–52 Old King Koal Co. | | 5/5/53<br>Dismissed. |
| 1–53 County of Riverside, Cal. | 137 F.Supp. 409<br>133 Ct.Cl. 662 | 1/31/56<br>None. |
| 2–53 Wright H. Huntley | 135 F.Supp. 542<br>133 Ct.Cl. 226 | 11/8/55<br>$20,147.27 |
| 3–53 AV–Equip. Mfg.,Co. | | 6/17/55<br>Dismissed. |
| 4–53 Willard L. Gleeson | | 11/6/57<br>None. |
| 1–54 B Amusement Co. | 180 F.Supp. 386<br>148 Ct.Cl. 337 | 1/20/60<br>None. |
| 2–54 Lauren F. Teutsch | 288 F.2d 920<br>153 Ct.Cl. 86 | 4/7/61<br>None. |
| 3–54 Tom R. Hickman | 135 Ct.Cl. 380 | 6/5/56<br>$3500 with interest. |
| 4–54 S.A. Healy Co. | | 12/4/57<br>None. |
| 5–54 Bank of Am., Nat'l Trust & Savings Ass'n | | 6/3/59<br>None. |
| 6–54 Electric Ferries, Inc. | 137 Ct.Cl. 400 | 3/6/57<br>None. |
| 7–54 Matson Navigation Co. | 141 F.Supp. 929<br>135 Ct.Cl. 526 | 6/5/56<br>None. |
| 8–54 Palmer–Bee Co. | 142 Ct.Cl. 485 | 5/7/58<br>$132,886.61 |
| 9–54 Fredericktown Lead Co. | | 11/16/56<br>Dismissed. |

| DOCKET NO.—CASE NAME [1] | REPORTED [2] | RECOMMENDATION FOR PAYMENT [3] |
|---|---|---|
| 10–54 *Equitable Infants Wear, Inc.* | 149 F.Supp. 254<br>137 Ct.Cl. 762 | 3/6/57<br>None. |
| 11–54 *Henry J. Krueger* | 161 Ct.Cl. 599 | 5/10/63<br>None. |
| 12–54 *J. Marvin Boyd* | 147 Ct.Cl. 655 | 10/7/59<br>None. |
| 13–54 *Walter M. Flora* | | 4/5/55<br>Dismissed. |
| 14–54 *West Coast Meat Co.* | | 12/28/56<br>Dismissed. |
| 15–54 *William T. Dorminy* | | 12/5/56<br>$4,204 |
| 16–54 *Major C. Todd* | 292 F.2d 841<br>155 Ct.Cl. 87 | 7/19/61<br>$23,240 |
| 17–54 *G.W. Todd* | 155 Ct.Cl. 111 | 7/19/61<br>$16,240 |
| 1–55 *Maurice Mumford* | 137 Ct.Cl. 329 | 1/16/57<br>None. |
| 2–55 *Wilbraham Academy* | 143 Ct.Cl. 936 | 10/31/58<br>None. |
| 3–55 *George D. Emery Co.* | 145 Ct.Cl. 71 | 2/11/59<br>$20,000 |
| 4–55 *DeSoto Lead & Zinc Co.* | 146 Ct.Cl. 640 | 7/15/59<br>None. |
| 5–55 *Galen H. Clark Packing Co.* | 158 Ct.Cl. 93 | 7/18/62<br>None. |
| 6–55 *Frederick P. Fulmer* | 144 Ct.Cl. 812 | 1/14/59<br>None. |
| 7–55 *Georgia Kaolin Co.* | 145 Ct.Cl. 39 | 2/11/59<br>$105,000. |
| 8–55 *Milton Beatty* | 168 F.Supp. 204<br>144 Ct.Cl. 203 | 12/3/58<br>None. |
| 9–55 *Edward Gordon* | 180 F.Supp. 591<br>148 Ct.Cl. 31 | 1/20/60<br>None. |
| 10–55 *State of Oklahoma* | 146 Ct.Cl. 185 | 6/3/59<br>$652,019.71 |
| 11–55 *Richard M. Taylor* | 150 F.Supp. 567<br>138 Ct.Cl. 524 | 5/8/57<br>None. |
| 12–55 *Joseph H. Lym* | 142 Ct.Cl. 143 | 5/7/58<br>$111,080.60 |
| 13–55 *William E. Nash* | 141 Ct.Cl. 135 | 1/15/58<br>$9,945.18 |
| 14–55 *State House, Inc.* | 157 F.Supp. 853<br>141 Ct.Cl. 51 | 1/15/58<br>$63,818 |
| 15–55 *F. & M. Schaefer Brewing* | 175 F.Supp. 180 | 7/15/59 |

| DOCKET NO.—CASE NAME[1] | REPORTED[2] | RECOMMENDATION FOR PAYMENT[3] |
|---|---|---|
| Co. | 146 Ct.Cl. 629 | None. |
| 1–56 Massachusetts College of Pharmacy | 141 Ct.Cl. 775 | 3/5/58 $81.70 |
| 2–56 Maco Warehouse Co., Cal. | 169 F.Supp. 494 144 Ct.Cl. 538 | 1/14/59 $3,873.22 |
| 3–56 Erie R.R. Co. | 156 F.Supp. 908 140 Ct.Cl. 398 | 12/4/57 None. |
| 4–56 Edward F. O'Hare | 288 F.2d 705 153 Ct.Cl. 55 | 4/7/61 None. |
| 5–56 Frank T. McCormick | 153 Ct.Cl. 64 | 4/7/61 None. |
| 6–56 Marion G. Denton | 144 Ct.Cl. 840 | 1/14/59 None. |
| 7–56 Thomas A. Hellander | 178 F.Supp. 932 147 Ct.Cl. 550 | 12/2/59 None. |
| 8–56 Imperial Agric. Corp. | 147 Ct.Cl. 532 | 12/2/59 None. |
| 9–56 C.H. Baldwin | | 11/4/59 Dismissed. |
| 10–56 Estate of Charles O. Fairbank | 164 Ct.Cl. 1 | 1/24/64 None. |
| 11–56 Edward R. Maher | 172 F.Supp. 689 145 Ct.Cl. 701 3 A.F.T.R. 1357 | 5/6/59 None. |
| 12–56 Hartmann H. Pauly | 152 Ct.Cl. 838 | 3/1/61 None. |
| 13–56 Ottinger Bros. | 301 F.2d 336 157 Ct.Cl. 12 | 4/4/62 None. |
| 14–56 United States Flare Corp. | | 6/19/59 Petition withdrawn. |
| 15–56 Trust Ass'n of H. Kempner | | 3/2/59 Dismissed. |
| 1–57 M.F. Comer Bridge & Foundation Co. | 178 F.Supp. 808 147 Ct.Cl. 504 | 12/2/59 None. |
| 2–57 MacArthur Mining Co. | | 5/9/57 Papers returned. |
| 3–57 Eglin Manor, Inc. | 279 F.2d 268 150 Ct.Cl. 143 | 6/8/60 None. |
| 4–57 Fawick Corp. | 149 Ct.Cl. 623 | 5/4/60 None. |
| 5–57 Harold William Abbott | 175 F.Supp. 917 146 Ct.Cl. 272 | 7/13/59 $23,317.61 |
| 6–57 In re Norway | 172 F.Supp. 651 145 Ct.Cl. 470 | 4/8/59 None. |
| 1–58 Harvey–Whipple, Inc. | 342 F.2d 48 | 3/12/65 |

| DOCKET NO.—CASE NAME [1] | REPORTED [2] | RECOMMENDATION FOR PAYMENT [3] |
|---|---|---|
| | 169 Ct.Cl. 689 | None. |
| 2–58 *James William O'Donnell* | 166 Ct.Cl. 107 | 5/15/64 None. |
| 3–58 *Wilma D. Marsh* | 153 Ct.Cl. 698 | 5/12/61 None. |
| 4–58 *Tatem Mfg. Co.* | 386 F.2d 898 181 Ct.Cl. 496 | 11/9/67 None. |
| 5–58 *Meriden Indus., Co.* | 386 F.2d 885 181 Ct.Cl. 438 | 11/9/67 None. |
| 6–58 *Pioneers, Inc.* | | 12/14/61 Dismissed. |
| 7–58 *S.N.T. Fratelli Gondrand* | 166 Ct.Cl. 473 | 6/12/64 None. |
| 8–58 *Borough of Ringwood* | 288 F.2d 891 153 Ct.Cl. 71 | 4/7/61 None. |
| 9–58 *Bernard J. Hoffman* | | 4/1/60 $20,000 |
| 10–58 *R.M. Clark* | 167 Ct.Cl. 197 | 7/17/64 $39,567.67 |
| 11–58 *Drake Am. Corp.* | 168 Ct.Cl. 318 | 12/11/64 None. |
| 12–58 *Aurex Corp.* | 175 Ct.Cl. 1 | 4/15/66 $172,550. |
| 13–58 *H.W. Nelson Co.* | 308 F.2d 950 158 Ct.Cl. 629 62–2 TC p9766 | 10/3/62 None. |
| 14–58 *Claude S. Reeder* | 152 Ct.Cl. 863 | 1/6/61 None. |
| 15–58 *Sanitary Equip. Mfg. Co.* | 159 Ct.Cl. 589 | 11/2/62 Dismissed. |
| 16–58 *Chicago School of Automotive Trades, Inc.* | 167 Ct.Cl. 106 None. | 7/17/64 |
| 17–58 *Floyd Oles* | | 7/7/60 Dismissed. |
| 18–58 *Thomas R. Mackie* | 172 Ct.Cl. 393 | 7/16/65 None. |
| 19–58 *MacArthur Mining Co.* | 167 Ct.Cl. 143 | 7/17/64 None. |
| 20–58 *Jane Froman* | 157 Ct.Cl. 661 | 6/6/62 $20,000 for each plaintiff. |
| 1–59 *Rochester Iron & Metal Co.* | 339 F.2d 640 168 Ct.Cl. 422 | 12/11/64 None. |
| 2–59 *North Counties Hydro– Elec. Co.* | 170 Ct.Cl. 241 | 4/16/65 $187,058 |
| 3–59 *Schutt Constr. Co.* | 353 F.2d 1018 | 12/17/65 |

| DOCKET NO.—CASE NAME[1] | REPORTED[2] | RECOMMENDATION FOR PAYMENT[3] |
|---|---|---|
| | 173 Ct.Cl. 836 | $42,000 |
| 4–59 Walter H. Duisberg | 154 Ct.Cl. 855 | 6/9/61 $327,850 |
| 5–59 Herman Adams | 358 F.2d 986 175 Ct.Cl. 288 | 4/15/66 $42,952.04 |
| 6–59 Robert H. Point | | 3/25/60 Discontinued. |
| 7–59 Cuyahoga County, Ohio | 294 F.2d 775 155 Ct.Cl. 307 | 10/4/61 $22,353.87 |
| 8–59 Kraemer Mills, Inc. | 319 F.2d 535 162 Ct.Cl. 367 | 7/12/63 None. |
| 9–59 Hardy Mfg. Corp. | | 6/11/62 Dismissed. |
| 1–60 North Am. Philips Co. | 358 F.2d 980 175 Ct.Cl. 71 | 7/27/67 $120,000 |
| 2–60 Town of Kure Beach, N.C. | 168 Ct.Cl. 597 | 12/11/64 $100,000 |
| 3–60 William E. Stone | 160 Ct.Cl. 128 | 1/11/63 None. |
| 4–60 Archie L. Dickson, Jr. | 159 Ct.Cl. 185 | 11/7/62 Disability retirement pay. |
| 5–60 Ralph Feffer & Sons | 166 Ct.Cl. 506 | 6/12/64 None. |
| 6–60 Oregon Forest Fire Ass'n | 170 Ct.Cl. 308 | 4/16/65 None. |
| 7–60 Rocky River Co. | 169 Ct.Cl. 203 | 1/22/65 $88,729.60 |
| 8–60 Fred Foster | | 10/30/61 Dismissed. |
| 9–60 Charles G.G. Group | 165 Ct.Cl. 612 | 4/17/64 None. |
| 10–60 Adler Constr. Co. | 167 Ct.Cl. 888 | 7/8/64 Dismissed. |
| 11–60 Estates of E.L. Armiger | 339 F.2d 625 168 Ct.Cl. 379 | 12/11/64 $25,000 for each estate. |
| 12–60 Catalina Properties, Inc. | 305 F.2d 380 158 Ct.Cl. 205 | 7/18/62 ** $29,425.01 |
| 1–61 Bernhard F. Elmers | 172 Ct.Cl. 226 | 7/16/65 None. |
| 2–61 Simpson Constr. Co. | 167 Ct.Cl. 887 | 7/8/65 Discontinued. |
| 3–61 Sorenson Fish Co. | 156 Ct.Cl. 700 | 1/26/62 Discontinued. |
| 4–61 Josephine C. Rumley, Ex'r | 169 Ct.Cl. 100 | 1/22/65 $11,667.06 |

| DOCKET NO.—CASE NAME [1] | REPORTED [2] | RECOMMENDATION FOR PAYMENT [3] |
|---|---|---|
| 5–61 *Moorland Court, Inc.* | 357 F.2d 362<br>174 Ct.Cl. 810 | 3/18/66<br>None. |
| 6–61 *H.K. Ferguson Co.* | 167 Ct.Cl. 887 | 7/8/64<br>Discontinued. |
| 1–62 *Jefferson Constr. Co.* | 168 Ct.Cl. 648 | 12/11/64<br>$110,000. |
| 2–62 *N.M. Bentley* | | 6/10/64<br>Discontinued. |
| 1–67 *Frances von Wedel* | 186 Ct.Cl. 937 | 1/6/68<br>$35,625.11 |
| 2–67 *Zdenka Ruchwarger* | 188 Ct.Cl. 1129 | 7/23/69<br>None. |
| 3–67 *N.M. Bentley* | 189 Ct.Cl. 547 | 11/12/69<br>None. |
| 1–68 *Sherman Webb* | 192 Ct.Cl. 925 | 5/1/70<br>$295,790.24 |
| 2–68 *Alvin V. Burt, Jr.* | 199 Ct.Cl. 897 | 11/16/72 **<br>$118,892 |
| 3–68 *Ralph J. Messina* | 193 Ct.Cl. 993 | 11/20/70<br>None. |
| 4–68 *Faith M. Lewis Kochendorfer* | 193 Ct.Cl. 1045 | 12/30/70<br>$157,900.27 |
| 5–68 *Stephen H. Clarkson* | 194 Ct.Cl. 963 | 4/13/71<br>$20,768. |
| 1–69 *Edward White Rawlins* | 197 Ct.Cl. 972<br>210 Ct.Cl. 672 * | 2/24/72<br>6/29/76<br>$75,160.55 |
| 2–69 *Certain Kaw Indians* | 196 Ct.Cl. 731 | 10/15/71<br>None. |
| 3–69 *Robert D. Bechtel* | 198 Ct.Cl. 929 | 6/9/72<br>Compensation recommended. |
| 4–69 *Richard Grainger* | 197 Ct.Cl. 1018 | 2/28/72<br>Private bill recommended. |
| 5–69 *Southwest Metro. Water Dist., Col.* | 194 Ct.Cl. 994 | 5/6/71<br>$246,239. |
| 1–70 *Viorica Anna Ghitescu* | 201 Ct.Cl. 823 | 4/3/73<br>$132,399.77 |
| 2–70 *Neva Vera Barnes McQuown Ex'r* | 199 Ct.Cl. 858 | 11/6/72<br>None. |
| 3–70 *H & H Mfg. Co.* | 201 Ct.Cl. 799 | 11/22/72<br>None. |
| 4–70 *O'Brien Dieselectric Corp.* | 207 Ct.Cl. 903 | 7/29/75<br>None. |

| DOCKET NO.—CASE NAME [1] | REPORTED [2] | RECOMMENDATION FOR PAYMENT [3] |
|---|---|---|
| 5–70 Adler Constr. Co. | 199 Ct.Cl. 809 | 10/24/72 $300,000. |
| 6–70 Concrete Indus. (Monier), Ltd. | 205 Ct.Cl. 811 * | 12/13/74 $1,022,714. |
| 7–70 Mocatta & Goldsmid, Ltd. | 223 Ct.Cl. 629 * | 11/16/79 $3,355,498. |
| 1–71 John S. Attinello | 197 Ct.Cl. 1040 | 3/13/72 $100,000. |
| 2–71 John T. Knight | 202 Ct.Cl. 1043 | 8/31/73 Valid claim. |
| 3–71 Michael D. Manemann | 202 Ct.Cl. 1068 | 10/10/73 $27,000. |
| 1–72 Arizona Ins. & Inv. Co. | 221 Ct.Cl. 997 * | 5/29/79 None. |
| 2–72 John J. Yarnall | 212 Ct.Cl. 513 * | 11/16/76 None. |
| 3–72 Seaview Elec. Co. | 209 Ct.Cl. 667 | 3/29/76 None. |
| 4–72 P. Oliver | 217 Ct.Cl. 742 * | 1/10/78 None. |
| 5–72 Crown Coat Front Co. | 209 Ct.Cl. 653 | 2/3/76 None. |
| 6–72 ISC Metals, Inc. | 223 Ct.Cl. 626 * | 2/11/80 None. |
| 7–72 Eriez Magnetics Corp. | 209 Ct.Cl. 673 | 2/10/76 None. |
| 8–72 Datronics Eng'r, Inc. | 210 Ct.Cl. 665 | 6/22/76 $23,752. |
| 9–72 William Phillips | 207 Ct.Cl. 924 | 10/6/75 None. |
| 10–72 Donald J. Alm | 204 Ct.Cl. 791 | 3/14/74 None. (Admin. settlement of $20,297.20) |
| 1–73 Carl Johnstone, Jr. | 218 Ct.Cl. 628 * | 10/2/78 None. |
| 2–73 J. Clarence Ingram | 221 Ct.Cl. 999 * | 6/14/79 None. |
| 1–74 Sperling & Schwartz, Inc. | 218 Ct.Cl. 625 * | 7/20/78 None. |
| 2–74 Marlin Toy Prod., Inc. | 218 Ct.Cl. 630 * | 12/19/78 $40,000 |
| 3–74 Agnes J. Wong | 220 Ct.Cl. 750 * | 5/16/79 None. |
| 4–74 Thomas Raymond Pomaski | 230 Ct.Cl. 713 * | 3/23/82 None. |

| DOCKET NO.—CASE NAME[1] | REPORTED[2] | RECOMMENDATION FOR PAYMENT[3] |
|---|---|---|
| 5–74 *John J. Egan* | | 6/23/83 Dismissed. |
| 1–75 *Marlin Toy Prod., Inc.* | | 1/20/75 Consolidated with No. 2–74. |
| 2–75 *John J. Egan* | | 12/19/75 Consolidated with No. 5–74. |
| 1–76 *Estelle M. Fass* | 217 Ct.Cl. 743 * | 5/18/78 None. |
| 2–76 *Sea Gate, Inc.* | 4 Cl.Ct. 25 | 8/20/84 None. |
| 3–76 *Jeanette Green* | | 11/29/76 Discontinued. |
| 4–76 *Wounded Knee Innocent Victims* | 229 Ct.Cl. 465 * | 12/15/81 None. |
| 5–76 *G.E. Amick* | 5 Cl.Ct. 426 | 8/10/84 $100,753 |
| 6–76 *Harvey E. Ward* | 1 Cl.Ct. 46 | 11/23/82 Retirement benefits. |
| 7–76 *John T. Knight* | 213 Ct.Cl. 663 | 2/14/77 $106,340.33 |
| 8–76 *Viola J. Stewart* | 227 Ct.Cl. 511 * | 2/20/81 None. |
| 1–77 *Rawleigh Moses & Co.* | 218 Ct.Cl. 625 * | 9/11/78 Dismissed. |
| 2–77 *California Canners & Growers Ass'n* | RP 9 Cl.Ct. 774 HO 7 Cl.Ct. 69 | 4/18/86—None. |
| 3–77 *Cecilia L. Thieman* | | 12/7/82 None. |
| 1–78 *Carlos Acuna* | 1 Cl.Ct. 270 | 11/1/82 None. |
| 2–78 *Lance Indus., Inc.* | 3 Cl.Ct. 762 | 5/8/84 None. |
| 1–79 *John Shane* | 3 Cl.Ct. 294 | 11/1/83 None. |
| 1–80 *Merchants Nat. Bank of Mobile* | RP 7 Cl.Ct. 1 HO 5 Cl.Ct. 180 | 12/6/84–$809,609 |
| 1–83 *Frank L. Hulsey* | 6 Cl.Ct. 593 | 1/22/86 Dismissed. |
| 2–83 *LaPaz Enter., Ltd.* | | 3/29/89 None. |
| 3–83 *Alabama Coushatta Tribes of Texas & Louisiana* | HO 9 Cl.Ct. 500 HO 12 Cl.Ct. 426 | Pending. |
| 1–84 *James P. Purvis* | | 3/7/86 |

| DOCKET NO.—CASE NAME[1] | REPORTED[2] | RECOMMENDATION FOR PAYMENT[3] |
|---|---|---|
| | | $700,000 plus attorney fees. |
| 2–84 *White Sands Ranchers of N.M.* | RP 16 Cl.Ct. 13 HO 14 Cl.Ct. 559 | 11/30/88—None. |
| 1–86 *Edward J. Chapman, Jr. Ex'r* | | 12/20/89 $15,000 |
| 2–86 *Spalding and Son, Inc.* | | Pending. |
| 1–88 *Larry D. Land* | | Pending. |
| 2–88 *Frederick Paul* | | 4/23/90 None. |
| 3–88 *Nebraska Aluminum Castings, Inc.* | | Pending. |
| 4–88 *Dynamic Technology Int'l, Inc.* | | Pending. |